.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION
# CASE NO.: 4:19-cv-00053-RH-MAF

WALLACE GARY COLLIER a/k/a
GARY WINTERS,

     Plaintiff,

v.

JULIE L. JONES, WOODROW A.
MYERS and CORIZON HEALTH
SERVICES,

     Defendants.

_____/

## DEFENDANTS CORIZON HEALTH, INC. AND WOODROW A. MYERS' MOTION FOR SUMMARY JUDGMENT

Defendants Corizon Health, Inc.[1] ("Corizon") and Woodrow A. Myers ("Myers") (collectively "Defendants") pursuant to Federal Rule of Civil Procedure 56 and rule 56.1, Local Rules of the United States District Court for the Northern District of Florida, files their Motion for Summary Judgment as follows:

## MOTION

---

[1] Collier identified this Defendant as Corizon Health Services. The proper name for this Defendant is Corizon Health, Inc.

1.     Plaintiff Wallace Gary Collier ("Collier")[2] filed suit in this District naming the Defendants. The operative pleading is the Second Amended Complaint ("Complaint") [ECF #15] filed October 7, 2019.

2.     The record evidence does not support the claims.

3.     Therefore, the Defendants are entitled to summary judgment.

## MEMORANDUM OF LAW

### I.   Background

Collier is a life-sentenced prisoner of the Florida Department of Corrections and has been in custody since 1981.  Corizon had a contract to provide medical and mental health services to inmates in certain Florida prisons from September 2013 to May 2016.  Myers was Corizon's CEO from October 2013 to October 2015.

According to the Complaint, Collier was diagnosed with Hepatitis-C in 2007.  He first learned that a cure for the disease was developed in mid-2015, and from that time until 2017, he asked for treatment.  He was told the medications were too expensive [ECF #15, pp. 7-8, ¶¶ 6-8, ¶11].  Collier claims Florida Department of Corrections officials sought funding for the medications, but were rebuffed [ECF #1, pp. 8-9, ¶8].

Collier was treated and cured of the disease from August to November 2018 [ECF #15, p. 11, ¶21].

---

[2] The Plaintiff's true identity is unknown.  He brought this case as Collier a/k/a Winters.  However, he was convicted as Winters a/k/a Collier [ECF #67-3].

The Toomey Law Firm LLC • The Old Robb & Stucky Building, Suite 203 • 1625 Hendry Street  • Fort Myers, Florida 33901

The Declaration of Craig L. Hutchinson, M.D. is in the record. Dr. Hutchinson is an infectious disease specialist, retained by Corizon to aid in implementing treatment for FDOC Hepatitis-C patients during the term of the contract with FDOC. During its provision of medical services, Corizon sought to obtain funding to provide DAAs to Florida inmates. When Sovaldi, the first of the highly-effective DAAs, was introduced in late 2013, the per-patient cost was $84,000. About a year later, Harvoni was introduced and cost nearly $95,000. Given thousands of FDOC inmates could qualify for treatment with these medications, there was only one source for funding: the Florida Legislature, as there was no possibility Corizon could absorb tens or hundreds of millions to provide the medications. To that end, Corizon encouraged FDOC, on several occasions, to obtain additional funding. Although both Corizon and FDOC's Assistant Secretary for Medical Services believed that funding was coming, the Florida Legislature never provided additional funds while Corizon provided services. Additionally, Corizon sought to have the medications provided free of charge by the manufacturer in return for patient treatment data. Those attempts were also unsuccessful. By the Fall of 2015, it was clear funding was not forthcoming, and Corizon cancelled its contract effective May 2016. During Corizon's time, FDOC never put DAAs on its formulary, which are medications approved for prescribing by Corizon physicians [ECF #67-1, pp. 1-2].

In the meantime, Corizon began accumulating data regarding the status of FDOC HCV patients.  This was done to prioritize and stage patients for treatment when funding, and thus the medications, became available.  It took more than a year to simply gather the data, as there was no system in place to accumulate the status of thousands of patients [ECF #67-1, p. 3].

Treatment guidelines and recommendations also affected the ability to provide DAAs.  Those guidelines were based on information received regarding the treatment of patients after DAAs were approved for use, and for the incarcerated population, were primarily developed by the Federal Bureau of Prisons.  Throughout Corizon's time, those guidelines were "constantly evolving". In fact, in June 2014, the FBOP counselled against using Sovaldi except in the most serious cases, as more efficient medications were in the offing. In July 2015, the guidelines called for "prioritization" of inmates with the most need [ECF #67-1, p. 4].

Although Corizon had no luck in obtaining funding from sources in Florida, the same efforts were successful in other states, notably Arizona, Kansas, Missouri and Michigan [ECF #67-1, pp. 4-5].

II.   **Argument**

A.   **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In 1986, the Supreme Court decided a trio of cases which encourage the use of summary judgment as a means to dispose of cases which are not factually or legally supported.  *See Celotex Corp.*, 477 U.S. at 317; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The primary purpose of granting summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute, so if the evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment should be granted.  *See Anderson*, 477 U.S. at 249-50.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Furthermore, once a moving party identifies those portions of the record showing the absence of a genuine issue of material fact, the party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may

not rely on mere allegations or denials.  *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256-57.  If the record as a whole could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment.  *See Matsushita*, 475 U.S. at 586.  Where the record facts render the non-moving party's claim implausible, the non-moving party must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment.  *Id.* at 587.

Evidence that is "merely colorable, or is not significantly probative" of a disputed fact, or a "mere scintilla of evidence" is not sufficient; there must be enough of a showing that the (trier of fact) could reasonably find for that party. *Anderson*, 477 U.S. 242; *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999); *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations, whether based on speculation or subjective beliefs, are insufficient to oppose a motion for summary judgment.  *Waddell v. Valley Forge Dental Assoc., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that plaintiff's "conclusory assertions . . . , in the absence of (admissible) supporting evidence, are insufficient to withstand summary judgment"); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of party's own conclusory allegations is not sufficient to oppose summary judgment. . . . ").

**B.**     **Myers' Constitutional Liability**

42 U.S.C. § 1983 was enacted as part of the Civil Rights Act of 1871 as the "Ku Klux Klan Act," which was primarily directed to the violence perpetrated by the Klan and the failure of state officials to control those activities. The section provides a remedy for persons deprived of federal rights under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

The portion now codified as section 1983 was enacted for the purpose of "ensuring a right of action to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto." *Chapman*, 441 U.S. at 611; *Mitchum v. Foster*, 407 U.S. 225, 238 (1972). Section 1983 is not a source of substantive rights, but merely a method for vindicating those rights conferred by the Constitution or federal statutes. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

A successful Eighth Amendment claim of cruel and unusual punishment due to deprivation of medical attention requires proof of deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This requires proof the inmate suffered an objectively serious medical need, and the

defendants subjectively and intentionally disregarded that need. *See Farmer v. Brennan,* 511 U.S. 825, 833-38, (1994); *Estelle* at 106 (1976); *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law).

Because society does not expect prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if the objective need is "serious."' *Hudson v. McMillian*, 503 U.S. 1, 8, (1992). A serious medical need is one that has been diagnosed by a physician as needing treatment or one for which even a layperson would recognize the need for a physician's care. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). Additionally, the medical need "must be one that, if left unattended, poses a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003); *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010)(holding that alleged condition must be "so extreme that is poses an unreasonable risk of serious damage to the prisoner's health or safety"). Additionally, there must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (quotations omitted).

To satisfy the subjective component, a defendant must be "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and must also have drawn the inference." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008) (quotation omitted and alterations adopted). However, "should haves" are not grist for constitutional litigation. "There is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . . .'" *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (quoting *Farmer*, 511 U.S. at 838). In this context, deliberate indifference requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence. *Id.*

However, negligence is not grist for constitutional litigation.  The Supreme Court has stated that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995) (finding that decisions based on medical judgment are not actionable). In *Estelle*, the court reinstated the district court's dismissal of a prisoner's section 1983 complaint for failure to state a claim. Recognizing the plaintiff's primary claim was that "more should have been done" to diagnose and treat a back injury, the Court explained, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and

unusual punishment. At most it is medical malpractice." *Id.* at 107; *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) (recognizing that "[n]egligence or even gross negligence does not satisfy this standard"). For medical treatment to rise to the level of a constitutional violation, the care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Because negligence can never be a basis, once an inmate receives medical care, courts are hesitant to find an Eighth Amendment violation has occurred. *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985).

Myers is sued in his individual capacity.  Nothing in the record shows that he had any interaction with Collier.  Indeed, as the chief executive officer of a company providing medical care in hundreds of prisons and jails it is absurd to claim he had any interaction with a single inmate or directed his care.  There is no evidence Myer knew Collier had a serious medical need, yet denied him that care. The claim simply has no basis.

### C. Corizon's Constitutional Liability

Because Corizon is a corporation, liability only attaches if an official unconstitutional policy or custom of the corporation caused the alleged deprivation of constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997) (extending the application

of *Monell* to private corporations performing traditional public functions); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*) (stating that a "[corporation] is liable under section 1983 only for acts for which [the corporation] is actually responsible"), *abrogated in part by Bell Atl. Corp.*, 550 U.S. at 561-63. Therefore, a corporation's liability may not be vicarious. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694.

"A policy is a decision that is officially adopted by the [corporation], or created by an official of such rank that he or she could be said to be acting on behalf of the [corporation]. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "To establish a policy or custom, it is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the [corporation]." *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986). The Supreme Court requires "a plaintiff seeking to impose liability on a [corporation] under §1983 to identify a [corporate] 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997).

However, a plaintiff must do more than merely identify a policy—there must be proof the policy was created with "deliberate indifference to its known or

obvious consequences." *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1375-76

(11th Cir. 2000); *see also Monell*, 436 U.S. 658. That is, "liability under §1983

attaches where-and only where-a deliberate choice to follow a course of action is

made from among various alternatives by the official or officials responsible for

establishing final policy with respect to the subject matter in question." *Pembaur v.*

*Cincinnati*, 475 U.S. 469, 483-84 (1986).

> The *Brown* Court also narrowed the test for causation when it stated:

> [I]t is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, 520 U.S. at 404 (emphasis in original).  A plaintiff's burden is heavy, and

the Eleventh Circuit described both the required showing and the reason for

heightened showing:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to *respondeat superior* liability—a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under §1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.

*Gold v. City of Miami*, 151 F.3d 1346, 1351 n.10 (11th Cir. 1998); *see also Brown*,

520 U.S. at 415 (stating that "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability").

While a corporation may be liable for deliberate indifference regarding medical care, claims of negligence are never enough to satisfy pleading requirements, as "should haves" are not grist for constitutional litigation. *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).

The Eleventh Circuit reviewed the necessary showing in *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004). There, the plaintiff brought section 1983 claims against a Georgia county, claiming policies constituted and resulted in deliberate indifference to his medical needs. Specifically, the plaintiff claimed a policy of understaffing officers to transport inmates to the hospital caused a delay in his transport to the hospital.

In *McDowell*, an inmate was seen and treated for back pain at a local hospital on June 5, 1997. At 9:30 the next night, he reported an inability to urinate and difficulty walking, and medical personnel in the employ of a private medical contractor decided to send him back to the hospital.  But transporting officers could only take one inmate at a time, and another inmate with trauma was transported first. The next morning, McDowell's transport was bumped several times by mental health inmates, as his condition was not considered an emergency

and mental health transports were given priority by policy. Later, McDowell reported no feeling in his legs; was examined by a physician; his condition deemed emergent; and he was taken to the hospital by ambulance. A spinal abscess was diagnosed, and surgery was performed. After surgery, McDowell was an incomplete paraplegic. *See McDowell at 1286-87.*

*McDowell* arrived at the 11th Circuit after the district court granted summary judgment to the county. The court noted the longstanding rule that municipalities cannot be vicariously liable in section 1983 cases, and a plaintiff must show a custom or policy constituted deliberate indifference and a constitutional violation. *Id.* at 1289 (citing *Monell*, 436 U.S. at 692).

"This threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.' " *McDowell,* 392 F.3d at 1290 (quoting *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). That identification "prevents the imposition of liability based upon an isolated incident." *Id.* "Rather, the incident must result from a demonstrated practice." *Id.* The Eleventh Circuit concluded that "based on these instructions, McDowell must establish that the county's policy was to understaff the field division, and that this practice left the division unable to execute medical transports." *Id.*

McDowell could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition." *Id.* Therefore, the court determined this occurrence was an "isolated incident" rather than a "persistent" or "widespread" policy. *Id.* at 1290-91.

Next, the *McDowell* court analyzed whether the "municipality's action was 'taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.'" *Id.* at 1291 (citing *Davis ex rel. Doe v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000)). The court found McDowell could not rely on a "generalized policy of understaffing, and a resultant inability to transport." Instead, he had to show the county had a "deliberate intent" to inadequately staff the jail. *Id.*

Relying on the Supreme Court's decision in *Brown*, the *McDowell* court found that in a case "where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights . . . , 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" *Id.* (quoting *Brown*, 520 U.S. at 405). "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Brown*, 520 U.S. at 415, 117 S.Ct. 1382 (emphasis in original). For municipal action "to meet

this burden, a plaintiff must demonstrate that the lawful action was 'taken with deliberate indifference as to its known or obvious consequences.' " *McDowell*, 392 F.3d at 1291 (quoting *Brown*, 520 U.S. at 407). A "showing of simple or even heightened negligence is not enough." *Id.* (citing *Brown* at 407).

Applying these rules, the Eleventh Circuit found McDowell's argument without merit. The court determined there was no evidence the governing body knew of any potential medical concerns caused by its decision, and found the policy to be sound. *Id.* (stating that the policy to transport inmates or call an ambulance was a "clear, simple directive that said if you cannot transport with your resources you are to call an ambulance for needed medical transportation"). McDowell could not establish "that the Board would anticipate that inmates would not receive timely medical attention." *Id.* at 1292. Thus, the court found the alleged constitutional violation was not a "highly predictable consequence" of the county's failure to budget and staff the jail. *Id.*

The court then considered causation. The county's "deliberate conduct" had to be the "moving force" behind McDowell's injury. *Id.* The court recognized the Supreme Court's caveat in *Brown* that "[t]o prevent municipal liability for a . . . decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* (quoting *Brown*, 520 U.S. at 410). To "test the link" between

the injury and the County's conduct, the *McDowell* court looked "to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that the injuries were a 'plainly obvious consequence' of that decision." *Id.* (stating that "[w]hile it may be true that the Board's budget decision would make a violation of his constitutional rights 'more likely,' that alone cannot 'give rise to an inference that a policymaker's failure to scrutinize the [budget]. . . produced a specific constitutional allegation)(quoting *Brown* at 411). Again, relying on *Brown*, the court went on to state that "liability must be premised on a finding that "*this*" budget decision was 'highly likely to inflict the *particular* injury' McDowell suffered."   *Id.* at 1292 (quoting *Brown* at 411) (emphasis in original).  The *McDowell* court stated:

> McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally, McDowell did not demonstrate that the County was the moving force behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable. Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before. To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

*Id.* at 1292-93.

Collier has two methods to prove Corizon's unconstitutional policy: (1) an officially promulgated unconstitutional policy, or (2) a widespread unconstitutional

and unofficial custom or practice created by a policymaker for Corizon.  He must also prove the policy was created with knowledge that his injuries were a highly probable consequence of the policy's creation and the policy was the "moving force" behind his injury.

Collier claims the usual: Corizon denied him DAAs because of cost. However, medical providers are allowed to consider costs in providing care:  It is surely uncontroversial that "the deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society." *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) (Alito, J.). Every minute of every day, ordinary Americans forgo or delay beneficial—and even life-altering—medical treatment because it's just too expensive. A couple decides to pass on in vitro fertilization in favor of less expensive (if also less effective) fertility treatment. A woman suffering from an autoimmune condition postpones an intravenous-immunoglobulin infusion because her insurance hasn't come through. Parents opt to delay reconstructive surgery for a physically disabled child. Healthcare can be expensive—sadly, sometimes prohibitively so. What a topsy-turvy world it would be if incarcerated inmates were somehow immune from that cold—and sometimes cruel—reality. *See Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) ("A prison is not required by the Eighth Amendment to give a

prisoner medical care that is as good as he would receive if he were a free person, let alone an affluent free person.").

So, to be clear, the Eighth Amendment does not prohibit prison officials from considering cost in determining what type (or level) of medical care inmates should receive. Nor, correlatively, are cost considerations off-limits to reviewing courts charged with determining whether prison officials have acted in so reckless and conscience-shocking a manner as to violate the Constitution. *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1276-77 (11th Cir. 2020).

In this Court's final order in *Hoffer v. Inch*, 382 F.Supp. 3d 1288 (N.D. Fla. 2019), it voiced skepticism of FDOC's claimed identification of 7,185 inmates with chronic HCV, where statistical averages would place the number between 14,700 and 40,184. *Id*. at 1299. Even taking FDOC's reported number, treatment of all inmates during Corizon's time and at the lowest estimated per-patient cost would exceed $700 million. The higher estimate put the cost at over $1 Billion, but only for those already incarcerated. Those coming into the system, according to the median expressed in *Hoffer*, would be infected at a 26% rate. *Id*.

No rational person could expect Corizon to absorb those costs. The funding just did not exist. Its mission and duty was to stage patients for treatment according to the severity of disease, so treatment could begin when funding was available. It did, and that data was provided to FDOC for presentation to the

Florida Legislature for funding.  After all, no company, agency or government smaller than the State of Florida could provide funding on that magnitude.  The funding never materialized during Corizon's tenure.

Corizon is aware of the cases emanating from *Estelle*, holding that cost alone cannot be a basis for denying medical care to prisoners.  See, e.g., *Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 185 (M.D. Fla. 2012) ("cost is not a factor which can justify the lack of timely medical treatment for [a serious medical need].") (citing *Ancata v. Prison Health Servs.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care or treatment of inmates.").  However, that is no longer the law in this Circuit, as courts have never been presented with a situation where the cost of treatment could exceed $1 billion.  That is, as they say, "a horse of a different color."

### III.   Conclusion

For the foregoing reasons, the Defendants request that this Court grant their Motion for Summary Judgment.

### CERTIFICATE OF WORD LIMIT

Pursuant to Local Rule 7.1(F), this Motion contains 4609 words.

By: ___/s/ Gregg A. Toomey___
Gregg A. Toomey
Florida Bar No. 159689

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of June, 2021 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, and will send a copy of the foregoing via U.S. Mail to the following:

Wallace Gary Collier, #O81345
Union Correctional Institution
PO Box 1000
Raiford, FL 32083
*Pro Se*

THE TOOMEY LAW FIRM LLC
*Attorneys for Defendants*
The Old Robb & Stucky Building
1625 Hendry Street, Suite 203
Fort Myers, FL  33901
Phone:  239.337.1630
Fax:  239-337.0307
Email:  gat@thetoomeylawfirm.com,
alr@thetoomeylawfirm.com, and
hms@thetoomeylawfirm.com

By:   ___/s/ Gregg A. Toomey_____
        Gregg A. Toomey
        Florida Bar No. 159689