

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**WALLACE GARY COLLIER,**
**A.K.A.  GARY WINTERS,**
**DOC # 081345**
      **Plaintiff,**

**vs.**

      **Case No.: <u>4:19- cv-53 – RH - MAF</u>**

**WOODROW A. MYERS, and**
**CORIZON HEALTH SERVICES,**
      **Defendants.**

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANT MYERS' AND CORIZONS'</u>
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff WALLACE GARY COLLIER, pursuant to Federal Rule of Civil

Procedure 56 and Northern District of Florida Local Rule 56.1, herein files His

Opposition to defendant's Motion for Summary Judgment.

Plaintiff will demonstrate herein, with an abundance of supporting evidence and

case law, that Defendants were in fact deliberately indifferent to his serious

medical needs at a critical time in the progression of his liver damage, caused by

Defendants non-treatment of his hepatitis C virus infection.

Plaintiff will also demonstrate herein that the record in this case, taken as a whole,



would lead a rational trier of fact to find for the Plaintiff and that the Plaintiff will

be able to prove his case at trial.

## MEMORANDUM OF LAW

## I. REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rules of Evidence, Article II, Rule 201, Plaintiff requests this

Honorable Court to take Judicial Notice of the following sworn testimonies and

exhibits from the five (5) day evidentiary hearing held in Hoffer v. Jones, 290 F.

Supp. 3d 1292 (N.D. FLA., 2017), specifically, the excerpts cited by Plaintiff

herein:

• ECF # 138, the sworn testimony of Dr. Margaret Koziel.

• ECF # 151, the sworn testimony of Mr. Thomas Reimers, Director of Health

Services, Florida Department of Corrections (2017).

• ECF # 340-19, the sworn testimony of Dr. Daniel Dewsnup.

• Exhibit # 6, HCV Guidance, September 21, 2017

Generally, the Eleventh Circuit has distinguished between taking judicial notice of

the fact that court records or rulings exist verses taking judicial notice of the truth

of the matters stated within those court records or court filings.  See Grayson v.

<u>Warden, Comm'r, Ala DOC</u>, 869 F. 3d 1204, 1225 (11 Cir. 2017).

## II. <u>THE LIABILITY OF DEFENDANTS – THE EVIDENCE</u>

Defendants offer no evidence that Plaintiff's claims fall short of the requirements of the many cases they cite.  Plaintiff will demonstrate, with evidence, how his claims meet or exceed the legal requirements of these cases, along with similar cases preferred by Plaintiff.

Plaintiff's first order of business, however, is to dispose of the defendant's claims which are allegedly supported by the three documents provided by Defendant's.

Document 67-3 is irrelevant to these proceedings and not admissible as evidence. As the Court can see, it concerns Plaintiff's criminal conviction of forty (40) years ago.  Defendant does not cite to this document and gives no explanation for it's inclusion.  Plaintiff requests that this document to be struck from the record.  See: <u>N.D. FLA. LOC. R 77.4 (c) (2)</u>.

Document 67-1 is the declaration of Craig L. Hutchinson M.D., of whom very little information is given.  The alleged facts and claims put forth therein are either inadvertent mistakes or dangerously close to perjury.  Plaintiff will now disprove them one by one.

Plaintiff directs the Court to document 67-1 @ # 2, 3, and 4.  Here, Dr. Hutchinson

admits to the availability of at least five (5) different Direct acting antivirals

(DAA'S) for use in patients with advanced liver fibrosis or other priority

conditions, in mid 2015. However, according to Dr. Hutchinson, "no company,

including Corizon, could absorb the costs," of treatment for even the most severe

cases. The funding, according to the Doctor, "had to come from the Florida

Legislature." That means from the taxpayers of Florida who are already paying

Corizon's contracted fee to treat these inmates, as we shall see.

At this same time period, Dr. Hugh Hood, Corizon's statewide medical director in

Alabama, explained in a sworn deposition, "Corizon assesses the inmate

population and creates a budget. Then, for a pre-arranged contract price Corizon

employs all medical staff in the facilities and covers the cost of medication..."

See: Eric C. Davidson v. Corizon, LEXIS 89527 (N. D. Ala. July, 2015) Doc. 74-

2, pages 28-29. See also: pertinent excerpts from the Corizon/Florida Department

of Corrections contract,  Plaintiff's Exhibit A (page 2 para. 4), (page 104 @ III

compensation) and (page 114 @ para. I).

While the FDOC does share in the liability for the Non treatment of high priority

cases, this does not dismiss the liability of Corizon and Woodrow Myers during the

time they were contracted as health care providers.  It is clear that Corizon was

contractually responsible for the costs of medication.  From July, 2013 to

November, 2015 Corizon signed amendments to the contract with Florida

Department of Corrections six (6) times.  See: EXHIBIT A, Corizon/Florida

Department of Corrections Contract; Amendments.  Woodrow Myers signed off on

Amendment # 3 in March, 2014.  In amendment # 4 Corizon was given a monthly

increase in payment of approximately $80, 000.00, which they were apparently

content with as Mr. Courtney, C.O.O. S.E. Region, signed off on 6/26/14.  In

amendment # 5 there is some type of adjustment in payment which, due to the

language involved, Plaintiff cannot state for sure if it was an increase or decrease

in payment.  Regardless, Mr. Courtney again was pleased and signed off on

7/24/14.  In amendment # 6 another monthly increase in payment of around

$100,000.00 appears to have been given.  Scott Bowers signed off on this on

11/9/15.  None of the conflicts in funding set forth by Dr. Hutchinson in his

declaration appear in these amendments.  Please see:  Hoffer evidentiary hearing

testimony of <u>Thomas Reimers, Director of Health Services, FDOC.</u>  ECF 151,

page 5 and 6, page 7 @ 1.  See also page 9 to page 25, 1-4.  This testimony verifies

and clarifies Corizon's inept, grossly inadequate treatment of HCV Patients in

FDOC.

## III. STAGING INMATES FOR TREATMENT

There are three essential tests required in the staging of HCV patients for

treatment:

    1. genotype

    2. viral load

    3. fibrosis score (combinations of imaging, biopsy, or fibro-sure tests.)

See: Plaintiff's EXHIBIT-E – HCV GUIDANCE (From Hoffer v. Jones, 290 F.

Supp. 3d 1292 (N.D. Fla. 2017) evidentiary hearing, EXHIBIT-6) @ PL004976,

page 8 of 10, pretreatment assessment.

See also: PL004977, page 9 of 10, last paragraph.

See also: PL004983, page 1 of 10, recommended assessments

Also from Hoffer, supra, see the testimony of Margaret Koziel, MD, expert witness

for the Plaintiff, @ ECF 138;

• page 53 @ 13-25, AST and ALT are not good indicators of fibrosis.

• page 58 @ 16-25 APRI is not a good indicator of fibrosis.

• page 115 @ 14-25 missing ultrasounds.

In paragraphs 5-10 of his Declaration Dr. Hutchinson speaks of the "daunting

task"…"to stage and thereby prioritize."… all inmates with hepatitis C."  Dr.

Hutchinson then claims, "among the FDOC inmates being staged for treatment was

Collier/Winters," referring to Plaintiff.  This is complete nonsense.  Plaintiff was

not only denied treatment for his serious medical need by Corizon but was also

never staged for treatment by Corizon and neither were all the other inmates on the

111 pages of document 67-2. The lab work on these pages is simply the cursory monitoring performed for years in the Chronic Illness Clinic (CIC) by Corizon. These documents contain very few genotypes, zero (0) viral loads and zero (0) fibrosis scores. It would be impossible to stage anyone using these lab tests. Please compare the Plaintiff's CIC labs done by Corizon (Plaintiff's EXHIBIT B) and the CIC labs done by Centurion [1] after Corizon's departure (Plaintiff's EXHIBIT C).

It is clear that the Federal Bureau of Prisons (FBOP) recommended DAA treatment for the highest priority cases in 2014. Many prison systems were doing just that. See the testimony of <u>Dr. Daniel Dewsnup</u> [2] in the 5 day evidentiary hearing held in Hoffer v. Jones, supra ECF 340-19, page 14 @ 2-25.

Even as far back as 2012 priority treatment for HCV was based on the degree of fibrosis, according to FBOP guidelines. See: Johnson v. Bryson, LEXIS 224413 (MD, GA. 2019) @ II (B) paragraph 2.

Where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts for purposes of ruling on a motion for

---

[1] A truly daunting task as the imminent orders from Hoffer v. Jones are on the horizon.
[2] Dr. Dewsnup was the expert witness for Defendant Julie Jones in the Hoffer case. His credentials include: masters in clinical microbiology, internal medicine residency (3 years), fellowship at Stanford University (Division of Infectious Diseases) curiously Dr. Dewsnup and Dr. Margaret Koziel (also highly qualified) the expert witness for the Plaintiff's agreed on almost all points in their testimony.

summary judgment." Scott v. Harris, 550 US 372, 380; 127 S. Ct. 1769, 1776; 167

L. Ed. 2d 686 (2007)

## IV. THE LIABILITY OF DEFENDANTS-CASE LAW

To prevail on this claim Plaintiff must show (1) a serious medical need, (2)

Defendant's deliberate indifference to that need, and (3) causation between

Defendant's indifference and Plaintiff's injuries.  Goebert v. Lee County, 510 F. 3d

1312, 1326 (11th Cir. 2007).

(1) Serious Medical Need:

"A serious medical need is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctors attention.'" Mann v. Taser, Int'l, Inc., 588 F.

3d 1291, 1307 (11th Cir. 2009).  In the alternative, a serious medical need is

determined by whether a delay in treating the need worsens the condition." Id. "In

either case, 'the medical need must be one that, if left unattended, poses a

substantial risk of serious harm.'"

Id. quoting Farrow v. West, 320 F. 3d 1235, 1243 (11th Cir. 2003)  See: EXHIBIT-

E, HCV Guidance @ PL004971, page 3 of 10, 1st paragraph.

HCV is a serious  medical need for which treatment is required; refusing to provide

an inmate with such treatment violates the eighth amendment.  See <u>Furman v. Warden</u>, 827 F App'x 927, 934 (11th Cir. 2020).  (holding that evidence of permanent liver damage from failure to provide treatment for HCV was more than a "de minimis" injury and prisoner was not precluded from seeking an award of compensatory and punitive damages.)

Defendant's spent over two (2) pages in the motion for summary judgment (page 7, last paragraph through page 9) citing cases to demonstrate that a successful eighth amendment claim requires proof that the Plaintiff suffered an objectively serious medical need.  See: Plaintiff's EXHIBIT C, Centurion Lab reports, pages 1 through 5 of the first report in the exhibit.  These reports (notably done immediately following Corizon's exit from their contract with FDOC) confirm Plaintiff's HCV infection to be of genotype 1a.  Having been diagnosed in 2007, it took nine (9) years  for Plaintiff to learn the genotype.  Plaintiff's serious medical need met all of the requirements of the cases cited by Defendant's, who gave no evidence to the contrary.  "That Hepatitis C presents a serious medical need is undisputed." <u>Loeber v. Andem</u>, 487 F. App'x 548, 549 (11th Cir. 2012).

(2) Deliberate Indifference

"Deliberate indifference may be established by a showing of delaying treatment for non-medical reasons, grossly inadequate care, a decision to take an easier but less

efficacious course of treatment, and medical care which is so cursory as to amount to no treatment at all." <u>McElliott v. Foley</u>, 182 F. 3d 1248, 1255 (11th Cir. 1999). It is clear that Corizon, through the custom and practice of non-treatment of HCV infected inmates as the moving force, committed each and every one of the above mentioned violations of Plaintiff's Constitutional eighth amendment rights.

(3) Causation

In the case of defendant Myers, supervisor liability has been established.  Counsel for defendant's Corizon and Myers, after rambling on for pages  about medical malpractice and negligence (as to the non-treatment of Plaintiff's HCV infection) now contends on page 10 that because, "Nothing in the record shows that he (Woodrow Myers) had any interaction with Collier," (Plaintiff) it is "absurd" to claim Myers "directed his care."  Therefore, he now states, "The claim simply has no basis."  Counsel for defendants is mistaken.

Defendant Myers, being a medical doctor and with the information gained from Corizon's assessment of the inmate population, was clear on what the medical situation was in the Florida Department of Corrections.
Personal participation is not required for liability under section 1983 so long as there is a causal connection between the Defendant and the injury allegedly sustained.  <u>Am. Fed'n of labor v. City of Miami</u>, 637 F. 3d 1178, 1190 (11th Cir.

2011).  "'A causal connection can be established if a supervisor has the ability to prevent or stop a known constitutional violation by exercising his supervisory authority and he fails to do so,' id., or when 'a history of wide spread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.' Brown v. Crawford, 906 F. 2d 667, 671 (11th Cir. 1990)." Hayes v. Sec'y, Fla. Dep't of Children and Families, 563 F. App'x701, 703 (11th Cir. 2014).   Plaintiff has presented such allegations which provide a causal connection to Plaintiff's injury.  In particular, Defendant's policy of not providing treatment for HCV due to the high cost of such treatment violated his Eighth Amendment rights.  Plaintiff's allegations are not based on a theory of respondent superior.

Plaintiff looks forward to testing the theory put forth by counsel for defendants that, Estelle, Fields v. Corizon Health Inc., and Ancata v. Prison Health Services, Inc. are "no longer the law in this circuit." (page 20, Defendants motion for summary judgment.)  There is no excuse for Corizon's inhumane non-treatment of a single inmate in the FDOC for Hepatitis-C.

## V.  CORIZON AS THE FUNCTIONAL EQUIVALENT OF THE STATE

Corizon is not a government entity, however, "where a function which is traditionally the exclusive prerogative of the state ... is performed by a private

entity, state action is present for purposes of § 1983." <u>Ancata v. Prison Health</u>

<u>Servs</u>. 769 F. 2d 700, 703 (11th Cir. 1985)

An essential element in the custom and practice by Corizon of the non-treatment of

HCV infected inmates was to simply not give fibrosis tests, thereby not being

aware of the severity of an inmates injury. The single most damaging evidence of

the wide spread abuse suffered by HCV infected inmates, Plaintiff included, at the

hands of Woodrow A. Myers and Corizon, is the minuscule number of inmates

actually treated with DAA'S during the time Corizon held the health services

contract with the FDOC. Out of the thousands infected ten (10) were treated, zero

(0) funded by Corizon. Corizon, understandably, refused to provide Plaintiff with

this information during discovery. Please see: Hoffer evidentiary hearing

testimony of Thomas Reimers, Director of Health Services, FDOC. ECF 151, page

47 @ 19-25, page 48 @ 1-7. See also page 43 @ 8-12, and finally Page 56 @ 18-

25.

## VI. <u>CONCLUSION</u>

Plaintiff has read carefully, <u>McDowell v. Brown</u>, 392 F. 3d 1283. Plaintiff has also

read carefully the 5 pages of Defendants motion to dismiss (13-17) where

McDowell was expounded. McDowell is distinguished in every possible way from

the instant case except for the fact that the Plaintiff claimed deliberate indifference

after suffering a serious injury.  However, McDowell was unable to demonstrate the necessary components of deliberate Indifference, nor widespread abuse, nor a custom and practice of a constitutional violation.  This Plaintiff has shown all three.  As the Court stated, id. @ 1290, 1291 "Simply put, this isolated incident, however unfortunate, does not demonstrate evidence of the county's persistent or widespread policy."

Finally, had Corizon chosen a different path other than the complete non-treatment of HCV inmates in the FDOC and staged and treated say, 500 inmates a year for 3 years, it would have cost them approximately 75 million.  Many lives would have been saved and many men would have less serious liver damage.  Corizon's profits would have still been large.

This plaintiff, although treated for the virus by Court Order in 2018, still suffers from Advanced fibrosis.

This requires close monitoring for life.  See EXHIBIT-D, N. POST TREATMENT MONOTORING @ 2, HSB 15.03.09

Due to Plaintiff's advanced fibrosis he has a 2-5 times higher rate possibility of liver related mortality compared to treatment at an earlier F2 stage.

See: EXHIBIT-E, HCV GUIDANCE @ PL004971, page 3 of 10 paragraph 1.

For all of the foregoing reasons Plaintiff respectfully requests this Honorable Court

to DENY defendants motion for summary judgment.

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing document is in compliance with Loc. R.

7.1 (f) in that the word count is 3,052.

I HEREBY DECLARE UNDER PENALTY OF PERJURY that the foregoing

statements of fact are true and correct.

*Wallace Gary Collier*
WALLACE GARY COLLIER

Respectfully submitted this 6 th day of July, 2021

*Wallace Gary Collier*
WALLACE GARY COLLIER
D.O.C. # 081345
Union Correctional Institution
P. O. Box 1000
Raiford, Florida
                    32083

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to mail room officials at Union Correctional Institution to be sent by U.S.

Mail to:

> The Toomey Law Firm, LLC
> 1625 Hendry Street, Suite 203
> Fort Myers, Florida  33901
> (Attorneys for Defendants Woodrow Myers and Corizon)

This __6th__ day of July, 2021

*Wallace Gary Collier*
WALLACE GARY COLLIER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**WALLACE GARY COLLIER,**
**A.K.A.  GARY WINTERS,**
**DOC # 081345**
      **Plaintiff,**

**vs.**

**Case No.: <u>4:19- cv-53 – RH - MAF</u>**

**WOODROW A. MYERS, and**
**CORIZON HEALTH SERVICES,**
      **Defendants.**

## <u>NOTICE OF FILING</u>

Plaintiff, WALLACE GARY COLLIER, files the following documents in support

to his Opposition to the motion for summary judgment:

1. Corizon/FDOC contract excerpts

2. Corizon, labs, and clinic documents

3. Centurion, labs, and clinic documents

4. FDOC HSB 15.03.09, excerpt

5. HCV Guidance, excerpts

*Wallace Gary Collier*
WALLACE GARY COLLIER
D.O.C. # 081345

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished to mail room officials at Union Correctional Institution to be sent by U.S.

Mail to:

        The Toomey Law Firm, LLC
        1625 Hendry Street, Suite 203
        Fort Myers, Florida  33901
        (Attorneys for Defendants Woodrow Myers and Corizon)

This _6th_ day of July, 2021

                          *Wallace Gary Collier*
                          WALLACE GARY COLLIER

# EXHIBITS

EXHIBIT-A,   CORIZON/FDOC CONTRACT

EXHIBIT-B,   CORIZON, LABS, CLINIC

EXHIBIT-C,   CENTURION, LABS, CLINIC

EXHIBIT-D,   FDOC HSB 15.03.09, EXCERPT

EXHIBIT-E,   HCV GUIDANCE, EXCERPTS

# EXHIBIT – A

## CORIZON/FDOC CONTRACT

# CONTRACT BETWEEN

## THE FLORIDA DEPARTMENT OF CORRECTIONS

### AND

### CORIZON, INC.

This Contract is between the Florida Department of Corrections ("Department") and Corizon, Inc. ("Contractor") which are the parties hereto.

## WITNESSETH

Whereas, the Department is responsible for the inmates and for the operation of, and supervisory and protective care, custody and control of, all buildings, grounds, property and matters connected with the correctional system in accordance with Section 945.04, Florida Statutes;

Whereas, it is necessary that budget resources be allocated effectively;

Whereas, this Contract is entered into pursuant to RFP# 11-DC-8324, authorized pursuant to Section 287.057 (1)(b), Florida Statutes, and funded in Line Item 784, General Appropriations Act, 2012; and

Whereas, the Contractor is a qualified and willing participant with the Department to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

Therefore, in consideration of the mutual benefits to be derived hereby, the Department and the Contractor do hereby agree as follows:

## I.   CONTRACT TERM AND RENEWAL

### A.   Contract Term

This Contract shall begin on October 1, 2012, or the date on which it is signed by both parties, whichever is later, and shall end at midnight on September 30, 2017.  In the event this Contract is signed by the parties on different dates, the latter date shall control.

This Contract is in its initial term.

### B.   Contract Renewal

The Department has the option to renew this Contract for one (1) additional five (5) year period after the initial Contract period upon the same terms and conditions contained herein and at the renewal prices indicated in Section III., Compensation.  Exercise of the renewal option is at the Department's sole discretion and shall be conditioned, at a minimum, on the Contractor's performance of this Contract and subject to the availability of funds.  The Department, if it desires to exercise its renewal option, will provide written notice to the Contractor no later than thirty (30) days prior to the Contract expiration date.  The renewal

term shall be considered separate and shall require exercise of the renewal option should the Department choose to renew this Contract.

## II.    SCOPE OF SERVICE

A.    <u>General Service Description/Purpose</u>

1.  The Contractor is to establish a program for the provision of staffing and operation of health, mental/behavioral health, dental, healthcare network and utilization management, and any claims management services for all institutions. The program is to meet constitutional and community standards, the standards of the American Correctional Association (ACA) and/or National Commission on Correctional Health Care (NCCHC), Florida Statutes, Florida Administrative Code, court orders, applicable policies. procedures, and directives regarding the provision of health services in the Department. Department policy, procedure, or directive language will take precedence over the Contractor's policies and procedures in the event of any conflict between the two.

2.  The Contractor shall provide services in accordance with the American Correctional Association (ACA) Performance Based Standards, Expected Practices and Outcome Measures and/or National Commission on Correctional Health Care (NCCHC) and prevailing professional practices. The performance of the Contractor's personnel and administration must meet or exceed standards established by ACA and/or NCCHC as they currently exist and/or may be amended. The contractor shall identify the clinical criteria utilized to determine necessity for health care and treatment that at a minimum meet National Clinical Practice Guidelines (i.e. internally developed or other national criteria).

3.  Under no circumstances shall service delivery meeting less than the minimum service requirements be permitted without the prior written approval of the Department. Otherwise, it shall be considered that services will be performed in strict compliance with the requirements and rules, regulations and governance contained in this Contract and Contractor shall be held responsible therefore.

4.  The contractor shall be responsible for all pre-existing health care conditions of those inmates covered under this contract as of 12:00am on the first day of the contract implementation, per location. The contractor shall be responsible for all health care costs incurred for services provided after 12:00am on the first day of the contract without limitation as to the cause of an injury or illness requiring health care services.

5.  In addition, the Contractor shall implement a written health care work plan with clear objectives; develop and implement policies and procedures; comply with all state licensure requirements and standards regarding delivery of health care; maintain full reporting and accountability to the Department; and maintain an open, collaborative relationship with the Department's Administration, Office of Health Services, Department staff, and the individual institutions.

6.  The Contractor understands and agrees that the Department's institutions are first charged with the responsibility for maintaining custody and security for inmates. Therefore, the Department retains authority to assign inmates to the most appropriate institution. **The Contractor shall not dispute or refuse acceptance of any inmate assignment based on any medical, dental and/or mental health condition (s).**

may, result in determination of Breach of Contract and/or termination of the Contract in accordance with Section VI., Termination.

GG.    Deliverables

The following services or service tasks are identified as deliverables for the purposes of this Contract:

1. Appropriate health care services for inmates consisting of deliverables listed under Section II., EE., 1., Performance Outcomes, Measures, and Standards.
2. Reports as required in Section II., CC., Reporting Requirements.
3. Compliance with contract terms and conditions.

## III.    COMPENSATION

This is a full risk Contract without any caps or aggregate levels after which costs are shared. The Contractor is responsible for all costs associated with the provision of comprehensive healthcare services, with the exception of including HIV/STD care and pharmaceuticals provided by the County Health Departments at selected institutions, through the Department's 340b Agreement with the Florida Department of Health. The Department reserves the right to add/delete sites, as well as other medical and or mental health services and related drugs that are covered under the 340b drug pricing program. The Contractor may be required to certify receipt or non-receipt of medications ordered for treatment purposes.

In addition, the Department reserves the right to access any programs under the new Federal Healthcare Reform Act, Federal State Local Grants, and Partnership opportunities, or any state initiatives, that result in savings on healthcare costs. Changes will be made by formal contract amendment, as indicated in Section V., Contract Modification.

A.    Payment

1. The Department will compensate the Contractor on a monthly basis, for the provision of comprehensive healthcare services as specified in Section II., Scope of Service, at the **Single Capitation Rate of $8.4760 Per-Inmate, Per Day (Unit Price)** times the average monthly number of inmates, times the number of days in the month. This capitation rate is broken down as follows:

   - For the provision of comprehensive healthcare services, at the **Single Capitation Rate of $8.4611 Per-Inmate, Per Day (Unit Price)**; and

   - For the cost of a performance bond, at the **Single Capitation Rate of $0.0149 Per-Inmate, Per Day (Unit Price)**.

   The average monthly number of inmates will be determined by the Department's official Monthly Average Daily Population (ADP) report. Payment for each facility shall begin at 12:01 a.m. on the implementation date contingent upon actual implementation of services. The Department requires a consolidated, single invoice, on a monthly billing cycle for services performed.

   Monthly adjustments will also be made for costs defined as payable by the Contractor which have been paid by the Department or costs defined as payable by the Department

If applicable, the Contractor shall submit a plan describing how it will address the use of PRIDE in offering the items bid.

C.   Procurement of Materials with Recycled Content

It is expressly understood and agreed that any products or materials, which are the subject of or are required to carry out this Contract, shall be procured in accordance with the provisions of Section 403.7065, Florida Statutes.

D.   Sponsorship

If the Contractor is a nongovernmental organization which sponsors a program financed partially by State funds, including any funds obtained through this Contract, it shall, in publicizing, advertising, or describing the sponsorship of the program, state: "Sponsored by Corizon, Inc., and the State of Florida, Department of Corrections." If the sponsorship reference is in written material, the words "State of Florida, Department of Corrections" shall appear in the same size letters or type as the name of the organization.

E.   Employment of Department Personnel

The Contractor shall not knowingly engage in this project, on a full-time, part- time, or other basis during the period of this Contract, any current or former employee of the Department where such employment conflicts with Section 112.3185, Florida Statutes.

F.   Non-Discrimination

No person, on the grounds of race, creed, color, national origin, age, gender, marital status, or disability, shall be excluded from participation in, be denied the proceeds or benefits of, or be otherwise subjected to discrimination in the performance of this Contract.

G.   Americans with Disabilities Act

The Contractor shall comply with the Americans with Disabilities Act. In the event of the Contractor's noncompliance with the nondiscrimination clauses, the Americans with Disabilities Act, or with any other such rules, regulations, or orders, this Contract may be canceled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Contracts.

H.   Contractors Acting as an Agent of the State

In the Contractor's performance of its duties and responsibilities under this Contract, the Contractor shall, at all times, act and perform as an agent of the Department, but not as an employee of the Department. The Department shall neither have nor exercise any control or direction over the methods by which the Contractor shall perform its work and functions other than as provided herein. Nothing in this Contract is intended to, nor shall be deemed to constitute, a partnership or joint venture between the parties.

I.   Indemnification for Contractors Acting as an Agent of the State

The Contractor shall be liable, and agrees to be liable for, and shall indemnify, defend, and hold the Department, its employees, agents, officers, heirs, and assignees harmless from any and all claims, suits, judgments, or damages including court costs and attorney's fees arising out of intentional acts, negligence, or omissions by the Contractor, or its employees or

agents, in the course of the operations of this Contract, including any claims or actions brought under Title 42 USC §1983, the Civil Rights Act, up to the limits of liability set forth in Section 768.28, Florida Statutes.

J.     Contractor's Insurance for Contractors Acting as an Agent of the State

The Contractor warrants that it is and shall remain for the term of this Contract, in compliance with the financial responsibility requirements of Section 458.320, Florida Statutes, and is not entitled to, and shall not claim, any exemption from such requirements. The Contractor also warrants that funds held under Section 458.320, Florida Statutes, are available to pay claims against the State in accordance with Section VII., I., Indemnification for Contractors Acting as an Agent of the State.

The Contractor agrees to provide adequate liability insurance coverage to the extent of liability under Section 768.28, Florida Statutes, on a comprehensive basis and to hold such liability insurance at all times during the existence of this Contract. Upon the execution of this Contract, the Contractor shall furnish the Contract Manager written verification supporting such insurance coverage. Such coverage may be provided by a self-insurance program established and operating under the laws of the State of Florida. The Department reserves the right to require additional insurance where appropriate.

If the Contractor is a state agency or subdivision as defined in Section 768.28, Florida Statutes, the Contractor shall furnish the Department, upon request, written verification of liability protection in accordance with Section 768.28, Florida Statutes. Nothing herein shall be construed to extend any party's liability beyond that provided in Section 768.28, Florida Statutes.

K.     Disputes

Any dispute concerning performance of this Contract shall be resolved informally by the Contract Manager. Any dispute that cannot be resolved informally shall be reduced to writing and delivered to the Department's Assistant Secretary for Health Services. The Assistant Secretary for Health Services or designee shall decide the dispute, reduce the decision to writing, and deliver a copy to the Contractor, the Contract Manager, and the Contract Administrator.

L.     Copyrights, Right to Data, Patents and Royalties

Where activities supported by this Contract produce original writing, sound recordings, pictorial reproductions, drawings or other graphic representation and works of any similar nature, the Department has the right to use, duplicate and disclose such materials in whole or in part, in any manner, for any purpose whatsoever and to have others acting on behalf of the Department to do so. If the materials so developed are subject to copyright, trademark, or patent, legal title and every right, interest, claim or demand of any kind in and to any patent, trademark or copyright, or application for the same, will vest in the State of Florida, Department of State for the exclusive use and benefit of the State. Pursuant to Section 286.021, Florida Statutes, no person, firm or corporation, including parties to this Contract, shall be entitled to use the copyright, patent, or trademark without the prior written consent of the Department of State.

The Department shall have unlimited rights to use, disclose or duplicate, for any purpose whatsoever, all information and data developed, derived, documented, or furnished by the Contractor under this Contract. All computer programs and other documentation produced

CONTRACT #C2757

Waiver of breach of any provision of this Contract shall not be deemed to be a waiver of any other breach and shall not be construed to be a modification of the terms of this Contract.

This Contract and any attachments or exhibits if included, and RFP #11-DC-8324 and the Contractor's response to RFP #11-DC-8324, contain all the terms and conditions agreed upon by the parties. In the event of any conflict in language among these documents, the Department's Contract and current policies and procedures will govern.

IN WITNESS THEREOF, the parties hereto have caused this Contract to be executed by their undersigned officials as duly authorized.

**CONTRACTOR:**
**CORIZON, INC.**

SIGNED
BY:

NAME: _Richard Hallworth_

TITLE: _Chief Executive Officer_

DATE: _10/12/12_

FEID #: _43 1 28 1 312_

**FLORIDA DEPARTMENT OF CORRECTIONS**

SIGNED
BY:

NAME: Kenneth S. Tucker

TITLE: Secretary
Department of Corrections

DATE: _10/15/12_

Approved as to form and legality, subject to execution.

SIGNED
BY:

NAME: Jennifer A. Parker

TITLE: **General Counsel**
**Department of Corrections**

DATE: _10/11/12_

MODEL DOCUMENT REVISED 11/01/11

**CONTRACT #C2757**
**AMENDMENT #1**

**CONTRACT AMENDMENT BETWEEN**

**THE FLORIDA DEPARTMENT OF CORRECTIONS**

**AND**

**CORIZON, INC.**

This is an Amendment to the Contract between the Florida Department of Corrections ("Department") and Corizon, Inc. ("Contractor") to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

This Amendment:

- Revises Section entitled "WITNESSETH", third paragraph;
- Revises Section I., A., Contract Term;
- Revises Section II., B., 19., Off-Site Transportation; and
- Revises Section III. A., 2., CPI Adjustments.

Original contract period:                    October 1, 2012 through September 30, 2017

In accordance with Section V., CONTRACT MODIFICATION; the following changes are hereby made:

1.  Section entitled "WITNESSETH", third paragraph, is hereby revised to read:

    Whereas, this Contract is entered into pursuant to RFP# 11-DC-8324, authorized pursuant to Section 287.057 (1)(b), Florida Statutes, and funded in Line Item 784, General Appropriations Act 2012, and Line Item 707, General Appropriations Act, 2013; and

    Whereas, this Contract was the subject of a Petition for Quo Warranto in the case of Florida Public Employees Council 79, et. al. vs. Kenneth S. Tucker, in his capacity as Secretary of the Florida Department of Corrections, et. al., 2nd Circuit Court, Leon County Florida, Case No. 2012-CA-3119, from the date of September 27, 2012 until resolved by an appellate decision on June 5, 2013, which included an injunction between December 4, 2012 and June 5, 2013, and for the duration of that time frame the parties mutually ceased performance of the Contract; and

2.  Section I., A., Contract Term, is hereby revised to read:

    I.      A.      Contract Term

            This Contract shall begin on October 1, 2012, or the date on which it is signed by both parties, whichever is later, and shall end at midnight on June 30, 2018.  In the event this Contract is signed by the parties on different dates, the latter date shall control.

            This Contract is in its initial term.

3.  Section II. B., 19., Off-Site Transportation, is hereby revised to read:

    II.    B.    19.  Off-Site Transportation

To keep security staff overtime to a minimum for health care related transports, the Contractor is required to establish off-site services as conveniently located to the institutions as possible. Some off-site specialty visits are unavoidable and not controllable by the Contractor. Except for radiotherapy services, the Contractor shall be required to pay the sum of $250.00 per inmate per round trip over 50 miles for every trip made. However, for the first thirty (30) days of service at each facility, the Department will waive the $250.00 charge for those specialty consults or surgeries scheduled by the Department prior to the transition date and deemed medically necessary by the Department's Utilization Management staff. Mileage shall be calculated door-to-door from institution to the appointment site and back to the institution, taking the most direct route using an acceptable mapping application. Inmate transfers/movements and/or referrals between institutions for security and/or health related needs directed by the Department are not applicable to this issue.

In addition, the institutions must have access to 24/7 on call availability of physician, psychiatrist, psychologist, dentist, and health care administrator services. The on-call coverage shall be made available by the service contractor responsible for on-site services.

When inmates experiencing emergent or urgent health problems are brought to the attention of institution personnel, health care personnel must be prepared to address them immediately. This response may consist of permitting the patient to report or be escorted to the health services unit/infirmary for evaluation, or sending health services personnel to the patient's location. The Contractor must plan in advance for the management of emergency services, and must maintain an "open" system capable of responding to emergency circumstances as they occur.

Contract employees shall not provide personal transportation services to inmates.

In addition, inmate transfers/movement and/or referrals between other institutions and RMC hospital or designated secure hospital units will not be subject to the $250 off-site transportation fee.

4.  Section III. A., 2., CPI Adjustments, is hereby revised to read:

    III.    A.    2.  CPI Adjustments

The Department will allow for changes to the per diem based on increases or decreases in the medical consumer price index (CPI) for services, adjusted for geographic region, subject to legislative approval and appropriation. If the adjusted medical services CPI increases, the vendor(s) may submit a written request for an increase to the per diem prior to September 1 of each year. However, the amount of the increase may not exceed the adjusted medical services CPI for the 12-month period ended June 30 of the same year. If the medical services CPI decreases, the Department must notify the vendor(s) in writing by September 1 of each year if the Department plans to seek a decrease in the per diem rate. However, the amount of

the decrease may not exceed the adjusted medical services CPI for the 12-month period ended June 30 of the same year. Any requested increase to the health services per diem rates will be reflected in the Department's annual Legislative Budget Request and subject to Legislative approval and appropriation.  Any increase to the health services contract will be effective on the date specified in the appropriation. If the appropriation does not specify an effective date, the increase to the health services per diem will be effective on July 1 of the year in which the appropriation is made.  Any decrease to the health services per diem rates will be automatically effective at the beginning of the next contract year and will not require legislative approval.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

CONTRACT #C2757
AMENDMENT #1

All other terms and conditions of the original Contract remain in full force and effect.

This Amendment shall begin on the date on which it is signed by both parties.

IN WITNESS THEREOF, the parties hereto have caused this Amendment to be executed by their undersigned officials as duly authorized.

**CONTRACTOR:**
**CORIZON, INC.**

SIGNED
BY: _Stuart K. Campbell_

NAME: _Stuart K. Campbell_

TITLE: _President & COO_

DATE: _7/1/13_

FEID #: _43 1281312_

**DEPARTMENT OF CORRECTIONS**

SIGNED
BY: _____

NAME: Michael D. Crews

TITLE: Secretary
Department of Corrections

DATE: _7/11/13_

Approved as to form and legality, subject to execution.

SIGNED
BY: _____

NAME: Jennifer A. Parker

TITLE: General Counsel
Department of Corrections

DATE: _7/5/13_

CONTRACT #C2757
AMENDMENT #2

## CONTRACT AMENDMENT BETWEEN

## THE FLORIDA DEPARTMENT OF CORRECTIONS

## AND

## CORIZON, INC.

This is an Amendment to the Contract between the Florida Department of Corrections ("Department") and Corizon, Inc. ("Contractor") to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

This Amendment:

- Revises Section II., B., 12., Radiotherapy Services;
- Revises Section II., DD., Contract Termination Requirements;
- Revises Section III., A., Payment, #1;
- Revises Section III., C., Submission of Invoice(s);
- Revises Section III., D., Supporting Documentation for Invoice; and
- Revises Section III., K., Final Invoice.

| | |
|---|---|
| Original contract period: | October 1, 2012 through September 30, 2017 |
| Amendment #1 | October 1, 2012 through June 30, 2018 |

In accordance with Section V., CONTRACT MODIFICATION; the following changes are hereby made:

1.  Section II., B., 12., Radiotherapy Services, is hereby revised to read:

     II.    B.    12. Radiotherapy Services

           The Department currently maintains a contract for radiotherapy services with CCCNF-Lake Butler, LLC (Department Contract #C2573). The Contractor shall use the CCCNF-Lake Butler, LLC (pursuant to the referenced contract) for all radiotherapy services provided under this Contract or Department designated substitution. The Contractor is responsible for all costs incurred in the provision of radiotherapy services by CCCNF-Lake Butler, LLC. The Department will adjust each second semi-monthly invoice received from Corizon, in order to credit the Department for any payments made to CCNF-Lake Butler, LLC, on behalf of Corizon. The Department shall provide all supporting services outlined in the contract with CCCNF-Lake Butler, LLC.

2.  Section II., DD., Contract Termination Requirements, is hereby revised to read:

     II.    DD.    Contract Termination Requirements

           If, at any time, the Contract is canceled, terminated or otherwise expires, and a Contract is subsequently executed with a firm other than the Contractor, or service delivery is resumed by the Department, the Contractor has the affirmative obligation to assist in the

smooth transition of Contract services to the subsequent Contractor (or to the Department). This includes, but is not limited to, the development of a Department approved transition plan that includes health record updates and disposition, identification of hospitalized inmates, inventories of equipment and supplies (pharmaceuticals, if applicable, etc.), disposition of employee health and safety training education and immunization records, and final submission of all required monthly, quarterly, and annual reports. The Contractor shall work with the Department during that time to coordinate the phase-out schedule, with the understanding that as institutions are removed from the Contract, the Contractor understands that its revenue will drop. The Contractor shall make timely provision of all contract-related documents and information, not otherwise protected from disclosure by law to the replacing party.

The Contractor shall submit a transition plan to the Contract Manager no less than one hundred and twenty (120) days prior to intended contract termination by the Contractor outlining steps for transition of service upon contract expiration or in the event of contract termination.    The plan shall set forth the date and time of transfer of responsibility by the Contractor to the entity assuming service, with a schedule for each institution as well as a transfer plan for any inmates in outside hospitals at the time of transition.  Failure to timely submit the transition plan shall result in forfeiture of ten percent (10%) of both final semi-monthly payments.  In addition, upon the expiration date of the Contract, the Contractor shall provide inventories of equipment consistent with the levels and types of inventories provided upon Contractor's initial assumption of services under the Contract.

3.   Section III., A., <u>Payment</u>, #1, is hereby revised to read:

    III.    A.    <u>Payment</u>

        1.   The Department will compensate the Contractor on a semi-monthly basis (the first semi-monthly invoice will cover the 1st through the 15th and the second semi-monthly invoice will cover the 16th through the last day of the month), for the provision of comprehensive healthcare services as specified in Section II., Scope of Service, at the **Single Capitation Rate of $8.4760 Per-Inmate, Per Day (Unit Price)** times the average semi-monthly number of inmates for that period, times the number of days in the semi-monthly period.  This capitation rate is broken down as follows:

- For the provision of comprehensive healthcare services, at the **Single Capitation Rate of $8.4611 Per-Inmate, Per Day (Unit Price)**; and

- For the cost of a performance bond, at the **Single Capitation Rate of $0.0149 Per-Inmate, Per Day (Unit Price)**.

The average semi-monthly number of inmates will be determined by the Department's official Semi-Monthly Average Daily Population (ADP) report. Payment for each facility shall begin at 12:01 a.m. on the implementation date contingent upon actual implementation of services.  The Department requires a consolidated, single invoice, on a semi-monthly billing cycle for services performed.

Adjustments will be made on the second semi-monthly invoice of the month for costs defined as payable by the Contractor which have been paid by the Department

or costs defined as payable by the Department which have been paid by the Contractor. Such adjustments will be added or deducted to the subsequent second semi-monthly payment of each month after reconciliation between the Department and the Contractor.

This Contract does not include the Pharmaceutical Services component; therefore, the Departments' cost of all non-formulary pharmaceuticals and emergency pharmaceuticals filled at local pharmacies will be adjusted from the second semi-monthly payment. If, according to the request for proposals, Pharmaceutical Services are added to the Contract at a later date, the per diem rate will be increased by the amount that was included in the Contractors price proposal.

The cost of the Health Services Contract Monitors will be a deduction from the second semi-monthly management payment to the Contractor. The actual cost for such deductions will be based upon the appropriated rate, salary and expense dollars for the function.

The last two payments of the Contract will be withheld until all pending adjustments including those provided for in Section II., DD., of this Contract, have been determined and reconciled.

The Contractor verifies that they shall not dispute or refuse acceptance of any inmate assignment based on any medical and/or mental health condition(s). Furthermore, except as outlined in Section III., A., 2., CPI Adjustments, no additional compensation shall be granted to the Contractor unless the conditions under Chapter 287, Florida Statutes has been satisfactorily met and/or allowed. The Contractor agrees that they shall not terminate the Contract during the initial period based upon monetary losses and acknowledges that termination for this purpose shall result in damages assessed at the full contract compensation to the State payable within 90 days of notice by the Contractor.

4.  Section III., C., <u>Submission of Invoice(s)</u>, is hereby revised to read:

    III.  C.  <u>Submission of Invoice(s)</u>

    The Contractor agrees to request compensation on a semi-monthly basis for services rendered through submission to the Department of a properly completed invoice for each institution/facility serviced within fifteen (15) days following the end of the semi-monthly period for which payment is being requested. The first semi-monthly invoice will cover the 1st through the 15th and will be due by the 25th of the month, and the second semi-monthly invoice will cover the 16th through the end of the month and will be due by the 15th of the following month. The Contractor shall submit invoices pertaining to this Contract to the Contract Manager. Invoices will be reviewed and approved by the Contract Manager and then forwarded to the appropriate Financial Services' Office for further processing of payment. The Contractor's invoice shall include the Contractor's name, mailing address, and tax ID number/FEIN as well as the Contract Number and date services provided. Every invoice must be accompanied by the appropriate supporting documentation as indicated in Section III., D., Supporting Documentation for Invoice.

5. Section III., D., <u>Supporting Documentation for Invoice</u>, is hereby revised to read:

III.   D.   Supporting Documentation for Invoice

Invoices must be submitted in detail sufficient for a proper preaudit and postaudit thereof. The Contractor shall provide a semi-monthly summary report as an attachment to the semi-monthly invoice. **Invoices will only be approved after receipt of the required invoice supporting documentation.**

Services will be considered complete and certified as payable when the required monthly report for the previous semi-monthly period (1st through the 15th or the 16th through the end of the month) has been received. If the report is not received, payment for services provided will be withheld until the report is received.

6. Section III., K., <u>Final Invoice</u>, is hereby revised to read:

III.   K.   Final Month Invoices

The Contractor shall submit the final invoices for payment to the Department no more than forty-five (45) days after acceptance of the final deliverable by the Department or the end date of this Contract, whichever occurs last. If the Contractor fails to do so, all right to payment is forfeited, and the Department will not honor any request submitted after aforesaid time period. Any payment due under the terms of the Contract may be withheld until all applicable deliverables and invoices have been accepted and approved by the Department.

---

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

---

CONTRACT #C2757
AMENDMENT #2

All other terms and conditions of the original Contract and any previous amendments remain in full force and effect.

This Amendment shall begin on the date on which it is signed by both parties.

IN WITNESS THEREOF, the parties hereto have caused this Amendment to be executed by their undersigned officials as duly authorized.

**CONTRACTOR:**
**CORIZON, INC.**

SIGNED BY: *Stuart K Campbell*

NAME: *Stuart K. Campbell*

TITLE: *President & COO*

DATE: *10/1/13*

FEID #: *43/281312*

**DEPARTMENT OF CORRECTIONS**

SIGNED BY: _____

NAME: Michael D. Crews

TITLE: Secretary
Department of Corrections

DATE: *10/15/13*

**Approved as to form and legality, subject to execution.**

SIGNED BY: *Dorothy M Ridgway*

NAME: Jennifer A. Parker

TITLE: **General Counsel**
**Department of Corrections**

DATE: *10/7/13*

*TQB 10/7/13*

**CONTRACT #C2757**
**AMENDMENT #3**

## CONTRACT AMENDMENT BETWEEN

## THE FLORIDA DEPARTMENT OF CORRECTIONS

## AND

## CORIZON, LLC

This is an Amendment to the Contract between the Florida Department of Corrections ("Department") and Corizon, LLC ("Contractor") to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

This Amendment:

- Changes the name of the Contractor;
- Revises Section III., E., Official Payee;
- Revises Section IV., A., Department's Contract Manager;
- Revises Section IV., C., Contractor's Representative;
- Revises Section VII., D., Sponsorship; and
- Revises Attachment #1, Business Associate Agreement, first paragraph.

|  |  |
|---|---|
| Original contract period: | October 15, 2012 through September 30, 2017 |
| Amendment #1 | July 11, 2013 through June 30, 2018 |
| Amendment #2 | October 15, 2013 through June 30, 2018 |

In accordance with Section V., CONTRACT MODIFICATION; the following changes are hereby made:

1. The Contractor's name is hereby changed to Corizon, LLC ("Contractor") (formerly Corizon, Inc.). Corizon, LLC, is hereafter substituted throughout the contract as "Contractor" as if so originally named.

2. Section III., E., Official Payee, is hereby revised to read:

   III.   E.   Official Payee

   The name and address of the official payee to whom payment shall be made is as follows:

   Corizon, LLC
   105 Westpark Drive, Suite 200
   Brentwood, Tennessee 37027

3. Section IV., A., Department's Contract Manager, is hereby revised to read:

   IV.   A.   Department's Contract Manager

CONTRACT #C2757
AMENDMENT #3

The Contract Manager for this Contract will be:

David Randall, OMC Manager – Health Services Operations
Office of Health Services-Administration
Florida Department of Corrections
501 South Calhoun Street
Tallahassee, Florida 32399-2500
Telephone: (850) 717-3279
Fax: (850) 922-6015
Email: Randall.David@mail.dc.state.fl.us

The Contract Manager will perform the following functions:

1. maintain a contract management file;
2. serve as the liaison between the Department and the Contractor;
3. evaluate the Contractor's performance;
4. direct the Contract Administrator to process all amendments, renewals, and termination of this Contract; and
5. evaluate Contractor performance upon completion of the overall Contract; this evaluation will be placed on file and will be considered if the Contract is subsequently used as a reference in future procurements.

The Contract Manager may delegate the following functions to the Local Contract Coordinator:

1. verify receipt of deliverables from the Contractor;
2. monitor the Contractor's performance; and
3. review, verify, and approve invoices from the Contractor.

The Local Contract Coordinator for this Contract will be:

Laura Carter, Operations Review Specialist
Office of Health Services-Administration
Florida Department of Corrections
501 South Calhoun Street
Tallahassee, Florida 32399-2500
Telephone: (850) 717-3265
Fax: (850) 487-8082
Email: carter.laura@mail.dc.state.fl.us

4. Section IV., C., Contractor's Representative, is hereby revised to read:

IV.   C.   Contractor's Representative

The name, title, address, and telephone number of the Contractor's representative responsible for administration and performance under this Contract is:

JM Courtney, Sr. Vice President State Corrections
Corizon, LLC
12647 Olive Boulevard
St. Louis, Missouri 63141

Telephone: (314) 919-9103
Fax: (314) 919-8908
Email: JM.Courtney@CorizonHealth.com

5.  Section VII., D., Sponsorship, is hereby revised to read:

VII.    D.      Sponsorship

If the Contractor is a nongovernmental organization which sponsors a program financed partially by State funds, including any funds obtained through this Contract, it shall, in publicizing, advertising, or describing the sponsorship of the program, state: "Sponsored by Corizon, LLC, and the State of Florida, Department of Corrections." If the sponsorship reference is in written material, the words "State of Florida, Department of Corrections" shall appear in the same size letters or type as the name of the organization.

6.  Attachment #1, Business Associate Agreement, first paragraph, is hereby revised to read:

This Business Associate Agreement supplements and is made a part of this Agreement between the Florida Department of Corrections ("Department") and Corizon, LLC ("Contractor"), (individually, a "Party" and collectively referred to as "Parties").

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

CONTRACT #C2757
AMENDMENT #3

All other terms and conditions of the original Contract and any previous amendments remain in full force and effect.

This Amendment shall begin on the date on which it is signed by both parties.

IN WITNESS THEREOF, the parties hereto have caused this Amendment to be executed by their undersigned officials as duly authorized.

**CONTRACTOR:**
**CORIZON, LLC**

SIGNED
BY: _____

NAME: Woodrow A Myers MD

TITLE: CEO

DATE: 3/11/14

FEID #: 43-1281312

**DEPARTMENT OF CORRECTIONS**

SIGNED
BY: _____

NAME: Michael D. Crews

TITLE: Secretary
Department of Corrections

DATE: 4/4/14

Approved as to form and legality, subject to execution.

SIGNED
BY: _____

NAME: Jennifer A. Parker

TITLE: General Counsel
Department of Corrections

DATE: 3/20/14

## CONTRACT AMENDMENT BETWEEN

## THE FLORIDA DEPARTMENT OF CORRECTIONS

## AND

## CORIZON, LLC

This is an Amendment to the Contract between the Florida Department of Corrections ("Department") and Corizon, LLC ("Contractor") to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

This Amendment:

- Revises Section III., A., Payment, #1.

| | |
|---|---|
| Original contract period: | October 15, 2012 through September 30, 2017 |
| Amendment #1: | July 11, 2013 through June 30, 2018 |
| Amendment #2: | October 15, 2013 through June 30, 2018 |
| Amendment #3: | April 4, 2014 through June 30, 2018 |

In accordance with Section V., CONTRACT MODIFICATION; the following changes are hereby made:

1. Section III., A., Payment, #1, is hereby revised to read:

   III.   A.   Payment

   1. The Department will compensate the Contractor on a semi-monthly basis (the first semi-monthly invoice will cover the 1st through the 15th and the second semi-monthly invoice will cover the 16th through the last day of the month), for the provision of comprehensive healthcare services as specified in Section II., Scope of Service, at the **Single Capitation Rate of $8.4965 Per-Inmate, Per Day (Unit Price)** times the average semi-monthly number of inmates for that period, times the number of days in the semi-monthly period. This capitation rate is broken down as follows:

      - For the provision of comprehensive healthcare services, at the **Single Capitation Rate of $8.4816 Per-Inmate, Per Day (Unit Price)**; and

      - For the cost of a performance bond, at the **Single Capitation Rate of $0.0149 Per-Inmate, Per Day (Unit Price)**.

      The average semi-monthly number of inmates will be determined by the Department's official Semi-Monthly Average Daily Population (ADP) report.

CONTRACT #C2757
AMENDMENT #4

Payment for each facility shall begin at 12:01 a.m. on the implementation date contingent upon actual implementation of services. The Department requires a consolidated, single invoice, on a semi-monthly billing cycle for services performed.

Adjustments will be made on the second semi-monthly invoice of the month for costs defined as payable by the Contractor which have been paid by the Department or costs defined as payable by the Department which have been paid by the Contractor. Such adjustments will be added or deducted to the subsequent second semi-monthly payment of each month after reconciliation between the Department and the Contractor.

This Contract does not include the Pharmaceutical Services component; therefore, the Departments' cost of all non-formulary pharmaceuticals and emergency pharmaceuticals filled at local pharmacies will be adjusted from the second semi-monthly payment. If, according to the request for proposals, Pharmaceutical Services are added to the Contract at a later date, the per diem rate will be increased by the amount that was included in the Contractors price proposal.

The cost of the Health Services Contract Monitors will be a deduction from the second semi-monthly management payment to the Contractor. The actual cost for such deductions will be based upon the appropriated rate, salary and expense dollars for the function.

The last two payments of the Contract will be withheld until all pending adjustments including those provided for in Section II., DD., of this Contract, have been determined and reconciled.

The Contractor verifies that they shall not dispute or refuse acceptance of any inmate assignment based on any medical and/or mental health condition(s). Furthermore, except as outlined in Section III., A., 2., CPI Adjustments, no additional compensation shall be granted to the Contractor unless the conditions under Chapter 287, Florida Statutes has been satisfactorily met and/or allowed. The Contractor agrees that they shall not terminate the Contract during the initial period based upon monetary losses and acknowledges that termination for this purpose shall result in damages assessed at the full contract compensation to the State payable within 90 days of notice by the Contractor.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

CONTRACT #C2757
AMENDMENT #4

All other terms and conditions of the original Contract and any previous amendments remain in full force and effect.

This Amendment shall begin on the date on which it is signed by both parties.

IN WITNESS THEREOF, the parties hereto have caused this Amendment to be executed by their undersigned officials as duly authorized.

**CONTRACTOR:**
**CORIZON, LLC**

SIGNED BY:

NAME: J M Courtney

TITLE: CCO - Southeast

DATE: 26 June 14

FEID #: 43-1281312

**DEPARTMENT OF CORRECTIONS**

SIGNED BY:

NAME: Michael D. Crews

TITLE: Secretary
Department of Corrections

DATE: 6/30/14

Approved as to form and legality, subject to execution.

SIGNED BY:

NAME: Jennifer A. Parker

TITLE: General Counsel
Department of Corrections

DATE: 6/30/14

CONTRACT #C2757
AMENDMENT #5

## CONTRACT AMENDMENT BETWEEN

## THE FLORIDA DEPARTMENT OF CORRECTIONS

## AND

## CORIZON, LLC

This is an Amendment to the Contract between the Florida Department of Corrections ("Department") and Corizon, LLC ("Contractor") to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

In accordance with Section V., CONTRACT MODIFICATION; the following changes are hereby made:

This contract is hereby amended as follows:

1. Section III, **COMPENSATION**, subsection A Payment is amended to add paragraph 3. as follows:

> 3. The Contractor waives and relinquishes its right of Termination at Will under VI. **TERMINATION** subsection A, from August 1, 2014 through June 30, 2015, provided however, if any requested consumer price index adjustment pursuant to section III.A.2 during the 2015 regular legislative session is not appropriated, the Contractor may terminate at will with 120 days notice from the conclusion of the 2015 legislative session through June 30, 2015.

> From August 1, 2014 through June 30, 2015, the limitation of the following sentence of section III.A.2 shall be inapplicable in its entirety:
> *However, the amount of the increase may not exceed the adjusted medical services CPI for the 12-month period ended June 30 of the same year.*

> The Contractor also agrees that beginning October 1, 2014 through June 30, 2015, any Department audit under EE. Contractor's Performance with results that fail to achieve compliance with the performance standards in a minimum of 80% of the applicable performance measures will result in a reduction of the payment of the second monthly invoice of $2,500 per audit. This reduction will apply to each institutional health services unit, including main units and annexes.

In consideration of the above, the Department agrees to pay the Contractor $2,900,000, the first $1,450,000 of which will be payable in 5 equal monthly installments beginning August 1, 2014, and ending December 1, 2014, and the remainder in 6 equal monthly installments beginning January 1, 2015 and ending June 1, 2015.   The second monthly invoice will be reduced based on the difference in the June 30, 2014 actual population and end of the month average daily population (ADP) times the single capitation rate times the total days in the month.  This deduction is required because the increased population is included in the amount paid on the second monthly invoice.

All other terms and conditions of the original Contract and any previous amendments remain in full force and effect.

This Amendment shall begin on the date on which it is signed by both parties.

IN WITNESS THEREOF, the parties hereto have caused this Amendment to be executed by their undersigned officials as duly authorized.

CONTRACTOR:
CORIZON, LLC

SIGNED BY: _____

NAME: J M Courtney

TITLE: Chief Operating Officer, SE Region

DATE: 24 July 14

FEIN NO. 43 / 2 8 / 3 / 2

| FLORIDA DEPARTMENT OF CORRECTIONS | Approved as to form and legality subject to execution. |
|---|---|
| SIGNED BY: | SIGNED BY: |
| NAME:    Michael D. Crews | NAME:    Jennifer A. Barker |
| TITLE:    Secretary Department of Corrections | TITLE:    General Counsel Department of Corrections |
| DATE: 7/29/14 | DATE: 7/25/2014 |

CONTRACT #C2757
AMENDMENT #6

## CONTRACT AMENDMENT BETWEEN

## THE FLORIDA DEPARTMENT OF CORRECTIONS

## AND

## CORIZON, LLC

This is an Amendment to the Contract between the Florida Department of Corrections ("Department") and Corizon, LLC ("Contractor") to provide Comprehensive Healthcare Services to the Department's inmates in Regions I, II, and the following institutions in Region III: Avon Park CI, Central Florida Reception Center (CFRC), Hernando CI, Lake CI, Polk CI, Sumter CI, and Zephyrhills CI, and their assigned satellite facilities, including annexes, work camps, road prisons and work release centers.

This Amendment:

- Revises Section entitled "WITNESSETH", to add sixth paragraph;
- Revises Section III., A., Payment, #1; and
- Adds Section VII., FF., Cooperation with the Inspector General.

| Original contract period: | October 15, 2012 through September 30, 2017 |
| Amendment #1: | July 11, 2013 through June 30, 2018 |
| Amendment #2: | October 15, 2013 through June 30, 2018 |
| Amendment #3: | April 4, 2014 through June 30, 2018 |
| Amendment #4: | June 30, 2014 through June 30, 2018 |
| Amendment #5: | July 29, 2014 through June 30, 2018 |

In accordance with Section V., CONTRACT MODIFICATION; the following changes are hereby made:

1. Section entitled "WITNESSETH", sixth paragraph, is hereby added:

    Whereas the Legislature in the Department's Fiscal Year 2015-16 Legislative Budget provided for a price level increase to the health services general revenue fund, which was authorized effective July 1, 2015.

2. Section III., A., Payment, #1, is hereby revised to read:

    III.    A.    Payment

    1.  The Department will compensate the Contractor on a semi-monthly basis (the first semi-monthly invoice will cover the 1st through the 15th and the second semi-monthly invoice will cover the 16th through the last day of the month), for the provision of comprehensive healthcare services as specified in Section II., Scope of Service, at the following rates:

| Rate Period | Capitation Rate Per-Inmate Per Day (Unit Price) |
|---|---|
| October 15, 2012 – June 30, 2014 | $8.4760 |
| July 1, 2014 through June 30, 2015 | $8.4965 |
| July 1, 2015 through June 30, 2016 (rate adjusted to account for leap year) | $8.5391 |
| July 1, 2016 through June 30, 2018 | $8.5392 |

The **Capitation Rate** is payable **Per-Inmate, Per Day (Unit Price)** times the average semi-monthly number of inmates for that period, times the number of days in the semi-monthly period. The Capitation Rate includes the cost of a performance bond, at the Single Capitation Rate of $0.0149 Per-Inmate, Per Day (Unit Price).

In addition, for Fiscal Year 2015/2016, the Department will pay the Contractor $507,690. This amount will be payable on the second semi-monthly invoice in 12 equal monthly installments beginning July 1, 2015 and ending June 1, 2016.

The average semi-monthly number of inmates will be determined by the Department's official Semi-Monthly Average Daily Population (ADP) report. Payment for each facility shall begin at 12:01 a.m. on the implementation date contingent upon actual implementation of services. The Department requires a consolidated, single invoice, on a semi-monthly billing cycle for services performed.

Adjustments will be made on the second semi-monthly invoice of the month for costs defined as payable by the Contractor which have been paid by the Department or costs defined as payable by the Department which have been paid by the Contractor. Such adjustments will be added or deducted to the subsequent second semi-monthly payment of each month after reconciliation between the Department and the Contractor.

This Contract does not include the Pharmaceutical Services component; therefore, the Departments' cost of all non-formulary pharmaceuticals and emergency pharmaceuticals filled at local pharmacies will be adjusted from the second semi-monthly payment. If, according to the request for proposals, Pharmaceutical Services are added to the Contract at a later date, the per diem rate will be increased by the amount that was included in the Contractors price proposal.

The cost of the Health Services Contract Monitors will be a deduction from the second semi-monthly management payment to the Contractor. The actual cost for such deductions will be based upon the appropriated rate, salary and expense dollars for the function.

The last two payments of the Contract will be withheld until all pending adjustments including those provided for in Section II., DD., of this Contract, have been determined and reconciled.

The Contractor verifies that they shall not dispute or refuse acceptance of any inmate assignment based on any medical and/or mental health condition(s). Furthermore, except as outlined in Section III., A., 2., CPI Adjustments, no additional compensation shall be granted to the Contractor unless the conditions under Chapter

CONTRACT #C2757
AMENDMENT #6

287, Florida Statutes has been satisfactorily met and/or allowed. The Contractor agrees that they shall not terminate the Contract during the initial period based upon monetary losses and acknowledges that termination for this purpose shall result in damages assessed at the full contract compensation to the State payable within 90 days of notice by the Contractor.

3.  Section VII., FF., Cooperation with Inspector General, is hereby added:

    VII.   FF.   Cooperation with Inspector General

          In accordance with Section 20.055(5), Florida Statutes, the Contractor, and any subcontractor, understands and will comply with its duty to cooperate with the Inspector General in any investigation, audit, inspection, review, or hearing.

All other terms and conditions of the original Contract and any previous amendments remain in full force and effect.

The rates reflected in this Amendment shall become effective on July 1, 2015.

IN WITNESS THEREOF, the parties hereto have caused this Amendment to be executed by their undersigned officials as duly authorized.

**CONTRACTOR:**
**CORIZON, LLC**

SIGNED
BY:

NAME:   Scott A Bowes

TITLE:   President / COO

DATE:   11-9-15

FEID #:   43-1281312

**DEPARTMENT OF CORRECTIONS**

| | | | |
|---|---|---|---|
| SIGNED BY: | | SIGNED BY: | |
| NAME: | Julie L. Jones | NAME: | Kenneth S. Steely |
| TITLE: | Secretary Department of Corrections | TITLE: | General Counsel Department of Corrections |
| DATE: | 12/11/15 | DATE: | 11/20/15 |

**Approved as to form and legality, subject to execution.**

# EXHIBIT – B

## CORIZON, LABS, CLINIC

# BioReference
## L A B O R A T O R I E S

**FINAL REPORT**

<table>
<tr><td>
<strong>D<br>O<br>C<br>T<br>O<br>R</strong><br>
LAFONTANT, RODOLPHE<br>
F7124 - UNION CORRECTIONAL<br>
INST.<br>
7819 N.W. 228TH STREET,<br>
RAIFORD, FL 32026<br>
Acct #: (F7124)        RTG<br>
P: 386-431-2000
</td>
<td>
<strong>P<br>A<br>T<br>I<br>E<br>N<br>T</strong><br>
Winters, Gary<br>
DOB: 11/26/1954 Age: 59 Y Sex: M<br>
U/FL:         Bed:<br>
Rm:<br>
Inmate ID:   081345<br>
Address:,<br>
        , FL<br>
P:
</td>
<td>
<strong>S<br>A<br>M<br>P<br>L<br>E</strong><br>
Specimen ID: 940257422<br>
Date Of Report: 05/03/2014 04:29<br>
Date Collected: 05/02/2014 05:00<br>
Date Received: 05/02/2014 23:08
</td></tr>
</table>

Notes: PATIENT FASTING

## CLINICAL REPORT

### Clinical Abnormalities Summary:
(May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| | | | | |
|---|---|---|---|---|
| HDL CHOL., DIRECT | 35 LO | LDL Cholesterol | 116 HI | |
| HCT | 38.7 LO | Platelet Count | 114 LO | MPV | 12.4 HI |

### -------* CHEMISTRY *--------

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|------|--------|----------|-----------|-------|-----------------|------|
| Total Protein | 7.4 | | 5.9-8.4 | g/dL | 8.1 | 11/12/2013 |
| Albumin | 4.5 | | 3.5-5.2 | g/dL | 4.8 | 11/12/2013 |
| Globulin | 2.9 | | 1.7-3.7 | g/dL | 3.3 | 11/12/2013 |
| A/G Ratio | 1.6 | | 1.1-2.9 | | 1.5 | 11/12/2013 |
| Glucose | 75 | | 70-99 | mg/dL | 81 | 11/12/2013 |
| Sodium | 141 | | 133-145 | mmol/L | 141 | 11/12/2013 |
| Potassium | 4.0 | | 3.3-5.3 | mmol/L | 4.0 | 11/12/2013 |
| Chloride | 104 | | 96-108 | mmol/L | 104 | 11/12/2013 |
| CO2 | 25 | | 22-29 | mmol/L | 23 | 11/12/2013 |
| BUN | 16 | | 6-20 | mg/dL | 9 | 11/12/2013 |
| Creatinine | 1.12 | | 0.90-1.30 | mg/dL | 1.29 | 11/12/2013 |
| e-GFR | 67 | | >60 | mL/min | 57 LO | 11/12/2013 |
| e-GFR, African American | 81 | | >60 | mL/min | 69 | 11/12/2013 |
| BUN/Creat Ratio | 14.3 | | 10.0-28.0 | | 7.0 LO | 11/12/2013 |
| Calcium | 9.3 | | 8.6-10.4 | mg/dL | 9.7 | 11/12/2013 |
| Bilirubin, Total | 0.2 | | 0.1-1.0 | mg/dL | 0.5 | 11/12/2013 |
| Alk Phos | 77 | | 40-156 | U/L | 85 | 11/12/2013 |
| AST | 27 | | <40 | U/L | 38 | 11/12/2013 |
| ALT | 37 | | <41 | U/L | 48 | 11/12/2013 |

L. MELENDEZ<br>
UNION CI/CCC

☐ OK TO FILE M.D. INITIAL _____ DATE _____<br>
☐ FULL CHART FOLLOW UP _____ DATE _____<br>
☐ NO FURTHER ACTION

NOTE: Elevated serum paraproteins, chiefly of the IgM type, may cause interference with direct and total bilirubin assays, and cause a falsely elevated value.

### -* CARDIOVASCULAR/LIPIDS *--

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|------|--------|----------|-----------|-------|-----------------|------|
| Cholesterol | 174 | | <200 | mg/dL | 189 | 11/12/2013 |
| Triglycerides | 116 | | <150 | mg/dL | 159 HI | 11/12/2013 |
| HDL CHOL., DIRECT | | 35 LO | >40 | mg/dL | 36 LO | 11/12/2013 |
| HDL as % of Cholesterol | 20 | | >14 | % | 19 | 11/12/2013 |

Evaluation: AVERAGE RISK

---

Florida Clinical Laboratory<br>
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

Craig Deligdish M.D.<br>
Laboratory Director

Page 1 of   3<br>
Printed 05/05/2014 08:29

BioReference Laboratories is a Florida Clinical Laboratory



**FINAL REPORT**

D
O
C
T
O
R

LAFONTANT, RODOLPHE
F7124 - UNION CORRECTIONAL
INST.
7819 N.W. 228TH STREET,
RAIFORD, FL 32026
Acct #: (F7124)                RTG
P: 386-431-2000

S
A
M
P
L
E
N

Winters, Gary
DOB: 11/26/1954 Age: 59 Y Sex: M
U/FL:          Bed:
Rm:
Inmate ID:      081345
Address:,
                , FL
P:

Specimen ID: 940257422
Date Of Report: 05/03/2014 04:29
Date Collected: 05/02/2014 05:00
Date Received: 05/02/2014 23:08

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Chol/HDL Ratio | 5.0 | | <7.4 | | 5.3 | 11/12/2013 |
| Evaluation: AVERAGE RISK | | | | | | |
| LDL/HDL Ratio | 3.31 | | <3.56 | | 3.36 | 11/12/2013 |
| LDL Cholesterol | | 116 HI | <100 | mg/dL | 121 HI | 11/12/2013 |
| VLDL, CALCULATED | 23 | | 7-32 | mg/dL | 32 | 11/12/2013 |
| ------ * HEMATOLOGY *-------- | | | | | | |
| WBC | 4.96 | | 3.40-11.80 | x10(3)/uL | 5.37 | 11/12/2013 |
| RBC | 4.20 | | 4.20-5.90 | x10(6)/uL | 4.55 | 11/12/2013 |
| HGB | 13.3 | | 12.3-17.0 | gm/dL | 14.3 | 11/12/2013 |
| HCT | | 38.7 LO | 39.3-52.5 | % | 41.5 | 11/12/2013 |
| MCV | 92.1 | | 80.0-100.0 | fL | 91.2 | 11/12/2013 |
| MCH | 31.7 | | 25.0-34.1 | pg | 31.4 | 11/12/2013 |
| MCHC | 34.4 | | 29.0-35.0 | gm/dL | 34.5 | 11/12/2013 |
| RDW | 11.9 | | 10.9-16.9 | % | 12.7 | 11/12/2013 |
| POLYS | 48.0 | | 36.0-78.0 | % | 47.7 | 11/12/2013 |
| LYMPHS | 39.7 | | 12.0-48.0 | % | 40.2 | 11/12/2013 |
| MONOS | 8.9 | | 0.0-13.0 | % | 8.9 | 11/12/2013 |
| EOS | 2.8 | | 0.0-8.0 | % | 3.0 | 11/12/2013 |
| BASOS | 0.4 | | 0.0-2.0 | % | 0.2 | 11/12/2013 |
| IMMATURE GRANULOCYTES | 0.2 | | 0.0-1.6 | % | 0.0 | 11/12/2013 |
| Platelet Count | | 114 LO | 144-400 | x10(3)/uL | 136 LO | 11/12/2013 |
| MPV | | 12.4 HI | 8.2-11.9 | fL | 11.8 | 11/12/2013 |
| ------ * URINALYSIS *-------- | | | | | | |
| Color | YELLOW | | YELLOW, STRAW, AMBER | | YELLOW | 11/12/2013 |
| Character | CLEAR | | CLEAR | | CLEAR | 11/12/2013 |
| Specific Gravity URN | 1.018 | | 1.003 - 1.030 | | 1.015 | 11/12/2013 |
| pH Urine | 5.5 | | 5.0 - 8.0 | | 6.5 | 11/12/2013 |
| Protein, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Glucose, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Ketone, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Urobilinogen Urine | 0.2 | | 0.2 - 1.0 | Units | 0.2 | 11/12/2013 |
| Bilirubin, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Blood, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Nitrites Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Leukocyte Esterase | NEGATIVE | | NEGATIVE | | NEGATIVE | 11/12/2013 |
| Crystals Urine | NONE | | NONE | | NONE | 11/12/2013 |
| Crystal Amt. Urine | NONE | | NONE | | NONE | 11/12/2013 |
| WBC, Urine | 0-4 | | 0-4 | PER HPF | 0-4 | 11/12/2013 |
| RBC, Urine | NONE SEEN | | NONE SEEN | PER HPF | NONE SEEN | 11/12/2013 |

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

BioReference Laboratories is a Florida Clinical Laboratory

Craig Deligdish M.D.
Laboratory Director

Page 2 of
Printed:

□ FULL CHART
□ FOLLOW UP
□ NO FURTHER ACTION
M.D. INITIAL

# BioReference
LABORATORIES

**FINAL REPORT**

| D O C T O R | LAFONTANT, RODOLPHE<br>F7124 - UNION CORRECTIONAL<br>INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)          RTG<br>P: 386-431-2000 | P A T I E N T | Winters, Gary<br>DOB: 11/26/1954 Age: 59 Y Sex: M<br>U/FL:          Bed:<br>Rm:<br>Inmate ID:    081345<br>Address:,<br>, FL<br>P: | S A M P L E | Specimen ID: 940257422<br>Date Of Report: 05/03/2014 04:29<br>Date Collected: 05/02/2014 05:00<br>Date Received: 05/02/2014 23:08 |

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|------|--------|----------|-----------|-------|-----------------|------|
| Epithelial Cells, Ur | NONE | | FEW | | FEW | 11/12/2013 |
| Cast, Hyaline, Urine | 0-4 | | 0-4 | PER LPF | 0-4 | 11/12/2013 |
| Cast, Granular, Urin | NONE SEEN | | 0-1 | PER LPF | NONE SEEN | 11/12/2013 |
| Cast, RBC, Urine | NONE SEEN | | 0-1 | PER LPF | NONE SEEN | 11/12/2013 |
| Bacteria, Urine | NONE | | FEW | | NONE | 11/12/2013 |

R. LAFONTANT, MD
UNION CI/CORIZON

6-6-14

RECEIVED

MAY 08 2014

MEDICAL RECORDS
UNION CI

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

Craig Deligdish M.D.
Laboratory Director

Page 3 of   3
Printed 05/05/2014 08:29

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

**FINAL REPORT**

| | | |
|---|---|---|
| **D O C T O R** | LAFONTANT, RODOLPHE<br>F7124 - UNION CORRECTIONAL<br>INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)      RTG<br>P: 386-431-2000 | **P A T I E N T** Winters, Gary<br>DOB: 11/26/1954 Age: 59 Y Sex: M<br>U/FL:          Bed:<br>Rm:<br>Inmate ID:    081345<br>Address:,   , FL<br><br>P: |

| **S A M P L E** Specimen ID: 940376442 |
|---|
| Date Of Report: 07/23/2014 03:39 |
| Date Collected: 07/22/2014 11:12 |
| Date Received: 07/22/2014 23:04 |

**Notes:** NON FASTING

## CLINICAL REPORT

### Clinical Abnormalities Summary:
(May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| MCHC | 35.4 HI | Platelet Count | 139 LO | MPV | 12.1 HI |
|---|---|---|---|---|---|

------* HEMATOLOGY *--------

| Test | Result | Abnormal | Reference | Units | Previous Result | Previous Date |
|---|---|---|---|---|---|---|
| WBC | 6.46 | | 3.40-11.80 | x10(3)/uL | 4.96 | 05/02/2014 |
| RBC | 4.33 | | 4.20-5.90 | x10(6)/uL | 4.20 | 05/02/2014 |
| HGB | 14.3 | | 12.3-17.0 | gm/dL | 13.3 | 05/02/2014 |
| HCT | 40.4 | | 39.3-52.5 | % | 38.7 LO | 05/02/2014 |
| MCV | 93.3 | | 80.0-100.0 | fL | 92.1 | 05/02/2014 |
| MCH | 33.0 | | 25.0-34.1 | pg | 31.7 | 05/02/2014 |
| MCHC | | 35.4 HI | 29.0-35.0 | gm/dL | 34.4 | 05/02/2014 |
| RDW | 12.5 | | 10.9-16.9 | % | 11.9 | 05/02/2014 |
| POLYS | 50.4 | | 36.0-78.0 | % | 48.0 | 05/02/2014 |
| LYMPHS | 37.5 | | 12.0-48.0 | % | 39.7 | 05/02/2014 |
| MONOS | 9.0 | | 0.0-13.0 | % | 2.8 | 05/02/2014 |
| EOS | 2.6 | | 0.0-8.0 | % | 0.4 | 05/02/2014 |
| BASOS | 0.3 | | 0.0-2.0 | % | 0.2 | 05/02/2014 |
| IMMATURE GRANULOCYTES | 0.2 | | 0.0-1.6 | % | 114 LO | 05/02/2014 |
| Platelet Count | | 139 LO | 144-400 | x10(3)/uL | 114 LO | 05/02/2014 |
| MPV | | 12.1 HI | 8.2-11.9 | fL | 12.4 HI | 05/02/2014 |

L. MELENDEZ, MD
UNION CI/CORIZON
7-28-14

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

Craig Deligdish M.D.
Laboratory Director

Page 1 of  1
Printed 07/28/2014 10:21

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
### LABORATORIES

**FINAL REPORT**

| DOCTOR | PATIENT | SAMPLE |
|---|---|---|
| MELENDEZ, LINDA<br>F7124 - UNION CORRECTIONAL INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)   FX<br>P: 386-431-2000 | Winters, Gary<br>DOB: 11/26/1954 Age: 59 Y Sex: M<br>U/FL:        Bed:<br>Rm:<br>Inmate ID:     081345<br>Address:,<br>           , FL | Specimen ID: 940442359<br>Date Of Report: 09/03/2014 09:06<br>Date Collected: 09/02/2014 11:41<br>Date Received: 09/02/2014 23:22 |

**RECEIVED**
SEP 04 2014
MEDICAL RECORDS UNION CI

Notes: PATIENT FASTING

## CLINICAL REPORT

### Clinical Abnormalities Summary:
(May not contain all abnormal results; narrative comments may not have abnormal flags. Please review entire report.)

| | | | | | |
|---|---|---|---|---|---|
| Triglycerides | 166 HI | HDL CHOL., DIRECT | 33 LO | LDL/HDL Ratio | 3.73 HI |
| NON-HDL CHOLESTEROL | 156 HI | LDL Cholesterol | 123 HI | VLDL, CALCULATED | 33 HI |
| MCHC | 35.4 HI | Platelet Count | 133 LO | MPV | 12.1 HI |

-------* CHEMISTRY *--------

| Tests | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Total Protein | 7.8 | | 5.9-8.4 | g/dL | 7.4 | 05/02/2014 |
| Albumin | 4.9 | | 3.5-5.2 | g/dL | 4.5 | 05/02/2014 |
| Globulin | 2.9 | | 1.7-3.7 | g/dL | 2.9 | 05/02/2014 |
| A/G Ratio | 1.7 | | 1.1-2.9 | | 1.6 | 05/02/2014 |
| Glucose | 83 | | 70-99 | mg/dL | 75 | 05/02/2014 |
| Sodium | | | 133-145 | mmol/L | 141 | 05/02/2014 |
| Potassium | 3.8 | | 3.3-5.3 | mmol/L | 4.0 | 05/02/2014 |
| Chloride | 103 | | 96-108 | mmol/L | 104 | 05/02/2014 |
| CO2 | 23 | | 22-29 | mmol/L | 25 | 05/02/2014 |
| BUN | 12 | | 6-20 | mg/dL | 16 | 05/02/2014 |
| Creatinine | 1.07 | | 0.90-1.30 | mg/dL | 1.12 | 05/02/2014 |
| e-GFR | 71 | | >60 | mL/min | 67 | 05/02/2014 |
| e-GFR, African American | 86 | | >60 | mL/min | 81 | 05/02/2014 |
| BUN/Creat Ratio | 11.2 | | 10.0-28.0 | | 14.3 | 05/02/2014 |
| Calcium | 9.6 | | 8.6-10.4 | mg/dL | 9.3 | 05/02/2014 |
| Bilirubin, Total | 0.4 | | <1.2 | mg/dL | 0.2 | 05/02/2014 |

NOTE: New reference range for Bilirubin, Total effective 8-22-2014.

| Alk Phos | 84 | | 40-156 | U/L | 77 | 05/02/2014 |
|---|---|---|---|---|---|---|
| AST | 27 | | <40 | U/L | 27 | 05/02/2014 |
| ALT | 35 | | <41 | U/L | 37 | 05/02/2014 |

☐ OK TO FILE   M.D. INITIAL_____ DATE_____
☐ PULL CHART FOLLOW UP_____ DATE_____
☐ NO FURTHER ACTION   M.D. INITIAL_____ DATE_____

NOTE: Elevated serum paraproteins, chiefly of the IgM type, may cause interference with direct and total bilirubin assays, and cause a falsely elevated value.

-* CARDIOVASCULAR/LIPIDS *--

| Cholesterol | 189 | | <200 | mg/dL | 174 | 05/02/2014 |
|---|---|---|---|---|---|---|
| Triglycerides | | 166 HI | <150 | mg/dL | 116 | 05/02/2014 |
| HDL CHOL., DIRECT | | 33 LO | >40 | mg/dL | 35 LO | 05/02/2014 |

Craig Deligdish M.D.
Laboratory Director

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227
BioReference Laboratories is a Florida Clinical Laboratory

# BioReference LABORATORIES

**FINAL REPORT**

| DOCTOR | PATIENT | SAMPLE |
|---|---|---|
| MELENDEZ, LINDA<br>F7124 - UNION CORRECTIONAL INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)   FX<br>P: 386-431-2000 | Winters, Gary<br>DOB: 11/26/1954 Age: 59 Y Sex: M<br>U/FL:       Bed:<br>Rm:<br>Inmate ID:    081345<br>Address:,   , FL<br>P: | Specimen ID: 940442359<br>Date Of Report: 09/03/2014 09:06<br>Date Collected: 09/02/2014 11:41<br>Date Received: 09/02/2014 23:22 |

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| HDL as % of Cholesterol | 17 | | >14 | % | 20 | 05/02/2014 |
| Evaluation: AVERAGE RISK | | | | | | |
| Chol/HDL Ratio | 5.7 | | <7.4 | | 5.0 | 05/02/2014 |
| Evaluation: AVERAGE RISK | | | | | | |
| LDL/HDL Ratio | 3.73 HI | | <3.56 | | 3.31 | 05/02/2014 |
| NON-HDL CHOLESTEROL | 156 HI | | <130 | mg/dL | | 05/02/2014 |
| LDL Cholesterol | 123 HI | | <100 | mg/dL | 116 HI | 05/02/2014 |
| VLDL, CALCULATED | 33 HI | | 7-32 | mg/dL | 23 | 05/02/2014 |
| ------* HEMATOLOGY *-------- | | | | | | |
| WBC | 6.83 | | 3.40-11.80 | x10(3)/uL | 6.46 | 07/22/2014 |
| RBC | 4.33 | | 4.20-5.90 | x10(6)/uL | 4.33 | 07/22/2014 |
| HGB | 14.2 | | 12.3-17.0 | gm/dL | 14.3 | 07/22/2014 |
| HCT | 40.1 | | 39.3-52.5 | % | 40.4 | 07/22/2014 |
| MCV | 92.6 | | 80.0-100.0 | fL | 93.3 | 07/22/2014 |
| MCH | 32.8 | | 25.0-34.1 | pg | 33.0 | 07/22/2014 |
| MCHC | | 35.4 HI | 29.0-35.0 | gm/dL | 35.4 HI | 07/22/2014 |
| RDW | 12.1 | | 10.9-16.9 | % | 12.5 | 07/22/2014 |
| POLYS | 48.8 | | 36.0-78.0 | % | 50.4 | 07/22/2014 |
| LYMPHS | 39.4 | | 12.0-48.0 | % | 37.5 | 07/22/2014 |
| MONOS | 8.9 | | 0.0-13.0 | % | 9.0 | 07/22/2014 |
| EOS | 2.5 | | 0.0-8.0 | % | 2.6 | 07/22/2014 |
| BASOS | 0.3 | | 0.0-2.0 | % | 0.3 | 07/22/2014 |
| IMMATURE GRANULOCYTES | 0.1 | | 0.0-1.6 | % | 0.2 | 07/22/2014 |
| Platelet Count | | 133 LO | 144-400 | x10(3)/uL | 139 LO | 07/22/2014 |
| MPV | | 12.1 HI | 8.2-11.9 | fL | 12.1 HI | 07/22/2014 |



RECEIVED
SEP 04 2014
BY: .....................

S B
10/8/14

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

**Craig Deligdish M.D.**
**Laboratory Director**

Page 2 of 2
Printed 09/04/2014 08:41

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

**FINAL REPORT**

| | |
|---|---|
| **DOCTOR**<br>QUINONEZ, LESTER<br>F7124 - UNION CORRECTIONAL INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)     FX<br>P: (386)431-2000 | **PATIENT**<br>Winters, Gary<br>DOB: 11/26/1954  Age: 60 Y Sex: M<br>U/FL:        Bed:<br>Rm:<br>Inmate ID:    081345<br>Address:,<br>         , FL FL<br>P: |

| **SAMPLE** |
|---|
| Specimen ID: 941014776 |
| Date Of Report: 07/22/2015 03:48 |
| Date Collected: 07/21/2015 08:05 |
| Date Received: 07/21/2015 23:56 |
| *North America Eastern Time* |

**Notes:** PATIENT FASTING

## CLINICAL REPORT

**Clinical Abnormalities Summary:** (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| | | | | |
|---|---|---|---|---|
| BUN/Creat Ratio | 9.7 LO | ALT | 43 HI | |
| HDL CHOL., DIRECT | 31 LO | LDL/HDL Ratio | 3.94 HI | NON-HDL CHOLESTER 150 HI |
| LDL Cholesterol | 122 HI | | | |
| Platelet Count | 119 LO | MPV | 12.4 HI | |
| Crystals Urine | OXALATE * | Crystal Amt. Urine | MODERATE * | |

### -------* CHEMISTRY *--------

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Total Protein | 7.6 | | 5.9-8.4 | g/dL | 7.8 | 09/02/2014 |
| Albumin | 4.4 | | 3.5-5.2 | g/dL | 4.9 | 09/02/2014 |
| Globulin | 3.2 | | 1.7-3.7 | g/dL | 2.9 | 09/02/2014 |
| A/G Ratio | 1.4 | | 1.1-2.9 | | 1.7 | 09/02/2014 |
| Glucose | 72 | | 70-99 | mg/dL | 83 | 09/02/2014 |
| Sodium | 144 | | 135-147 | mmol/L | 144 | 09/02/2014 |
| Potassium | 3.8 | | 3.5-5.5 | mmol/L | 3.9 | 09/02/2014 |
| Chloride | 103 | | 96-108 | mmol/L | 105 | 09/02/2014 |
| CO2 | 27 | | 22-29 | mmol/L | 23 | 09/02/2014 |
| BUN | 11 | | 8-23 | mg/dL | 12 | 09/02/2014 |
| Creatinine | 1.13 | | 0.80-1.30 | mg/dL | 1.07 | 09/02/2014 |
| e-GFR | 66 | | >60 | mL/min | 71 | 09/02/2014 |
| e-GFR, African American | 80 | | >60 | mL/min | 86 | 09/02/2014 |
| BUN/Creat Ratio | | 9.7 LO | 10.0-28.0 | | 11.2 | 09/02/2014 |
| Calcium | 9.1 | | 8.6-10.4 | mg/dL | 9.6 | 09/02/2014 |
| Bilirubin, Total | 0.6 | | <1.2 | mg/dL | 0.4 | 09/02/2014 |
| Alk Phos | 67 | | 40-156 | U/L | 84 | 09/02/2014 |
| AST | 28 | | <40 | U/L | 27 | 09/02/2014 |
| ALT | | 43 HI | <41 | U/L | 35 | 09/02/2014 |

### -* CARDIOVASCULAR/LIPIDS *--

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Cholesterol | 181 | | <200 | mg/dL | 189 | 09/02/2014 |
| Triglycerides | 142 | | <150 | mg/dL | 166 HI | 09/02/2014 |
| HDL CHOL., DIRECT | | 31 LO | >40 | mg/dL | 33 LO | 09/02/2014 |
| HDL as % of Cholesterol | 17 | | >14 | % | 17 | 09/02/2014 |
| Evaluation: AVERAGE RISK | | | | | | |
| Chol/HDL Ratio | 5.8 | | <7.4 | | | 09/02/2014 |

---

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

James Weisberger M.D.
Laboratory Director

Page 1 of 3
Printed 07/22/2015 06:12

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

**FINAL REPORT**

| | | |
|---|---|---|
| **D O C T O R** | QUINONEZ, LESTER<br><br>F7124 - UNION CORRECTIONAL INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)<br>P: (386)431-2000        FX | |

| **P A T I E N T** | Winters, Gary<br>DOB: 11/26/1954 Age: 60 Y Sex: M<br>U/FL:        Bed:<br>Rm:<br>Inmate ID:    081345<br>Address:,<br>        , FL FL<br>P: |

| **S A M P L E** | Specimen ID: 941014776<br>Date Of Report: 07/22/2015 03:48<br>Date Collected: 07/21/2015 08:05<br>Date Received: 07/21/2015 23:56<br><br>*North America Eastern Time* |

## CLINICAL REPORT

| Test | Result | Abnormal | References | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Evaluation: AVERAGE RISK | | | | | | |
| LDL/HDL Ratio | 3.94 HI | | <3.56 | | 3.73 HI | 09/02/2014 |
| NON-HDL CHOLESTEROL | 150 HI | | <130 | mg/dL | 156 HI | 09/02/2014 |
| LDL Cholesterol | 122 HI | | <100 | mg/dL | 123 HI | 09/02/2014 |
| VLDL, CALCULATED | 28 | | 7-32 | mg/dL | 33 HI | 09/02/2014 |

NOTE: Patients taking N-acetylcysteine (NAC, an OTC mucolytic agent) or acetaminophen in large doses (leading to elevated levels of the metabolite NAPQI) may have falsely low levels of the following analytes in blood or urine due to drug interference: Cholesterol, HDL, LDL, Triglycerides, Uric Acid (serum and urine). (Roche Diagnostics Communication, 5/7/15)

### ------* HEMATOLOGY *--------

| Test | Result | Abnormal | References | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| WBC | 5.56 | | 3.40-11.80 | x10(3)/uL | 6.83 | 09/02/2014 |
| RBC | 4.41 | | 4.20-5.90 | x10(6)/uL | 4.33 | 09/02/2014 |
| HGB | 14.3 | | 12.3-17.0 | gm/dL | 14.2 | 09/02/2014 |
| HCT | 42.4 | | 39.3-52.5 | % | 40.1 | 09/02/2014 |
| MCV | 96.1 | | 80.0-100.0 | fL | 92.6 | 09/02/2014 |
| MCH | 32.4 | | 25.0-34.1 | pg | 32.8 | 09/02/2014 |
| MCHC | 33.7 | | 29.0-35.0 | gm/dL | 35.4 HI | 09/02/2014 |
| RDW | 12.5 | | 10.9-16.9 | % | 12.1 | 09/02/2014 |
| POLYS | 42.2 | | 36.0-78.0 | % | 39.4 | 09/02/2014 |
| LYMPHS | 46.0 | | 12.0-48.0 | % | 8.9 | 09/02/2014 |
| MONOS | 9.0 | | 0.0-13.0 | % | 2.5 | 09/02/2014 |
| EOS | 2.2 | | 0.0-8.0 | % | 0.3 | 09/02/2014 |
| BASOS | 0.4 | | 0.0-2.0 | % | | 09/02/2014 |
| IMMATURE GRANULOCYTES | 0.2 | | 0.0-1.6 | % | | 09/02/2014 |
| Platelet Count | 119 LO | | 144-400 | x10(3)/uL | 133 LO | 09/02/2014 |
| MPV | 12.4 HI | | 8.2-11.9 | fL | 12.1 HI | 09/02/2014 |

### ------* URINALYSIS *--------

| Test | Result | Abnormal | References | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Color | YELLOW | | YELLOW, STRAW, AMBER | | YELLOW | 05/02/2014 |
| Character | CLEAR | | CLEAR | | CLEAR | 05/02/2014 |
| Specific Gravity URN | 1.017 | | 1.003 - 1.030 | | 1.018 | 05/02/2014 |
| pH Urine | 6.0 | | 5.0 - 8.0 | | 5.5 | 05/02/2014 |
| Protein, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 05/02/2014 |
| Glucose, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 05/02/2014 |
| Ketone, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 05/02/2014 |
| Urobilinogen Urine | 0.2 | | 0.2-1.0 | Units | 0.2 | 05/02/2014 |
| Bilirubin, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 05/02/2014 |
| Blood, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 05/02/2014 |

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

James Weisberger M.D.
Laboratory Director

Page 2 of 3
Printed 07/22/2015 06:12

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

**FINAL REPORT**

| | | |
|---|---|---|
| **D O C T O R** | QUINONEZ, LESTER<br><br>F7124 - UNION CORRECTIONAL INST.<br>7819 N.W. 228TH STREET,<br>RAIFORD, FL 32026<br>Acct #: (F7124)          FX<br>P: (386)431-2000 | |

**P A T I E N T**
Winters, Gary
DOB: 11/26/1954  Age: 60 Y Sex: M
U/FL:              Bed:
Rm:
Inmate ID:   081345
Address:,
         , FL FL
P:

**S A M P L E**
Specimen ID: 941014776
Date Of Report: 07/22/2015 03:48
Date Collected: 07/21/2015 08:05
Date Received: 07/21/2015 23:56

*North America Eastern Time*

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Nitrites Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 05/02/2014 |
| Leukocyte Esterase | NEGATIVE | | NEGATIVE | | NONE | 05/02/2014 |
| Crystals Urine | | OXALATE * | NONE | | NONE | 05/02/2014 |
| Crystal Amt. Urine | | MODERATE * | NONE | | NONE | 05/02/2014 |
| WBC, Urine | 0-4 | | 0-4 | PER HPF | 0-4 | 05/02/2014 |
| RBC, Urine | NONE SEEN | | NONE SEEN | PER HPF | NONE SEEN | 05/02/2014 |
| Epithelial Cells, Ur | NONE | | FEW | | NONE | 05/02/2014 |
| Cast, Hyaline, Urine | 0-4 | | 0-4 | PER LPF | NONE SEEN | 05/02/2014 |
| Cast, Granular, Urin | NONE SEEN | | 0-1 | PER LPF | NONE SEEN | 05/02/2014 |
| Cast, RBC, Urine | NONE SEEN | | 0-1 | PER LPF | NONE | 05/02/2014 |
| Bacteria, Urine | FEW | | FEW | | | |

Sb
7/30/11

S. BONGU, MD
UNION CI/CORIZON

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227
BioReference Laboratories is a Florida Clinical Laboratory

**James Weisberger M.D.**
Laboratory Director

Page 3 of 3
Printed 07/22/2015 06:12

FLORIDA DEPARTMENT OF CORRECTIONS
## CHRONIC ILLNESS CLINIC

Clinics:  Respiratory  Endocrine  Miscellaneous  Cardiovascular  Tuberculosis  Immunity  Neurology  (Gastrointestinal)  Oncology

INSTITUTION: Union Correctional_____  DATE: 5/13/14   TIME START: 5:45 pm  TIME STOP: 6:00 pm

**SUBJECTIVE:  Chief complaint:** _"Evaluation"_

c/t denies dist pain is SOB
c/t denies meds side effects
c/t stats ____ w/ex

**Record Review since last CIC visit:** Yes/Labs 5-2-14

CBC - CMP V-4 Lipid - cwa
exact
HDL 35↓
LDL 116 ↑
Platelet 114

| OBJECTIVE: Temp: 98.8 °F | Pulse: 60 /min | Resp: 16 /min | BP: 129/81 | Wgt: 160 |
|---|---|---|---|---|

**Current Medications & Dosage:**
1)
2)
3)
4)  NONE
5)
6)
7)
8)
9)
10)

**OBJECTIVE:**
**General:** AxOx3, no jaundice
**HEENT:** NL, PERRLA, EOMI, no pharw plan
**Neck:** supple, no JVD
**Heart:** RRR no c/w
**Lungs:** CTAx2
**Abd:** soft, NT/ND, no organomegaly
**Ext:** no edema, no cyanosis, peripheral pulses palpable, ____ feet
      ____: no gw edges

**ASSESSMENT:**
① Hep C ⊕ - stable asymptomatic
② Thrombocytopenia (stable 114)
③ Tinea pedis

**CHRONIC ILLNESS EDUCATION**
✓ DISEASE PROCESS
✓ MEDICATION: COMPLIANCE
✓ INSTRUCTIONS/SIDE EFFECTS
✓ DIET/EXERCISE
✓ TREATMENT COMPLIANCE
✓ SMOKING CESSATION
✓ RISK FACTORS/RESTRICTIONS

**PLAN:** Diet & Exercise plan

Orders signed off

Note @ 5/14/14

T. CONROY, LPN
UNION CI
DATE: 5-13-14  ORACLE BIO CORIZON

**Medication:** ketoconazole 2% cream apply tid

**Labs:** CBC - CMP - lipids via ____ cte
       CBC to fu in OPD in 2 months

**Consultations (if needed):** ∅

**EDUCATION GIVEN:**
CARDIOVASCULAR ___ TUBERCULOSIS
RESPIRATORY ___ IMMUNITY
ENDOCRINE ___ NEUROLOGY
MISC. ___ GASTROINTESTINAL
ONCOLOGY ___ KIDNEY

**Other:** Education (value)     fu in OPD in 2 months     RTC 9-12-14
                                                          Fu OPD 8-14-14

**Health Classification Grade reviewed:** Yes  **Follow-up visits:** September 2014   SIGNATURE: ____

Rx to pharmacy
Req to lab.

**SIGNATURE:** ____

STAMP:
L. MENDEZ, MD
UNION CI CORIZON

WINTERS, GARY L
081345          W/M ____
DOB:  11/26/54   NKDA x ____

DC4-701F (Revised 3/8/13) This form is not to be amended, revised, or altered without approval of the Director of Health Services Administration.

FLORIDA DEPARTMENT OF CORRECTIONS
## CHRONIC ILLNESS CLINIC

Clinics:  Respiratory  Endocrine  Miscellaneous  Cardiovascular  Tuberculosis  Immunity  Neurology  (Gastrointestinal)  Oncology

INSTITUTION: _UCI_   DATE: _1 /20 /15_   TIME START: _8:40a_   TIME STOP: _2:30p_

**SUBJECTIVE:** Chief complaint: _Pt refers sleep_
_Well_

**Current Medications & Dosage:**
1) _NONE_
2)
3)
4)
5)
6)
7)
8)
9)
10)

Record Review since last CIC visit: _09-02-14_

_AST = 27 U/L_
_ALT = 33 U/L_

**OBJECTIVE:** Temp: _96.6_ °F   Pulse: _85_ /min   Resp: _16_ /min   BP: _127/89_   Wgt: _160_
General: _aao×3_
HEENT: _PERRL, WNM_
Heart: _Heart Rhino @ NSR_
Lungs: _CTA_
Abd: _Non Distended, No Masses_
Exts: _FROM+, No Swelling or Cyanosis_

**ASSESSMENT:**
_Hep C virus (+)_

### CHRONIC ILLNESS EDUCATION
- DISEASE PROCESS
- MEDICATION COMPLIANCE
- INSTRUCTIONS/SIDE EFFECTS
- DIET/EXERCISE
- TREATMENT COMPLIANCE
- SMOKING CESSATION
- RISK FACTORS/RESTRICTIONS

L. QUINONES, MD
UNION CI/CORIZON   Orders signed off.

**PLAN:**

Medication: _None_

Labs: _Viral Load, Genotype, CBC, CMP, U/A_
_Lipid Panel, TSH, PSA_

Consultations (if needed): _None_

Other: _Education about Condition_

w/AP 1/20/15  1/20/
____ CONROY, LPN
UNION CI/CORIZON
UNION CI/   ORDERS SIGNED OFF
DATE 1/20/15

**EDUCATION GIVEN:**

| | |
|---|---|
| CARDIOVASCULAR | TUBERCULOSIS |
| RESPIRATORY | IMMUNITY |
| ENDOCRINE | NEUROLOGY |
| MISC. | GASTROINTESTINAL |
| ONCOLOGY | KIDNEY |

Health Classification Grade reviewed: _4_   Follow-up visits: _6 month_   SIGNATURE _____

**SIGNATURE:** _____

STAMP  L. QUINONES, MD
UNION CI/CORIZON

8/14/15
RTC 7-2015
Reg to Lab

**WINTERS, GARY L**
081345          W/M
DOB:  11/26/54   NKDA

DC4-701F (Revised 3/8/13)
This form is not to be amended, revised, or altered without approval of the Director of Health Services Administration.

FLORIDA DEPARTMENT OF CORRECTIONS
## CHRONIC ILLNESS CLINIC

Clinics:  Respiratory  Endocrine  Miscellaneous  Cardiovascular  Tuberculosis  Immunity  Neurology  (Gastrointestinal)  Oncology

INSTITUTION: _UCI_   DATE: _8/14/15_   TIME START: _10:30_   TIME STOP: _10:51 A_

**SUBJECTIVE: Chief complaint:** 60 y/o
requests Hep viral
load & genotype test → y
result

**Record Review since last CIC visit:** _1-20-11_
7-22-15
CMP Mild ACT ↑
Lipids Normal
CBC Normal
U/A -ve

| Current Medications & Dosage: |
|---|
| 1) _____ |
| 2) _____ -NONE- _____ |
| 3) _____ |
| 4) _____ |
| 5) _____ |
| 6) _____ |
| 7) _____ |
| 8) _____ |
| 9) _____ |
| 10) _____ |

**OBJECTIVE:**   Temp: _96.9_ °F   Pulse: _63_ /min   Resp: _16_ /min   BP: _129_ / _81_   Wgt: _160_

Alert in no acute distress
Heart: s₁s₂ ⊕
Lungs: clear
Abd: soft nontender B/⊕
Ext: ⊖ edema

**ASSESSMENT:**

Hep C +ve

Thrombocytopenia probably
2° liver disease

**PLAN:** No meds

**Medication:** _____

**Labs:** Hep Viral load / Genotype
CBC (CMP/Lipids) / TSH

**Consultations (if needed):** _____

**Other:** _____

**Health Classification Grade reviewed:** _____   **Follow-up visits:** _6 mo_

### CHRONIC ILLNESS EDUCATION

- DISEASE PROCESS
- MEDICATION: COMPLIANCE
- INSTRUCTIONS/SIDE EFFECTS
- DIET/EXERCISE
- TREATMENT COMPLIANCE
- SMOKING CESSATION
- RISK FACTORS/RESTRICTIONS

(PENDING)

**Orders signed off:**
_8/14/15_       _8/14/15_
UNION CI
**DATE:** _____   **ORDERS SIGNED OFF:**
**EDUCATION GIVEN:**

| | |
|---|---|
| CARDIOVASCULAR | __ TUBERCULOSIS |
| RESPIRATORY | __ IMMUNITY |
| ENDOCRINE | ✓ NEUROLOGY |
| MISC. | ✓ GASTROINTESTINAL |
| ONCOLOGY | __ KIDNEY |

**SIGNATURE:**   S. Bongu

**STAMP:**
S. BONGU, MD
UNION CI/CORIZON

**WINTERS, GARY L**
081345      W/M  _____
DOB: 11/26/54    NKDA  _____

RTC = 2-12-16 = GC = _J. Irwin LPN_
RVN, LPN
Rx to Pharmacy      UNI N I/CORIZON
Req to Lab
Pass for Straw Hat

DC4-701F (Revised 3/8/13)
This form is not to be amended, revised, or altered without approval of the Director of Health Services Administration.

FLORIDA DEPARTMENT OF CORRECTIONS
## CHRONIC ILLNESS CLINIC

Clinics:  Respiratory  Endocrine  Miscellaneous  Cardiovascular  Tuberculosis  Immunity  Neurology  (Gastrointestinal)  Oncology

INSTITUTION: _UCI_  DATE: _2/12/16_  TIME START: _1115_  TIME STOP: _1130_

**SUBJECTIVE: Chief complaint:** _62 y/o of w/o's w/_ _hx of hepatitis C+ refuses to acknowledge_ _requesting information about treatment_ _options_

**Record Review since last CIC visit:** _8/14/15_
_HRV 103_ ...
_350 47 72  GFR 66_
_1.13  5.56 143.3_ _5/17_
_ 42.9 _
_AST 28_
_ALT 43  CHOL 181 TRIG 142  w/her HDL_

| Current Medications & Dosage: |
|---|
| 1) |
| 2) NONE |
| 3) |
| 4) ✓ |
| 5) |
| 6) |
| 7) |
| 8) |
| 9) |
| 10) |

**OBJECTIVE:**  Temp: _98.8_  Pulse: _90_ /min  Resp: _18_ /min  BP: _127/87_  Wgt: _160_
_Gen No acute distress_
_Neuro No focal deficit_  _ALBI - 0.580_
_HEENT WNL_
_Resp WNL_
_Abd soft_
_Ext No edema of extremed_

**ASSESSMENT:**
_Hepatitis C+ (Not treated)_
_Thrombocytopenia c Hepatitis C??_

| CHRONIC ILLNESS EDUCATION | |
|---|---|
| ✓ | DISEASE PROGRESS |
| ✓ | MEDICATION: COMPLIANCE |
| | INSTRUCTIONS/SIDE EFFECTS |
| ✓ | DIET/EXERCISE |
| ✓ | TREATMENT COMPLIANCE |
| ✓ | SMOKING CESSATION |
| ✓ | RISK FACTORS/RESTRICTIONS |

**PLAN:** _Continue monitoring AST/ALT/PLTS labs ordered to_  Orders signed off:
_monitor Hep C status_

**Medication:** ___

**Labs:** _To be drawn in July 2016 before next clinic_

UNION CI ___
DATE _2/14/16_  ORDERS SIGNED OFF: ___
EDUCATION GIVEN:

**Consultations (if needed):** _None_

| | CARDIOVASCULAR | | TUBERCULOSIS |
|---|---|---|---|
| | RESPIRATORY | | IMMUNITY |
| | ENDOCRINE | ✓ | NEUROLOGY |
| | MISC. | ✓ | GASTROINTESTINAL |
| | ONCOLOGY | | KIDNEY |

**Other:** _Counseled On condition, diet and exercise._
_Access sick call if needed_

**Health Classification Grade reviewed:** _2_  **Follow-up visits:** _6 months_  SIGNATURE ___

E. PEREZ-LUGO, MD
CHIEF HEALTH OFFICER
UNION CI/CORIZON

**SIGNATURE:** ___

Inmate Name _Winters, Gary_
DC# _081345_  Race/Sex _WM_
Date of Birth _11-26-54_
Institution _UCI_

_RTC 8-12-16_
_Lab to Lab_
_PRX_

J. HARVEY, LPN
UNION CI/CORIZON

DC4-701F (Revised 3/8/13)
This form is not to be amended, revised, or altered without approval of the Director of Health Services Administration.

# EXHIBIT – C

## CENTURION, LABS, CLINIC

# BioReference
## LABORATORIES

**FINAL REPORT**

| DOCTOR | PATIENT | SAMPLE |
|---|---|---|
| BONGU, SANJEEV<br><br>F7317 - UNION CORRECTIONAL INSTITUTION<br>7819 NW 228TH ST,<br>RAIFORD, FL 32026<br>Acct #: (F7317)     00<br>P: (386)431-4285 | WINTERS, GARY<br>DOB: 11/26/1954  Age: 61 Y  Sex: M<br>U/FL:        Bed:<br>Rm:<br>Patient ID:      081345<br>Address: 7819 NW 228TH ST,<br>         RAIFORD, FL 32026<br>P: | Specimen ID: 941856397<br>Date Of Report: 07/29/2016 15:42<br>Date Collected: 07/26/2016 05:00<br>Date Received: 07/26/2016 23:08<br><br>*North America Eastern Time* |

Notes: PATIENT FASTING

# CLINICAL REPORT

## Clinical Abnormalities Summary:
(May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| | | | |
|---|---|---|---|
| BUN/Creat Ratio | 8.7 LO | PHOSPHORUS | 2.5 LO | |
| HDL CHOL., DIRECT | 32 LO | LDL/HDL Ratio | 3.56 HI | LDL Cholesterol | 114 HI |
| MCHC | 35.4 HI | Platelet Count | 127 LO | MPV | 12.1 HI |
| TSH | 11.370 HI | HEP. A Ab., TOTAL | Reactive * | HEP. B CORE Ab. | Reactive * |
| HEP. B SURF. AB. | Reactive * | HEP. C Ab. | Reactive * | HEP C Ab. (S/CO R>11.00 HI |
| HEP. C RNA, (IU) | 52498 HI | HEP. C RNA, (LOG-10) | 4.72 HI | |

------* CHEMISTRY *--------

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Total Protein | 8.0 | | 5.9-8.4 | g/dL | 7.6 | 07/21/2015 |
| Albumin | 4.7 | | 3.5-5.2 | g/dL | 4.4 | 07/21/2015 |
| Globulin | 3.3 | | 1.7-3.7 | g/dL | 3.2 | 07/21/2015 |
| A/G Ratio | 1.4 | | 1.1-2.9 | | 1.4 | 07/21/2015 |
| Glucose | 86 | | 70-99 | mg/dL | 72 | 07/21/2015 |
| Sodium | 143 | | 135-147 | mmol/L | 144 | 07/21/2015 |
| Potassium | 4.4 | | 3.5-5.5 | mmol/L | 3.8 | 07/21/2015 |
| Chloride | 103 | | 96-108 | mmol/L | 103 | 07/21/2015 |
| CO2 | 29 | | 22-29 | mmol/L | 27 | 07/21/2015 |
| BUN | 10 | | 8-23 | mg/dL | 11 | 07/21/2015 |
| Creatinine | 1.16 | | 0.80-1.30 | mg/dL | 1.13 | 07/21/2015 |
| e-GFR | 68 | | >or=60 | mL/min | 66 | 07/21/2015 |
| e-GFR, African American | 79 | | >or=60 | mL/min | 80 | 07/21/2015 |
| BUN/Creat Ratio | | 8.7 LO | 10.0-28.0 | | 9.7 LO | 07/21/2015 |
| Calcium | 9.4 | | 8.6-10.4 | mg/dL | 9.1 | 07/21/2015 |
| Uric Acid | 7.9 | | 3.4-8.5 | mg/dL | | |
| Iron | 149 | | 45-160 | ug/dL | | |
| Bilirubin, Total | 0.6 | | <1.2 | mg/dL | 0.6 | 07/21/2015 |
| LD | 167 | | 135-225 | U/L | | |
| Alk Phos | 79 | | 40-156 | U/L | 67 | 07/21/2015 |
| AST | 28 | | <40 | U/L | 28 | 07/21/2015 |
| PHOSPHORUS | | 2.5 LO | 2.7-4.5 | mg/dL | | |
| ALT | 36 | | <41 | U/L | 43 HI | 07/21/2015 |
| GGTP | 20 | | 10-71 | U/L | | |

--* CARDIOVASCULAR/LIPIDS *--

| | | | | | | |
|---|---|---|---|---|---|---|
| Cholesterol | 170 | | <200 | mg/dL | 181 | 07/21/2015 |
| Triglycerides | 122 | | <150 | mg/dL | 142 | 07/21/2015 |

G HADDAD, MD
PHYSICIAN
James Weisberger M.D.
Laboratory Director

Page 1 of 5

Printed 08/12/2016 08:33

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227
BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

**FINAL REPORT**

| DOCTOR | PATIENT | SAMPLE |
|---|---|---|
| BONGU, SANJEEV<br><br>F7317 - UNION CORRECTIONAL INSTITUTION<br>7819 NW 228TH ST,<br>RAIFORD, FL 32026<br>Acct #: (F7317)          00<br>P: (386)431-4285 | WINTERS, GARY<br>DOB: 11/26/1954  Age: 61 Y Sex: M<br>U/FL:          Bed:<br>Rm:<br>Patient ID:     081345<br>Address: 7819 NW 228TH ST,<br>             RAIFORD, FL 32026<br>P: | Specimen ID: 941856397<br>Date Of Report: 07/29/2016 15:42<br>Date Collected: 07/26/2016 05:00<br>Date Received: 07/26/2016 23:08<br><br>*North America Eastern Time* |

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| HDL CHOL., DIRECT | | 32 LO | >40 | mg/dL | 31 LO | 07/21/2015 |
| HDL as % of Cholesterol | 19 | | >14 | % | 17 | 07/21/2015 |
| Evaluation: AVERAGE RISK | | | | | | |
| Chol/HDL Ratio | 5.3 | | <7.4 | | 5.8 | 07/21/2015 |
| Evaluation: AVERAGE RISK | | | | | | |
| LDL/HDL Ratio | | 3.56 HI | <3.56 | | 3.94 HI | 07/21/2015 |
| LDL Cholesterol | | 114 HI | <100 | mg/dL | 122 HI | 07/21/2015 |
| VLDL, CALCULATED | 24 | | 7-32 | mg/dL | 28 | 07/21/2015 |
| ------* HEMATOLOGY *-------- | | | | | | |
| WBC | 4.55 | | 3.66-11.99 | x10(3)/uL | 5.56 | 07/21/2015 |
| RBC | 4.53 | | 4.20-5.90 | x10(6)/uL | 4.41 | 07/21/2015 |
| HGB | 14.4 | | 12.3-17.0 | gm/dL | 14.3 | 07/21/2015 |
| HCT | 40.7 | | 39.3-52.9 | % | 42.4 | 07/21/2015 |
| MCV | 89.8 | | 80.0-100.0 | fL | 96.1 | 07/21/2015 |
| MCH | 31.8 | | 25.0-34.1 | pg | 32.4 | 07/21/2015 |
| MCHC | | 35.4 HI | 29.0-35.0 | gm/dL | 33.7 | 07/21/2015 |
| RDW | 11.9 | | 10.9-16.9 | % | 12.5 | 07/21/2015 |
| POLYS | 49.8 | | 36.0-78.0 | % | 46.0 | 07/21/2015 |
| LYMPHS | 39.3 | | 12.0-48.0 | % | 40.4 | 07/21/2015 |
| MONOS | 9.2 | | 0.0-13.0 | % | 2.2 | 07/21/2015 |
| EOS | 1.5 | | 0.0-8.0 | % | 0.4 | 07/21/2015 |
| BASOS | 0.2 | | 0.0-2.0 | % | 0.2 | 07/21/2015 |
| IMMATURE GRANULOCYTES | 0.0 | | 0.0-1.6 | % | 0.2 | 07/21/2015 |
| Platelet Count | | 127 LO | 144-400 | x10(3)/uL | 119 LO | 07/21/2015 |
| MPV | | 12.1 HI | 8.2-11.9 | fL | 12.4 HI | 07/21/2015 |

NOTE: New reference ranges for WBC and Absolute counts are effective 4/25/2016.

| Test | Result | | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| ------* URINALYSIS *-------- | | | | | | |
| Color | YELLOW | | YELLOW, STRAW, AMBER | | YELLOW | 07/21/2015 |
| Character | CLEAR | | CLEAR | | CLEAR | 07/21/2015 |
| Specific Gravity Ur | 1.015 | | 1.003 - 1.030 | | 1.017 | 07/21/2015 |
| pH Urine | 7.0 | | 5.0 - 8.0 | | 6.0 | 07/21/2015 |
| Protein, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/21/2015 |
| Glucose, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/21/2015 |
| Ketone, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/21/2015 |
| Urobilinogen Urine | 0.2 | | 0.2 - 1.0 | mg/dL | 0.2 | 07/21/2015 |
| Bilirubin, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/21/2015 |

C. HADDAD, MD
PHYSICIAN
UNION CI

James Weisberger M.D.
Laboratory Director

Page 2 of 5
Printed 08/12/2016 08:33

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

FINAL REPORT

**DOCTOR**
BONGU, SANJEEV

F7317 - UNION CORRECTIONAL
INSTITUTION
7819 NW 228TH ST,
RAIFORD, FL 32026
Acct #: (F7317)
P: (386)431-4285                00

**SAMPLE / PATIENT**
WINTERS, GARY
DOB: 11/26/1954  Age: 61 Y  Sex: M
U/FL:              Bed:
Rm:
Patient ID:      081345
Address: 7819 NW 228TH ST,
         RAIFORD, FL 32026

P:

Specimen ID: 941856397
Date Of Report: 07/29/2016 15:42
Date Collected: 07/26/2016 05:00
Date Received: 07/26/2016 23:08

*North America Eastern Time*

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result / Date | |
|------|--------|----------|-----------|-------|------------------------|---|
| Blood, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/21/2015 |
| Nitrites Urine | NEGATIVE | | NEGATIVE | | NEGATIVE * | 07/21/2015 |
| Leukocyte Esterase | NEGATIVE | | NEGATIVE | | OXALATE * | 07/21/2015 |
| Crystals Urine | NONE | | NONE | | MODERATE * | 07/21/2015 |
| Crystal Amt. Urine | NONE | | NONE | | 0-4 | 07/21/2015 |
| WBC, Urine | 0-4 | | 0-4 | PER HPF | NONE SEEN * | 07/21/2015 |
| RBC, Urine | NONE SEEN | | NONE SEEN | PER HPF | NONE | 07/21/2015 |
| Epithelial Cells, Ur | NONE | | FEW | | 0-4 | 07/21/2015 |
| Cast, Hyaline, Urine | 0-4 | | 0-4 | PER LPF | NONE SEEN | 07/21/2015 |
| Cast, Granular, Ur | NONE SEEN | | 0-1 | PER LPF | NONE SEEN | 07/21/2015 |
| Cast, RBC, Urine | NONE SEEN | | 0-1 | PER LPF | FEW | 07/21/2015 |
| Bacteria, Urine | NONE | | FEW | | | |

-----* MISCELLANEOUS *------

| | | | | | |
|---|---|---|---|---|---|
| TSH | 10. | 11.370 HI | 0.178-4.530 | uIU/mL | |
| THYROXINE(T4) | 8.6 | | 4.9-12.9 | ug/dL | |
| T3 UPTAKE (T3U) | 27.9 | | 24.3-39.0 | % | |
| FREE T4 INDEX | 2.4 | | 1.5-3.8 | | |
| PSA Total | 0.70 | | <4.00 | ng/mL | |

NOTE: The PSA assay should not be the only test used for diagnostic purposes.
      Additional evaluation using DRE, ultrasound, TUR or similar procedures may
      be used for this purpose. Predictions of disease recurrence should not be
      based solely upon values obtained from serial PSA values obtained on the
      patient.
NOTE: Values obtained with different assay methods or kits cannot be
      used interchangeably.
NOTE: Results cannot be interpreted as absolute evidence of the presence or
      absence of malignant disease.

ASSAY INFORMATION: Method Electrochemiluminescence Immunoassay (Roche Diagnostics)

| | | | |
|---|---|---|---|
| HEP. A Ab., IgM | Non-Reactive | | Non-Reactive |

NOTE: Hep A Ab,IgM is positive or reactive during the acute phase,
      Hep A Ab/Total is positive or reactive during the recovery phase
      or is indicative of a past infection.

| | | | |
|---|---|---|---|
| HEP. A Ab., TOTAL | | Reactive * | Non-Reactive |
| HEP. B CORE Ab. | | Reactive * | Non-Reactive |
| HEP. B SURF. AB. | | Reactive * | Non-Reactive |
| HEP. B SURF. AG | Non-Reactive | | Non-Reactive |
| HEP. C GENOTYPE *NJ1 | Type 1a | | See Below |

NOTE: Hepatitis C genotype was evaluated and its performance characteristics were

C. HADDAD, MD
PHYSICIAN
UNION CI

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

James Weisberger M.D.
Laboratory Director

Page 3 of 5
Printed 08/12/2016 08:33

# BioReference
### L A B O R A T O R I E S

**FINAL REPORT**

**D O C T O R**

BONGU, SANJEEV

F7317 - UNION CORRECTIONAL
INSTITUTION
7819 NW 228TH ST,

RAIFORD, FL 32026
Acct #: (F7317)            00
P: (386)431-4285

**P A T I E N T**

WINTERS, GARY
DOB: 11/26/1954 Age: 61 Y Sex: M
U/FL:               Bed:
Rm:
Patient ID:     081345
Address: 7819 NW 228TH ST,
         RAIFORD, FL 32026

P:

**S A M P L E**

Specimen ID: 941856397
Date Of Report: 07/29/2016 15:42
Date Collected: 07/26/2016 05:00
Date Received: 07/26/2016 23:08

*North America Eastern Time*

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Performing Laboratory |
|------|--------|----------|-----------|-------|----------------------|

determined by BioReference Laboratories. It has not been cleared by the
U.S. Food and Drug Administration. The FDA has determined that such
clearance or approval is not necessary. This test is used for clinical
purposes. It should not be regarded as investigational or for research.
This lab has been approved by CLIA 88 and designated as a high
complexity laboratory and is qualified to perform this test.

NOTE: Hepatitis C Virus Genotype/Subtype assay is able to identify the
      following subtypes:
      1a, 1b, 1a/1b, 1, 2a/2c, 2b, 2, 3a, 3b, 3c, 3,
      3k, 4a/4c/4d, 4b, 4e, 4f, 4h, 4, 5a, 6a/6b, 6 (subtypes c-l)

ASSAY INFORMATION: Test# 2161 (Hepatitis C Genotype) performed using
                   Siemens Versant(R) LiPA Assay.

| | | | | | |
|------|--------|----------|-----------|-------|----------------------|
| HIV Ag/Ab | Non-Reactive | | Non-Reactive | | |

Assay Information: Assay for the detection of HIV p24 antigen
                   and antibodies to Human Immunodeficiency
                   Virus Type 1,including Group O (HIV-1 + "O")
                   and/or Type 2 (HIV-2)
                   Method: Chemiluminescence (Siemens Healthcare
                   Diagnostics)

| | | | | | |
|------|--------|----------|-----------|-------|----------------------|
| HEP. C Ab. | Reactive * | | Non-Reactive | | |

NOTE: Results for Hepatitis C Virus Antibody when reported as
      reactive indicate the presence of significant antibody
      levels as defined as a signal to cutoff ratio [s/co] of
      greater than or equal to 11.00. Sera with a high s/co
      ratio will confirm reactive in >95% of cases. However, <5%
      of results reported as reactive may be false-positives.
      Additional testing is available for patients whose anti-
      HCV result is inconsistent with clinical findings.

| | | | | | |
|------|--------|----------|-----------|-------|----------------------|
| HEP C Ab. (S/CO RATIO) | >11.00 HI | | <0.80 | | |

Hepatitis B Result Interpretation
(for reference use only)

| Marker | LI/EA* | Acute | Past | Chronic | HBV Vacc. |
|--------|--------|-------|------|---------|-----------|
| HBsAg | + | + | - | + | - |
| HBeAg | + | + | - | +/- | - |
| HEP.B.CORE AB,IgM | - | + | - | - | - |
| HEP.B.CORE AB. | - | + | + | + | - |
| HBeAb | - | +/- | +/- | +/- | - |
| HBsAb | +/- | - | + | - | + |

*Late Incubation/Early Acute
NOTE: In remote past infection, HBsAb level may be Negative or

C. HADDAD, MD
PHYSICIAN
UNION CI

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

James Weisberger M.D.
Laboratory Director

Page 4 of 5
Printed 08/12/2016 08:33

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES

**FINAL REPORT**

| | | |
|---|---|---|
| **D O C T O R** | BONGU, SANJEEV<br><br>F7317 - UNION CORRECTIONAL INSTITUTION<br>7819 NW 228TH ST,<br><br>RAIFORD, FL 32026<br>Acct #: (F7317)<br>P: (386)431-4285 | 00 |
| **P A T I E N T** | WINTERS, GARY<br>DOB: 11/26/1954  Age: 61 Y Sex: M<br>U/FL:          Bed:<br>Rm:<br>Patient ID:   081345<br>Address: 7819 NW 228TH ST,<br>         RAIFORD, FL 32026<br><br>P: |
| **S A M P L E** | Specimen ID: 941856397<br>Date Of Report: 07/29/2016 15:42<br>Date Collected: 07/26/2016 05:00<br>Date Received: 07/26/2016 23:08<br><br>*North America Eastern Time* |

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result/Date |
|---|---|---|---|---|---|
| Non-Reactive in some patients. | | | | | |
| ANA SCREEN *NJ1 | Negative | | Neg=<1:80 | | |
| IRON, % SAT. | 42 | | 20-55 | % | |
| TIBC | 352 | | 228-428 | ug/dL | |
| HEP. C RNA, (IU) *NJ1 | 52498 HI | | <15 | IU/mL | |

```
HEP C ULTRAQUANT,RNA TEST CODES 8784/8793 INTERPRETATION

            HEP C (IU/mL)      Interpretation
            <15 ND             Not Detected
            <15 D              Detected
            15->50,000,000     Detected

The COBAS AmpliPrep/COBAS TaqMan HCV Test is not intended for use as
the sole diagnostic test to confirm the presence of HCV infection.

NOTE: Results for Roche COBAS AmpliPrep/TaqMan HEP C Ultrasensitive
      assay reports with a range of <15-50 million IU/mL.
```

| HEP. C RNA, (LOG-10) *NJ1 | 4.72 HI | | <1.18 | log-10 | |

**\*Performing Laboratory Information**

NJ1 - BioReference Laboratories, Inc., 481 Edward H. Ross Dr, Elmwood Park, NJ 07407

APRI

ALT
—— x 1100
TRT

PLT

C HADDAD, MD
PHYSICIAN
UNION CI

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

**James Weisberger M.D.**      Page 5 of 5
**Laboratory Director**    Printed 08/12/2016 08:33

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## L A B O R A T O R I E S
an **OPKO** Health Company

**FINAL REPORT**

**DOCTOR**
PEREZ, ELLIOT

F7317 - UNION CORRECTIONAL
INSTITUTION
7819 NW 228TH ST,
RAIFORD, FL 32026
Acct #: (F7317)          00
P: (386)431-4166

**PATIENT**
WINTERS, GARY
DOB: 11/26/1954  Age: 62 Y  Sex: M
U/FL:          Bed:
Rm:
Patient ID:     081345
Address: 7819 NW 228TH ST,
          RAIFORD, FL 32026
P:

**SAMPLE**
Specimen ID: 942873813
Date Of Report: 10/25/2017 04:22
Date Collected: 10/24/2017 05:00
Date Received: 10/24/2017 23:31

*North America Eastern Time*

Notes: PATIENT FASTING                          ENTERED INTO OBIS

## CLINICAL REPORT

### Clinical Abnormalities Summary:
(May not contain all abnormal results; narrative results may not have abnormal
flags. Please review entire report)

| | | | | | |
|---|---|---|---|---|---|
| BUN/Creat Ratio | 9.7 LO | | | | |
| HDL CHOL., DIRECT | 39 LO | LDL Cholesterol | 117 HI | | |
| HCT | 39.2 LO | Platelet Count | 119 LO | MPV | 12.2 HI |

### --* CHEMISTRY *--

| Test | Results | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Total Protein | 7.8 | | 5.9-8.4 | g/dL | 7.9 | 04/25/2017 |
| Albumin | 4.5 | | 3.6-5.2 | g/dL | 4.7 | 04/25/2017 |
| Globulin | 3.3 | | 1.7-3.7 | g/dL | 3.2 | 04/25/2017 |
| A/G Ratio | 1.4 | | 1.1-2.9 | | 1.5 | 04/25/2017 |
| Glucose | 81 | | 70-99 | mg/dL | 85 | 04/25/2017 |
| Sodium | 140 | | 135-147 | mmol/L | 143 | 04/25/2017 |
| Potassium | 4.3 | | 3.5-5.5 | mmol/L | 4.0 | 04/25/2017 |
| Chloride | 101 | | 96-108 | mmol/L | 103 | 04/25/2017 |
| CO2 | 24 | | 22-29 | mmol/L | 27 | 04/25/2017 |
| BUN | 10 | | 8-23 | mg/dL | 10 | 04/25/2017 |
| Creatinine | 1.03 | | 0.67-1.31 | mg/dL | 1.04 | 04/25/2017 |
| e-GFR | 77 | | >or=60 | mL/min | 77 | 04/25/2017 |
| e-GFR, African American | 89 | | >or=60 | mL/min | 89 | 04/25/2017 |
| BUN/Creat Ratio | 9.7 | 9.7 LO | 10.0-28.0 | | 9.6 LO | 04/25/2017 |
| Calcium | 9.3 | | 8.6-10.4 | mg/dL | 9.7 | 04/25/2017 |
| Uric Acid | 6.8 | | 3.4-8.5 | mg/dL | | |
| Iron | 72 | | 59-158 | ug/dL | | |
| Bilirubin, Total | 1.0 | | <1.2 | mg/dL | 0.5 | 04/25/2017 |
| LD | 180 | | 135-225 | U/L | | |
| Alk Phos | 63 | | 40-156 | U/L | 68 | 04/25/2017 |
| AST | 28 | | <40 | U/L | 25 | 04/25/2017 |
| PHOSPHORUS | 2.7 | | 2.7-4.5 | mg/dL | | |
| ALT | 29 | | <41 | U/L | 30 | 04/25/2017 |
| GGTP | 26 | | 10-71 | U/L | | |

### --* CARDIOVASCULAR/LIPIDS *--

| Test | Results | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Cholesterol | 173 | | <200 | mg/dL | 178 | 04/25/2017 |
| Triglycerides | 86 | | <150 | mg/dL | 146 | 04/25/2017 |
| HDL CHOL., DIRECT | 39 | 39 LO | >40 | mg/dL | 33 LO | 04/25/2017 |
| HDL as % of Cholesterol | 23 | | >14 | % | 18 | 04/25/2017 |

Evaluation: AVERAGE RISK

E. Perez-Lugo M.D
Site Medical Director
Jarrett Weisberger M.D.
Union Laboratory Director

# BioReference
## LABORATORIES
### an OPKO Health Company

**FINAL REPORT**

| | | |
|---|---|---|
| **DOCTOR** PEREZ, ELLIOT<br><br>F7317 - UNION CORRECTIONAL INSTITUTION<br>7819 NW 228TH ST,<br>RAIFORD, FL 32026<br>Acct #: (F7317)    00<br>P: (386)431-4166 | **PATIENT** WINTERS, GARY<br>DOB: 11/26/1954  Age: 62 Y  Sex: M<br>U/FL:      Bed:<br>Rm:<br>Patient ID:   081345<br>Address: 7819 NW 228TH ST,<br>.   RAIFORD, FL 32026<br>P: | **SAMPLE** Specimen ID: 942873813<br>Date Of Report: 10/25/2017 04:22<br>Date Collected: 10/24/2017 05:00<br>Date Received: 10/24/2017 23:31<br><br>*North America Eastern Time* |

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|---|---|---|---|---|---|---|
| Chol/HDL Ratio | 4.4 | | <7.4 | | 5.4 | 04/25/2017 |
| | | | | | | |
| Evaluation: AVERAGE RISK | | | | | | |
| | | | | | | |
| LDL/HDL Ratio | 3.00 | | <3.56 | | 3.52 | 04/25/2017 |
| LDL Cholesterol | 117 | HI | <100 | mg/dL | 116 HI | 04/25/2017 |
| VLDL, CALCULATED | 17 | | 7-32 | mg/dL | 23 | 04/25/2017 |
| ------* HEMATOLOGY *-------- | | | | | | |
| WBC | 8.83 | | 3.66-11.99 | x10(3)/uL | 5.74 | 07/28/2017 |
| RBC | 4.31 | | 4.20-5.90 | x10(6)/uL | 4.30 | 07/28/2017 |
| HGB | 13.6 | | 12.3-17.0 | gm/dL | 13.7 | 07/28/2017 |
| HCT | | 39.2 LO | 39.1-52.5 | % | 38.6 LO | 07/28/2017 |
| MCV | 91.0 | | 80.0-100.0 | fL | 89.8 | 07/28/2017 |
| MCH | 31.6 | | 25.0-34.1 | pg | 31.9 | 07/28/2017 |
| MCHC | 34.7 | | 29.0-35.0 | gm/dL | 35.5 HI | 07/28/2017 |
| RDW | 12.0 | | 10.9-16.9 | % | 12.3 | 07/28/2017 |
| POLYS | 63.4 | | 36.0-78.0 | % | 42.4 | 07/28/2017 |
| LYMPHS | 27.1 | | 12.0-48.0 | % | 46.4 | 07/28/2017 |
| MONOS | 8.4 | | 0.0-13.0 | % | 8.5 | 07/28/2017 |
| EOS | 0.8 | | 0.0-8.0 | % | 2.1 | 07/28/2017 |
| BASOS | 0.2 | | 0.0-2.0 | % | 0.3 | 07/28/2017 |
| IMMATURE GRANULOCYTES | 0.1 | | 0.0-1.6 | % | | 07/28/2017 |
| Platelet Count | | 119 LO | 144-400 | x10(3)/uL | 127 LO | 07/28/2017 |
| MPV | | 12.2 HI | 8.2-11.9 | | | 07/28/2017 |
| ------* URINALYSIS *-------- | | | | | | |
| Color | DK YELLOW | | YELLOW, STRAW, AMBER | | YELLOW | 07/28/2017 |
| Character | CLEAR | | CLEAR | | CLEAR | 07/28/2017 |
| Specific Gravity Ur | 1.016 | | 1.003-1.030 | | 1.012 | 07/28/2017 |
| pH Urine | 6.0 | | 5.0-8.0 | | 6.5 | 07/28/2017 |
| Protein, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Glucose, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Ketone, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Urobilinogen Urine | 0.2 | | 0.2-1.0 | mg/dL | 0.2 | 07/28/2017 |
| Bilirubin, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Blood, Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Nitrites Urine | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Leukocyte Esterase | NEGATIVE | | NEGATIVE | | NEGATIVE | 07/28/2017 |
| Crystals Urine | NONE | | NONE | | NONE | 07/28/2017 |
| Crystals Amt. Urine | NONE | | NONE | PER HPF | NONE | 07/28/2017 |
| WBC, Urine | 0-4 | | 0-4 | | 0-4 | 07/28/2017 |

E. Perez-Lugo M.D.
Site Medical Director
Union CI - Centurion

Florida Clinical Laboratory<br>
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227<br>
James Weisberger M.D.<br>
Laboratory Director<br>
Page 2 of 3<br>
Printed 10/25/2017 08:00<br>
BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
### LABORATORIES
an **OPKO** Health Company

**FINAL REPORT**

**DOCTOR**
PEREZ, ELLIOT

F7317 - UNION CORRECTIONAL INSTITUTION
7819 NW 228TH ST,
RAIFORD, FL 32026
Acct #: (F7317)
P: (386)431-4166                    00

**PATIENT**
WINTERS, GARY
DOB: 11/26/1954   Age: 62 Y  Sex: M
U/FL:              Bed:
Rm:
Patient ID:    081345
Address: 7819 NW 228TH ST,
         RAIFORD, FL 32026

P:

**SAMPLE**
Specimen ID: 942873813
Date Of Report: 10/25/2017 04:22
Date Collected: 10/24/2017 05:00
Date Received: 10/24/2017 23:31

*North America Eastern Time*

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Previous Result | Date |
|------|--------|----------|-----------|-------|-----------------|------|
| RBC, Urine | NONE SEEN | | NONE SEEN | PER HPF | NONE SEEN | 07/28/2017 |
| Epithelial Cells, Ur | NONE | | NONE-FEW | | NONE | 07/28/2017 |
| Cast, Hyaline, Urine | 0-4 | | 0-4 | PER LPF | 0-4 | 07/28/2017 |
| Cast, Granular, Ur | NONE SEEN | | 0-1 | PER LPF | NONE SEEN | 07/28/2017 |
| Cast, RBC, Urine | NONE SEEN | | 0-1 | PER LPF | NONE SEEN | 07/28/2017 |
| Bacteria, Urine | NONE | | NONE-FEW | | NONE | 07/28/2017 |
| ----- * MISCELLANEOUS * ----- | | | | | | |
| Hemoglobin A1C | 5.1 | | <5.7 | % | | |

HEMOGLOBIN A1c AND eAG REFERENCE RANGES

A1c(%)        DIABETES CATEGORY*
<5.7              Normal (non-diabetic)
5.7-6.4           Increased risk of diabetes
=>6.5             Consistent with diabetes

A1c(%)        eAG(ESTIMATED AVERAGE PLASMA GLUCOSE)(mg/dL)
6                 126
7                 154
8                 183
9                 212
10                240
11                269
12                298
*recommended ranges-American Diabetes Association(2010)

NOTE: The amount of glycated hemoglobin as measured by the HbA1c test may be overestimated
      in African Americans and should not be used as the sole parameter of glycemic burden.
      Similarly, hemolysis, genetic hemoglobin variants and chemically modified hemoglobin
      derivatives (as seen in renal failure, smoking, aspirin use) may also affect glycated
      hemoglobin levels.

| TSH | 1.970 | | 0.178-4.530 | UIU/ML | 4.660 HA | 04/28/2017 |

*[signature]* 10/25/17

E. Perez-Lugo M.D.
Site Medical Director
Union CI - Centurion

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

James Weisberger M.D.
Laboratory Director

Page 3 of
Printed 10/25/2017 08:0

# BioReference
### LABORATORIES
an **OPKO** Health Company

**FINAL REPORT**

| PHYSICIAN | PATIENT | SAMPLE |
|---|---|---|
| PEREZ, ELLIOT<br><br>F7317 - UNION CORRECTIONAL INSTITUTION<br>7819 NW 228TH ST,<br>RAIFORD, FL 32026<br>Acct #: (F7317)          00<br>P: (386)431-4166 | WINTERS, GARY<br>DOB: 11/26/1954  Age: 62 Y Sex: M<br>U/FL:          Bed:<br>Rm:<br>Patient ID:    081345<br>Address: 7819 NW 228TH ST,<br>          RAIFORD, FL 32026<br><br>P: | Specimen ID: 942947951<br>Date Of Report: 11/27/2017 11:48<br>Date Collected: 11/22/2017 08:59<br>Date Received: 11/24/2017 21:51<br><br>North America Eastern Time |

Notes: NON FASTING

ENTERED INTO OBIS

## CLINICAL REPORT

## Clinical Abnormalities Summary: (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

UNION C.I.

| APOLIPOPROTEIN A1 | 96 LO |
|---|---|
| ALPHA-2-MACROGLOBULIN | 399 HI |

**------* CHEMISTRY *--------**

| Test | Result | Abnormal | Reference | Units | Rpt Date | Prior Result | Date |
|---|---|---|---|---|---|---|---|
| Bilirubin, Total | 0.3 | | <1.2 | mg/dL | 11/27/17 | 1.0 | 10/24/17 |
| ALT | 20 | | <41 | U/L | 11/27/17 | 20 | 10/24/17 |
| GGTP | 24 | | 10-71 | U/L | 11/27/17 | 26 | 10/24/17 |

**-* CARDIOVASCULAR/LIPIDS *--**

| APOLIPOPROTEIN A1 *NJ1 | | 96 LO | 104-202 | mg/dL | 11/27/17 | | |
|---|---|---|---|---|---|---|---|

**-* FIBROTEST - ACTITEST® *--**

| FIBROSIS SCORE *NJ1 | 0.68 | | | | 11/27/17 |
|---|---|---|---|---|---|
| FIBROSIS STAGE *NJ1 | F3 | | | | 11/27/17 |
| FIBROSIS INTERP *NJ1 | advanced fibrosis | | | | 11/27/17 |
| INFLAMMATION SCORE *NJ1 | 0.13 | | | | 11/27/17 |
| INFLAMMATION STAGE *NJ1 | A0 | | | | 11/27/17 |
| INFLAMMATION INTERP *NJ1 | no activity | | | | 11/27/17 |

FIBROSIS AND NECROINFLAMMATION SCORES AND INTERPRETATIONS

| FibroTest Score | Metavir Score | |
|---|---|---|
| 0.00-0.21 | F0 | no fibrosis |
| 0.22-0.27 | F0-F1 | |
| 0.28-0.31 | F1 | minimal fibrosis |
| 0.32-0.48 | F1-F2 | |
| 0.49-0.58 | F2 | moderate fibrosis |
| 0.59-0.72 | F3 | advanced fibrosis |
| 0.73-0.74 | F3-F4 | |
| 0.75-1.00 | F4 | severe fibrosis |

| ActiTest Score | Metavir Score | |
|---|---|---|
| 0.00-0.17 | A0 | no activity |
| 0.18-0.29 | A0-A1 | |
| 0.30-0.36 | A1 | minimal activity |
| 0.37-0.52 | A1-A2 | |
| 0.53-0.60 | A2 | significant activity |
| 0.61-0.62 | A2-A3 | |

E. L. Toledo
MD
Union CI. Centurion
11/29/17

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227
BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
## LABORATORIES
### an OPKO Health Company

FINAL REPORT

**PHYSICIAN**
PEREZ, ELLIOT

F7317 - UNION CORRECTIONAL
INSTITUTION
7819 NW 228TH ST,
RAIFORD, FL 32026
Acct #: (F7317)                    00
P: (386)431-4166

**PATIENT**
WINTERS, GARY
DOB: 11/26/1954  Age: 62 Y Sex: M
U/FL:            Bed:
Rm:
Patient ID:    081345
Address: 7819 NW 228TH ST,
         RAIFORD, FL 32026

P:

**SAMPLE**
Specimen ID: 942947951
Date Of Report: 11/27/2017 11:48
Date Collected: 11/22/2017 08:59
Date Received:  11/24/2017 21:51

*North America Eastern Time*

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Rpt Date Prior Result Date |
|---|---|---|---|---|---|
| 0.63-1.00 | A3 | severe activity | | | |

Performed By:
BioPredictive
218 Bd Saint-Germain
75007 Paris - France
P: +33 1 84 79 03 07

Precautions:
The reliability of results is dependent on compliance with the preanalytical and analytical conditions recommended
by BioPredictive.
The tests have to be deferred for: acute hemolysis, acute hepatitis, acute inflammation, extrahepatic
cholestasis.
The advice of a specialist should be sought for interpretation in chronic hemolysis and Gilbert's syndrome.
The test interpretation is not validated in liver transplant patients.
Isolated extreme values of one of the components should lead to caution in interpreting the results.
In case of discordance between a biopsy result and a test it is recommended to seek the advice of
a
gastroenterologist.
The causes of these discordances could be due to a flaw in the biopsy (i.e. a liver biopsy has a 25% variability
rate for one fibrosis stage.

Interpretability:
FibroTest(R) is interpretable for chronic Hepatitis B and C, alcoholic and nonalcoholic steatosis (NASH).
ActiTest(R) is interpretable for chronic Hepatitis B and C.

References:
1. Salkic NN, et al. FibroTest/Fibrosure for Significant Liver Fibrosis and Cirrhosis in
   Chronic Hepatitis B: A Meta-Analysis. Am J Gastroenterol 2014;109:796-809.
2. Sebastiani G, et al. The impact of liver disease aetiology and the stages of hepatic fibrosis on the
   performance of non invasive fibrosis markers: an international study of 2411 cases.
   Aliment Pharmacol Ther 2011;34:1202-1216.

----* MISCELLANEOUS *------

| | | | | | |
|---|---|---|---|---|---|
| HAPTOGLOBIN *NJ1 | 92 | | 30-200 | mg/dL | 11/27/17 |
| ALPHA-2-MACROGLOBULIN *NJ1 | | 399 HI | 130-300 | mg/dL | 11/27/17 |

NOTE: Specimen submitted is LIPEMIC. This may cause inaccurate results.
      Please resubmit a fasting specimen at your earliest convenience.

**\*Performing Laboratory Information**

NJ1 - BioReference Laboratories, Inc., 481 Edward H. Ross Dr, Elmwood Park, NJ 07407

E. L. Toledo,
MD
Union C.
11-29-17

James Weisberger M.D. Centurion
Laboratory Director  Page 2 of
                     Printed 11/28/2017 07:5

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
### LABORATORIES
an **OPKO** Health Company

**FINAL REPORT**

| PHYSICIAN | PATIENT | SAMPLE |
|---|---|---|
| PEREZ, ELLIOT<br><br>F7317 - UNION CORRECTIONAL INSTITUTION<br>7819 NW 228TH ST,<br>RAIFORD, FL 32026<br>Acct #: (F7317)          00<br>P: (386)431-4166 | WINTERS, GARY<br>DOB: 11/26/1954  Age: 63 Y Sex: M<br>U/FL:          Bed:<br>Rm:<br>Patient ID:   081345<br>Address: 7819 NW 228TH ST,<br>          RAIFORD, FL 32026<br><br>P: | Specimen ID: 942983077<br>Date Of Report: 12/11/2017 12:24<br>Date Collected: 12/08/2017 05:13<br>Date Received: 12/08/2017 23:03<br><br>North~~EASTERN~~ Eastern Time<br>~~ENTERED INTO OBIS~~ |

Notes: PATIENT FASTING

ENTERED INTO OBIS
DEC 1 2 2017

## CLINICAL REPORT

**Clinical Abnormalities Summary:**   (May not contain all abnormal results; narrative results may not have abnormal flags. Please review entire report.)

| HCT | 38.3 LO | Platelet Count | 128 LO |
|---|---|---|---|
| HEP. C RNA, (IU) | 64800 HI | HEP. C RNA,<br>(LOG-10) | 4.81 HI |

------* CHEMISTRY *--------

| Test | Result | Abnormal | Reference | Units | Rpt Date | Prior Result | Date |
|---|---|---|---|---|---|---|---|
| Total Protein | 7.5 | | 5.9-8.4 | g/dL | 12/11/17 | 7.8 | 10/24/17 |
| Albumin | 4.4 | | 3.5-5.2 | g/dL | 12/11/17 | 4.5 | 10/24/17 |
| Globulin | 3.1 | | 1.7-3.7 | g/dL | 12/11/17 | 3.3 | 10/24/17 |
| A/G Ratio | 1.4 | | 1.2-2.9 | | 12/11/17 | 1.4 | 10/24/17 |
| Glucose | 78 | | 70-99 | mg/dL | 12/11/17 | 81 | 10/24/17 |
| Sodium | 141 | | 136-145 | mmol/L | 12/11/17 | 140 | 10/24/17 |

NOTE: New reference range for Sodium implemented 11/6/17.

| Potassium | 4.6 | | 3.6-5.6 | mmol/L | 12/11/17 | 4.3 | 10/24/17 |

NOTE: New reference range for Potassium implemented 11/6/17.

| Chloride | 105 | | 96-108 | mmol/L | 12/11/17 | 101 | 10/24/17 |
| CO2 | 27 | | 22-29 | mmol/L | 12/11/17 | 24 | 10/24/17 |
| BUN | 12 | | 8-23 | mg/dL | 12/11/17 | 14 | 10/24/17 |
| Creatinine | 1.10 | | 0.67-1.31 | mg/dL | 12/11/17 | 1.03 | 10/24/17 |
| e-GFR | 74 | | >or-60 | mL/min | 12/11/17 | 77 | 10/24/17 |
| e-GFR, African American | 82 | | >or-60 | mL/min | 12/11/17 | 89 | 10/24/17 |
| BUN/Creat Ratio | 10.9 | | 10.0-28.0 | | 12/11/17 | 13.7 (LO) | 10/24/17 |
| Calcium | 9.3 | | 8.6-10.4 | mg/dL | 12/11/17 | 9.3 | 10/24/17 |
| Bilirubin, Total | 0.4 | | <1.2 | mg/dL | 12/11/17 | 0.6 | 10/24/17 |
| Alk Phos | 54 | | 40-156 | U/L | 12/11/17 | 63 | 10/24/17 |
| AST | 23 | | <40 | U/L | 12/11/17 | 20 | 11/22/17 |
| ALT | 29 | | <41 | U/L | 12/11/17 | 20 | 11/22/17 |

------* HEMATOLOGY *--------

| WBC | 5.83 | | 3.66-11.99 | x10(3)/uL | 12/11/17 | 8.83 | 10/24/17 |
| RBC | 4.28 | | 4.20-5.99 | x10(6)/uL | 12/11/17 | 4.32 | 10/24/17 |
| HGB | 13.3 | | 12.3-17.0 | gm/dL | 12/11/17 | 13.6 | 10/24/17 |
| HCT | 38.3 | LO | 38.5-52.0 | % | 12/11/17 | 39.3 (LO) | 10/24/17 |
| MCV | 89.9 | | 80.0-100.0 | fL | 12/11/17 | 91.0 | 10/24/17 |
| MCH | 31.2 | | 26.7-33.7 | pg | 12/11/17 | 31.5 | 10/24/17 |

INCIDENTAL NOTE
CONSULT/LAB/X-RAY/EKG
C. Ibel
ARNP 12/15
UCI - Centurion
REVIEWED: _____

James Weisberger, M.D.
Laboratory Director

Page 1 of 2
Printed 12/11/2017 07:58

Florida Clinical Laboratory
27 E. Hibiscus Blvd Suite C | Melbourne, FL 32901 | (800) 229-5227

BioReference Laboratories is a Florida Clinical Laboratory

# BioReference
### LABORATORIES
#### an **OPKO** Health Company

**FINAL REPORT**

**PHYSICIAN**
PEREZ, ELLIOT

F7317 - UNION CORRECTIONAL
INSTITUTION
7819 NW 228TH ST,
RAIFORD, FL 32026
Acct #: (F7317)                    00
P: (386)431-4166

**PATIENT**
WINTERS, GARY
DOB: 11/26/1954  Age: 63 Y  Sex: M
U/FL:          Bed:
Rm:
Patient ID:  081345
Address: 7819 NW 228TH ST,
         RAIFORD, FL 32026

P:

**SAMPLE**
Specimen ID: 942983077
Date Of Report: 12/11/2017 12:24
Date Collected: 12/08/2017 05:13
Date Received: 12/08/2017 23:03

*North America Eastern Time*

## CLINICAL REPORT

| Test | Result | Abnormal | Reference | Units | Rpt Date | Prior Result | Date |
|------|--------|----------|-----------|-------|----------|--------------|------|
| MCHC | 34.7 | | 29.0-35.0 | gm/dL | 12/11/17 | 34.7 | 10/24/17 |
| RDW | 12.1 | | 10.9-16.9 | % | 12/11/17 | 63.4 | 10/24/17 |
| POLYS | 48.2 | | 36.0-78.0 | % | 12/11/17 | 63.4 | 10/24/17 |
| LYMPHS | 40.3 | | 12.0-48.0 | % | 12/11/17 | 27.7 | 10/24/17 |
| MONOS | 9.1 | | 0.0-13.0 | % | 12/11/17 | 8.4 | 10/24/17 |
| EOS | 2.1 | | 0.0-8.0 | % | 12/11/17 | 0.3 | 10/24/17 |
| BASOS | 0.3 | | 0.0-2.0 | % | 12/11/17 | 0.2 | 10/24/17 |
| IMMATURE GRANULOCYTES | 0.0 | | 0.0-1.0 | % | 12/11/17 | | 10/24/17 |
| Platelet Count | | 128 LO | 144-400 | x10(3)/uL | 12/11/17 | 119 LO | 10/24/17 |
| MPV | 11.8 | | 8.2-14.0 | fL | 12/11/17 | | 10/24/17 |

## -----* MISCELLANEOUS *------

| | | | | | | |
|--|--|--|--|--|--|--|
| HEP C RNA, (IU) *NJ1 | | 64800 HI | <15 | IU/mL | 12/11/17 | |

HEP C ULTRAQUANT, RNA INTERPRETATION

|  | Interpretation |
|--|--|
| HEP-C (IU/mL) | |
| <15 ND | Not Detected |
| <15 D | Detected |
| 15 - >30,000,000 | Detected |

NOTE: The COBAS 8800 HCV Test is not intended for use as the sole
      diagnostic test to confirm the presence of HCV infection.

NOTE: Results for Roche COBAS 8800 HEP C Quantitative assay reports
      with a range of <15-30 million IU/mL.

| | | | | | | |
|--|--|--|--|--|--|--|
| HEP C RNA (LOG10) *NJ1 | | 4.81 HI | <1.18 | log_10 | 12/11/17 | |

**\*Performing Laboratory Information**

NJ1 - BioReference Laboratories, Inc., 481 Edward H. Ross Dr, Elmwood Park, NJ 07407

C. Ibe,
ARNP
UCI - Centurion

INCIDENTAL NOTE
CONSULT / LAB / X-RAY / EKG
REVIEWED: NORMAL
ABNORMAL

FLORIDA DEPARTMENT OF CORRECTIONS

# CHRONIC ILLNESS CLINIC

Circle Clinic(s): Cardiovascular  Endocrine  Gastrointestinal  Immunity  Miscellaneous  Neurology  Oncology  Respiratory  Tuberculosis

INSTITUTION: _UCI_   DATE: _8/12/16_   TIME START: _116_   TIME STOP: _200_

**SUBJECTIVE:** Current complaint related to CIC: _____

_Requesting Hep C Rx_

**Record Review including Labs since last CIC visit:**

_143 / 103 / 10 / 80 \ 40_
_41 / 40 / 127 / 4.4 / 25 / 1.5_
_GLT3_

| Current Medications & Dosage: | exp. |
|---|---|
| 1) Sunblock SPF45 AAD | 8/16 |
| 2) | |
| 3) | |
| 4) | |
| 5) | |
| 6) | |
| 7) | |
| 8) | |
| 9) | |
| 10) | |

**OBJECTIVE:** Temp: _98_ °F   Pulse: _72_ /min   Resp: _14_ /min   BP: _144/88_   Wgt: _158_

OU 20/40   OS 20/50   OD 20/50

HEENT - WNL

lungs - CTA

CV - RRR (M/R/G)

Abd - soft NT ND (+) bowel

Ext - C/C/E

(+) PE

**ASSESSMENT:**

1) THY(prim) - ↑ TSH 11.370 / add 60 mcg synthroid

2) Hx 1° AVB → ✓ EKG

3) Hep C - Pt requesting Rx ē DAA's

4) Derm

**PLAN:** - free peds.

Medication: Anthyroid / Synthroid

Labs: Thyroid panel prn to thy

Consultations (if needed): _____

Other: F/U 1 month

Current Medical Grade: _2_  Schedule next CIC appt. in: 30 60 90 120 180 (days) other: _____

| CHRONIC ILLNESS EDUCATION |
|---|
| DISEASE PROCESS |
| MEDICATION COMPLIANCE |
| INSTRUCTIONS/SIDE EFFECTS |
| DIET/EXERCISE |
| TREATMENT COMPLIANCE |
| SMOKING CESSATION |
| RISK FACTORS/RESTRICTIONS |

Orders signed off
UNION DATE: 8/12/16   ORDERS SIGNED OFF:
EDUCATION GIVEN:

___ CARDIOVASCULAR   ___ TUBERCULOSIS
___ RESPIRATORY   ___ IMMUNITY
X ENDOCRINE   ___ NEUROLOGY
___ MISC.   X GASTROINTESTINAL
___ ONCOLOGY   ___ KIDNEY

SIGNATURE: posted 8/12/16
G. HADDAD, MD
UNION CORRECTIONAL INSTITUTION
CENTURION

SIGNATURE:                          STAMP:
G. HADDAD, MD
PHYSICIAN
UNION CI

Rx → Pharm
lab → lab
R+C FU 9.16 · No labs
RTC ECCC 2.9.17

Inmate Name _Winters G._
DC# _081345_   Race/Sex _Wm_
Date of Birth _11.30.54_
Institution _UCI_

DC4-701F (Revised 11/21/14)
This form is not to be amended, revised, or altered without approval of the Director of Health Services Administration.

**FLORIDA DEPARTMENT OF CORRECTIONS**
**CLINICIAN'S ORDER SHEET**
USE BALL POINT PEN ONLY-PRESS FIRMLY—NO MORE THAN ONE ORDER PER LINE

| Institution: | | Date: | Time: | ☐ Inpatient ☐ Outpatient | Inmate Name |
|---|---|---|---|---|---|

List Allergies Here

DC#: 08345
Dorm:
Diagnosis:

STAT — Initial Each Order as Transcribed

| Date/Time Noted: | Nurse Signature/Stamp | Clinician Signature/Stamp | Date/Time: |
|---|---|---|---|

DC4-714B (Revised 12/20/16)   Distribution: White Original—Pharmacy   Canary—Medical Record

---

**FLORIDA DEPARTMENT OF CORRECTIONS**
**CLINICIAN'S ORDER SHEET**
USE BALL POINT PEN ONLY-PRESS FIRMLY—NO MORE THAN ONE ORDER PER LINE

| Institution: | | Date: | Time: | ☐ Inpatient ☐ Outpatient | Inmate Name |
|---|---|---|---|---|---|

List Allergies Here

WINTERS, GARY
DC#: 08345
Dorm:
Diagnosis:

STAT — Initial Each Order as Transcribed

| Date/Time Noted: | Nurse Signature/Stamp | Clinician Signature/Stamp | Date/Time: |
|---|---|---|---|

DC4-714B (Revised 12/20/16)   Distribution: White Original—Pharmacy   Canary—Medical Record

---

**FLORIDA DEPARTMENT OF CORRECTIONS**
**CLINICIAN'S ORDER SHEET**
USE BALL POINT PEN ONLY-PRESS FIRMLY—NO MORE THAN ONE ORDER PER LINE

| Institution: UCI | | Date: 11-21-17 | Time: 1720 | ☐ Inpatient ☑ Outpatient | Inmate Name Winters, Gary |
|---|---|---|---|---|---|

List Allergies Here

nkda

DC#: 08345
Dorm: SWU H32022
Diagnosis: HCV

STAT — Initial Each Order as Transcribed

Fibrotest/Viral Load 162098

11-21-17

E. Perez J Lugo MD 1700
Site Medical Director
Union - Centurion

| Date/Time Noted: | Nurse Signature/Stamp | Clinician Signature/Stamp | Date/Time: |
|---|---|---|---|

J. Harden,
LPN
Union CI - Centurion

DC4-714B (Revised 12/20/16)   Distribution: White Original—Pharmacy   Canary—Medical Record



## SCHRYVER MEDICAL, LLC

a TridentUSA HEALTH SERVICES company

800-638-3240

### Radiology Interpretation

**PATIENT NAME:** Gary Winters
**DATE OF BIRTH:** 11/26/1954
**ID/MRN:** 081345
**PHYSICIAN:** POLO MD, JOSE
**FACILITY:** UNION C.I. FL00044^MEDICAL^^UNION C.I.&FL00044 RM: MEDICAL , FL
**DATE OF SERVICE:** 05/18/2017 08:53:00
**HISTORY:** Hepatisis Type C Acute,

ABD US(LIM SINGLE ORGAN):
US ABDOMEN LIMITED - LIVER.
COMPARISON: None.
FINDINGS:
The liver shows homogeneous echotexture without focal masses or biliary dilatation.
Normal direction flow in the portal vein.
The common bile duct appears within normal limits.
No evidence of ascites.

**ENTERED**

IMPRESSION:
UNREMARKABLE LIVER ULTRASOUND.

**Electronically Signed By:** Dr. Divyang Patel M.D. 05/19/2017 9:35:37 MDT

This transmission is proprietary, privileged and confidential. It is intended to be communication only for the use of the addressee; access to this message by anyone else is unauthorized. If you are not the intended recipient and have received this communication in error, please notify us immediately. Any other action taken, including but not limited to the disclosure, copying or distribution of this communication is prohibited by law.
Our radiologists interpret only images that are submitted and are not present during examination to visualize performance of the ultrasound study. Therefore, the interpretation is based on correlation between the technologist's impression of the real time examination and the images submitted for interpretation.

J. Polo, MD
ACN 496
Locum PCP
5-31-17

**MobilexUSA**

## ULTRASOUND REPORT

**THIS REPORT IS BASED SOLELY UPON THE ULTRASOUND EXAMINATION.**
**CORRELATION WITH THE CLINICAL EXAMINATION IS ESSENTIAL.**

CONFIDENTIALITY NOTICE: This facsimile (including any accompanying documents) is intended for the use of MobilexUSA or the use of the named addressee(s) to which it is directed, and may contain information that is privileged or otherwise confidential. It is not intended for transmission to, or receipt by, anyone other than the named addressee(s) or person(s) authorized to deliver it to the named addressee(s). If you received this facsimile in error, please report the error by calling the MobilexUSA Privacy Office toll free at 866.686.1717, and providing your name, telephone number and the date. Once you have reported the error, someone from the Privacy Office will contact you within one business day. They may ask you to fax back the information you received so that the company can correct its records and prevent further miscommunication. Please keep the information in a secure place until you are contacted by the Privacy Office and complete the return of the information to that office. Once this is done, please destroy all copies of the mistakenly sent information, without forwarding it. Thank you for your cooperation.

**Facility:** UNION CI - 9949
      25636 NE SR-16
      RAIFORD, FL 32083-0221

**DOS:** 03/20/2018
**Case:** 26333308

**Patient:** WINTERS, GARY       **DOB:** 11/26/1954    **Age:** 63
**Number:** 081345                 **Room:** (MED)

**Examination:**

ABDOMINAL ULTRA LTD (ONE ORGAN

Results: Abdomen Ultrasound Limited: Real-time ultrasound series using hepatitis C protocol. Liver is within normal limits.. AP diameter approximately 11 cm. No focal lesion. Gallbladder is well-distended with no calculi or other intrinsic abnormality. Portal vein shows antegrade hepatopedal flow at 43 cm/s. Portal vein is 8 mm. In diameter. Common duct is 2.2 mm. Inferior vena cava is 1.6 cm. Spleen is homogeneous and 9 cm.

Conclusion: Liver is within normal limits. Portal venous flow is within normal limits. No evidence of portal hypertension. No ascites. Gallbladder within normal limits. Spleen within normal limits.

Electronically signed by IAN A. KELLMAN, M.D 3/22/2018 12:30:13 AM EDT.

**Report by:**       **Date:** 03/22/2018     **Time:** 12:30am ET

IAN KELLMAN, MD/LE

**Physician:** SANJEEV BONGU, MD

E. L. Toledo,
MD
Union CI - Centurion

3.24.18

Please call 1-800-940-0389, option 2, with any questions regarding this report.

South East Region
13773 ICOT BLVD
CLEARWATER, FL 33760
800.940.0389

# EXHIBIT – D

**FDOC HSB 15.03.09, EXCERPT**

HSB 15.03.09
Supplement #3 – Revised 5/2019
Hepatitis C Virus Infection Management

induced oxidative stress and RBC Lysis. Pregnancy testing is required prior to treatment with ribavirin-containing regimen, and thereafter as risk behavior for pregnancy occurs.

## N. POST-TREATMENT MONITORING

1. A post-treatment quantitative HCV-VL assessment will be drawn no earlier than 12 weeks after completion of treatment; and if HCV is undetectable, that defines a sustained viral response (SVR).

2. The following patients who sustain an SVR will remain in the Gastrointestinal Clinic (GC) in order to monitor for cirrhosis, complications or related comorbidities (based on highest pre-treatment F-score): F4 and F3 for continued monitoring of cirrhosis and HCCA surveillance; F2 with co-morbid medical conditions associated with HCV, including cryoglobulinemia with renal disease or vasculitis, certain types of lymphomas, hematologic malignancies or metabolic abnormalities. Co-HIV infection or co-HBV infection.

## O. OTHER HEALTH CARE INTERVENTION RECOMMENDED FOR CIRRHOSIS

1. All patients with cirrhosis shall have additional consultative co-management as follows:

   (a) At first identification of a F4 diagnosis the Platelet/Spleen diameter ratio shall be computed (example: 112,000/131 (mm) = 855). All patients with values <905 shall be referred for EGD for diagnosis of esophageal varices. If varices are present, non-selective beta-blockers to prevent variceal bleeding shall be initiated if not contra-indicated. Alternatively, some selected patients may require banding of varices; however, beta-blocker prophylaxis is preferred and recommended in accordance with AASLD recommendations.

   (b) Patients with decompensated cirrhosis shall be co-managed by a gastroenterologist or hepatologist. Decisions for co-management including ongoing variceal surveillance, antibiotic prophylaxis if risk factors are present for spontaneous bacterial peritonitis, optimized diuretic therapy for ascites, and optimized therapy for hepatic encephalopathy shall be addressed during the consultation.

2. In general, aspirin and NSAIDs should be avoided in advanced liver disease/cirrhosis and METFORMIN should be avoided in decompensated cirrhosis. Other resources should be consulted for more specific recommendations related to management of cirrhosis.

## P. REFERRAL FOR LIVER TRANSPLANTS FOR PATIENTS WITH DECOMPENSATED CIRRHOSIS

1. All patients who have any of the following triggering events will be referred to a Florida liver transplant center for evaluation in accordance with that center's criteria and procedures.

# EXHIBIT – E

**HCV GUIDANCE, EXCERPTS**

The American Association for the Study of Liver Diseases
and the Infectious Diseases Society of America Present

# HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C

Last Updated: September 21, 2017
www.hcvguidelines.org





PL 004947
© 2014-2017 by the American Association for the Study of Liver Diseases and the Infectious Diseases Society of America. All rights reserved.

 

# Introduction

NOTICE: Guidance for hepatitis C treatment in adults is changing constantly with the advent of new therapies and other developments. A static version of this guidance, such as printouts of this website material, booklets, slides, and other materials, may be outdated by the time you read this. We urge you to review this guidance on this website (www.hcvguidelines.org) for the latest recommendations.

The landscape of treatment for hepatitis C virus (HCV) infection has evolved substantially since the introduction of highly effective HCV protease inhibitor therapies in 2011. The pace of change has increased rapidly, as numerous new drugs with different mechanisms of action have become available over the past few years and several more are expected to be approved in the future. To provide healthcare professionals with timely guidance as new therapies are available and integrated into HCV regimens, the Infectious Diseases Society of America (IDSA) and American Association for the Study of Liver Diseases (AASLD), developed a web-based process for the rapid formulation and dissemination of evidence-based, expert-developed recommendations for hepatitis C management.

The AASLD/IDSA guidance on hepatitis C addresses management issues ranging from testing and linkage to care, the crucial first steps toward improving health outcomes for HCV-infected persons, to the optimal treatment regimen in particular patient situations. Recommendations are based on evidence and are rapidly updated as new data from peer-reviewed evidence become available. For each treatment option, recommendations reflect the best possible management for a given patient and a given point of disease progression. Recommendations are rated with regard to the level of the evidence and strength of the recommendation. The AASLD/IDSA guidance on hepatitis C is supported by the membership-based societies and not by pharmaceutical companies or other commercial interests. The boards of directors of AASLD and IDSA have appointed an oversight committee of 4 co-chairs and have selected panel members from the societies.

This guidance should be considered a living document in that the guidance will be updated frequently as new information and treatments become available. This continually evolving report provides guidance on FDA-approved regimens. At times, it may also recommend off-label use of certain drugs or tests, or provide guidance for regimens not yet approved by FDA. Readers should consult prescribing information and other resources for further information. Of note, the choice of treatment may, in the future, be further guided by data from cost-effectiveness studies.

**Last update:** September 21, 2017

AASLD   IDSA
Methods
From www.HCVGuidance.org on September 21, 2017

# Methods

The guidance was developed by a panel of HCV experts in the fields of hepatology and infectious diseases, using an evidence-based review of information that is largely available to healthcare practitioners. The process and detailed methods for developing the guidance are detailed in Methods Table 1. Recommendations were rated according to the strength of the recommendation and quality of the supporting evidence (see Methods Table 2). Commonly used abbreviations are expanded in Methods Table 3.

The panel regularly reviews available data and decides whether a regimen should be classified as recommended, alternative, or not recommended for a particular subgroup of patients. Recommended regimens are those that are favored for most patients in that subgroup, based on optimal efficacy, favorable tolerability and toxicity profiles, duration, and pill burden. Alternative regimens are those that are effective but, relative to recommended regimens, have potential disadvantages, limitations for use in certain patient populations, or less supporting data than recommended regimens. In certain situations, an alternative regimen may be an optimal regimen for a specific patient situation. Not recommended regimens are clearly inferior compared to recommended or alternative regimens due to factors such as lower efficacy, unfavorable tolerability and toxicity, longer duration, and/or higher pill burden. Unless otherwise indicated, such regimens should not be administered to patients with HCV infection.

**Last update:** September 21, 2017

Case 4:19-cv-00053-RH-MAF   Document 70   Filed 07/13/21   Page 84 of 92

AASLD  IDSA

# Testing and Linkage to Care: Figure 1 - CDC Recommended Testing Sequence for Identifying Current HCV Infection



\* For persons who might have been exposed to HCV within the past 6 months, testing for HCV RNA or follow-up testing for HCV antibody should be performed. For persons who are immunocompromised, testing for HCV RNA should be performed.

† To differentiate past, resolved HCV infection from biologic false positivity for HCV antibody, testing with another HCV antibody assay can be considered. Repeat HCV RNA testing if the person tested is suspected to have had HCV exposure within the past 6 months or has clinical evidence of HCV disease, or if there is concern regarding the handling or storage of the test specimen.

Adapted from Centers for Disease Control and Prevention (CDC), 2013 (CDC, 2013).

**Last update:** Reviewed September 2017

Case 4:19-cv-00053-RH-MAF Document 79 Filed 07/12/21 Page 85 of 92
When and in Whom to Initiate HCV Therapy
From www.HCVGuidance.org on September 21, 2017

AASLD ▓IDSA

# When and in Whom to Initiate HCV Therapy

Successful hepatitis C treatment results in sustained virologic response (SVR), which is tantamount to virologic cure and, as such, is expected to benefit nearly all chronically infected persons. When the US Food and Drug Administration (FDA) approved the first interferon-sparing treatment for HCV infection, many patients who had previously been "warehoused" sought treatment. The infrastructure (ie, experienced practitioners, budgeted healthcare dollars, etc) did not yet exist to treat all patients immediately. Thus, the panel offered guidance for prioritizing treatment first for those with the greatest need.

Since that time, there have been opportunities to treat many of the highest-risk patients and accumulate real-world experience regarding the tolerability and safety of interferon-free HCV regimens. More importantly, from a medical standpoint, data continue to accumulate that demonstrate the many benefits, both intrahepatic and extrahepatic, that accompany HCV eradication. Therefore, the panel continues to recommend treatment for all patients with chronic HCV infection, except those with a short life expectancy that cannot be remediated by HCV treatment, liver transplantation, or another directed therapy. Accordingly, prioritization tables have been removed from this section.

Despite the strong recommendation for treatment of nearly all HCV-infected patients, pretreatment assessment of a patient's understanding of treatment goals and provision of education about adherence and follow-up are essential. A well-established therapeutic relationship between clinician and patient remains crucial for optimal outcomes with direct-acting antiviral (DAA) therapies. Additionally, in certain settings there remain factors that impact access to medications and the ability to deliver them to patients. In these settings, clinicians may still need to decide which patients should be treated first. The descriptions of unique populations discussed in this section may help physicians make more informed treatment decisions for these groups. For additional information, see unique patient populations: Patients With HIV/HCV Coinfection , Patients With Decompensated Cirrhosis, Patients Who Develop Recurrent HCV Infection Post Liver Transplantation, Patients With Renal Impairment, HCV in Children, and HCV Post Kidney Transplant.

## Goal of Treatment

| RECOMMENDED | RATING ⓘ |
|---|---|
| The goal of treatment of HCV-infected persons is to reduce all-cause mortality and liver-related health adverse consequences, including end-stage liver disease and hepatocellular carcinoma, by the achievement of virologic cure as evidenced by a sustained virologic response. | I, A |

## Recommendation for When and in Whom to Initiate Treatment

| RECOMMENDED | RATING ⓘ |
|---|---|
| Treatment is recommended for all patients with chronic HCV infection, except those with a short life expectancy that cannot be remediated by HCV therapy, liver transplantation, or another directed therapy. Patients with a short life expectancy owing to liver disease should be managed in consultation with an expert. | I, A |

  **When and in Whom to Initiate HCV Therapy**
From www.HCVGuidance.org on September 21, 2017

## Clinical Benefit of Cure

The proximate goal of HCV therapy is SVR (virologic cure), defined as the continued absence of detectable HCV RNA for at least 12 weeks after completion of therapy. SVR is a marker for cure of HCV infection and has been shown to be durable in large prospective studies in more than 99% of patients followed-up for ≥5 years (Swain, 2010); (Manns, 2013). Patients in whom SVR is achieved have HCV antibodies but no longer have detectable HCV RNA in serum, liver tissue, or mononuclear cells, and achieve substantial improvement in liver histology (Marcellin, 1997); (Coppola, 2013); (Garcia-Bengoechea, 1999). Assessment of viral response, including documentation of SVR, requires use of an FDA-approved quantitative or qualitative nucleic acid test (NAT) with a detection level of ≤25 IU/mL.

Patients who are cured of their HCV infection experience numerous health benefits, including a decrease in liver inflammation as reflected by improved aminotransferase levels (ie, alanine aminotransferase [ALT] and aspartate aminotransferase [AST]), and a reduction in the rate of liver fibrosis progression (Poynard, 2002b). Among 3,010 treatment-naive patients from 4 randomized trials who had pretreatment and posttreatment liver biopsies (separated by a mean of 20 months) and were treated with 10 different interferon-based regimens, 39% to 73% of participants who achieved SVR had improvement in liver fibrosis and necrosis (Poynard, 2002b). Additionally, cirrhosis resolved in 49% of the cases. Portal hypertension, splenomegaly, and other clinical manifestations of advanced liver disease also improved. Among HCV-infected persons, SVR is associated with a >70% reduction in the risk of liver cancer (hepatocellular carcinoma [HCC]), and a 90% reduction in the risk of liver-related mortality and liver transplantation (Morgan, 2013); (van der Meer, 2012); (Veldt, 2007).

Cure of HCV infection also reduces symptoms and mortality from severe extrahepatic manifestations, including cryoglobulinemic vasculitis, a condition affecting 10% to 15% of HCV-infected patients (Fabrizi, 2013); (Landau, 2010); (Sise, 2016). HCV-infected persons with non-Hodgkin lymphoma and other lymphoproliferative disorders achieve complete or partial remission in up to 75% of cases following successful therapy for HCV infection (Gisbert, 2005); (Takahashi, 2012); (Svoboda, 2005); (Mazzaro, 2002); (Hermine, 2002). These reductions in disease severity contribute to dramatic reductions in all-cause mortality (van der Meer, 2012); (Backus, 2011). Furthermore, patients who achieve SVR have a substantially improved quality of life, which spans their physical, emotional, and social health (Boscarino, 2015); (Neary, 1999); (Younossi, 2013). Because of the many benefits associated with successful HCV treatment, clinicians should treat HCV-infected patients with antiviral therapy with the goal of achieving SVR, preferably early in the course of chronic HCV infection before the development of severe liver disease and other complications.

## Benefits of Treatment at Early Fibrosis Stages (Metavir Stage Less Than F2)

Initiating therapy in patients with lower-stage fibrosis augments the benefits of SVR. In a long-term follow-up study, 820 patients with biopsy-confirmed Metavir stage F0 or F1 fibrosis were followed for up to 20 years (Jezequel, 2015). The 15-year survival rate was significantly better for those who experienced SVR than for those whose treatment failed or for those who remained untreated (93%, 82%, and 88%, respectively; P =.003). The study results argue for consideration of earlier initiation of treatment. Several modeling studies also suggest a greater mortality benefit if treatment is initiated at fibrosis stages prior to F3 (Øvrehus, 2015); (Zahnd, 2015); (McCombs, 2015).

Treatment delay may decrease the benefit of SVR. In a report of long-term follow-up in France, 820 patients with biopsy-confirmed Metavir stage F0 or F1 fibrosis were followed up for as long as 20 years (Jezequel, 2015). The authors noted rapid progression of fibrosis in 15% of patients during follow-up, and in patients treated successfully, long-term survival was better. Specifically, at 15 years, survival rate was 92% for those with SVR versus 82% for treatment failures and 88% for those not treated. In a Danish regional registry study, investigators modeled treatment approaches with the aim of evaluating the benefit to the region in terms of reductions in morbidity and mortality and HCV prevalence (Øvrehus, 2015). Although they note that in their situation of low HCV prevalence (0.4%) with approximately 50% undiagnosed, a policy that restricts treatment to those with Metavir fibrosis stage F3 or higher would decrease mortality from HCC and cirrhosis, the number needed to treat to halve the prevalence of the disease is lower if all eligible patients receive treatment at diagnosis.

Case 4:19-cv-00053-RH-MAF Document 109-7 Filed 12/02/21 Page 87 of 92

A modeling study based on the Swiss HIV cohort study also demonstrated that waiting to treat HCV infection until Metavir fibrosis stages F3 and F4 resulted in 2- and 5-times higher rates of liver-related mortality, respectively, compared with treating at Metavir stage F2 (Zahnd, 2015). A US Veterans Administration dataset analysis that used very limited end points of virologic response dating from the interferon-treatment era suggested that early initiation of therapy (at a fibrosis-4 [FIB-4] score of <3.25) increased the benefit attained with respect to likelihood of treatment success and mortality reduction, and ultimately decreased the number of patients needed to treat to preserve 1 life by almost 50% (McCombs, 2015).

## Considerations in Specific Populations

Despite the recommendation for treatment of nearly all patients with HCV infection, it remains important for clinicians to understand patient- and disease-related factors that place individuals at risk for HCV-related complications (liver and extrahepatic) as well as for HCV transmission. Although these groups are no longer singled out for high prioritization for treatment, it is nonetheless important that clinicians recognize the unique dimensions of HCV disease and its natural history in these populations. The discussions offered below may assist clinicians in making compelling cases for insurance coverage of treatment when necessary.

### *Persons With Advanced Liver Disease*

For persons with advanced liver disease (Metavir stage F3 or F4), the risk of developing complications of liver disease, such as hepatic decompensation (Child-Turcotte-Pugh [CTP] Class B or C [Methods Table 3] ) or HCC, is substantial and may occur in a relatively short timeframe. A large prospective study of patients with cirrhosis resulting from HCV infection examined the risk of decompensation—including HCC, ascites, jaundice, bleeding, and encephalopathy—and found that the overall annual incidence rate was 3.9% (Sangiovanni, 2006). The National Institutes of Health (NIH)-sponsored HALT-C study included a group of 220 patients with cirrhosis resulting from HCV infection who were observed for approximately 8 years. A primary outcome of death, hepatic decompensation, HCC, or an increase in CTP score ≥2 occurred at a rate of 7.5% per year (Everson, 2006); (Di Bisceglie, 2008). Patients with a CTP score of ≥7 experienced a death rate of 10% per year.

Numerous studies have demonstrated that hepatitis C therapy and the achievement of SVR in this population results in dramatic decreases in hepatic decompensation events, HCC, and liver-related mortality (Morgan, 2013); (van der Meer, 2012); (Backus, 2011); (Dienstag, 2011); (Berenguer, 2009); (Mira, 2013). In the HALT-C study, patients with advanced fibrosis secondary to HCV infection who achieved SVR, compared with patients with similarly advanced liver fibrosis who did not achieve SVR, had a decreased need for liver transplantation (HR, 0.17; 95% CI, 0.06-0.46), decreased development of liver-related morbidity and mortality (HR, 0.15; 95% CI, 0.06-0.38), and decreased HCC (HR, 0.19; 95% CI, 0.04-0.80) (Dienstag, 2011). Importantly, persons with advanced liver disease also require long-term follow-up and HCC surveillance regardless of treatment outcome (see Monitoring Patients Who Are Starting Hepatitis C Treatment, Are on Treatment, or Have Completed Therapy).

Given the clinical complexity and need for close monitoring, patients with advanced liver disease that has already decompensated (CTP Class B or C [Methods Table 3] ) should be treated by physicians with experience treating HCV in conjunction with a liver transplantation center, if possible (see Patients with Decompensated Cirrhosis).

### *Persons Who Have Undergone Liver Transplantation*

In HCV-infected individuals, HCV infection of the liver allograft occurs universally in those with viremia at the time of transplantation. Histologic features of hepatitis develop in about 75% of recipients within the first 6 months following liver transplantation (Neumann, 2004). By the fifth postoperative year, up to 30% of untreated patients have progressed to cirrhosis (Neumann, 2004); (Charlton, 1998). A small proportion of patients (4% to 7%) develop an accelerated course of liver injury (cholestatic hepatitis C, associated with very high levels of viremia) with subsequent rapid allograft failure.

systems. Treatment uptake has historically been limited, in part because of the toxic effects and long treatment duration of older interferon-based therapies as well as concerns about cost (Spaulding, 2006). In particular, truncation of HCV treatment owing to release from prison has been cited as a major limitation to widespread, effective HCV treatment in correctional facilities (Post, 2013); (Chew, 2009). Shorter HCV treatment duration with DAAs reduces stay-related barriers to HCV treatment in prisons. Likewise, the improved safety of DAA regimens diminishes concerns about toxic effects. Coordinated treatment efforts within prison systems would likely rapidly decrease the prevalence of HCV infection in this at-risk population, although research is needed in this area.

## Persons on Hemodialysis

The prevalence rate of HCV infection is markedly elevated in persons on hemodialysis, ranging from 2.6% to 22.9% in a large multinational study (Fissell, 2004). Studies in the US found a similarly elevated prevalence rate of 7.8% to 8.9% (CDC, 2001); (Finelli, 2005). Importantly, the seroprevalence of HCV was found to increase with time on dialysis, suggesting that nosocomial transmission, among other risk factors, plays a role in HCV acquisition in these patients (Fissell, 2004). Improved education and strict adherence to universal precautions can drastically reduce nosocomial HCV transmission risk for persons on hemodialysis (Jadoul, 1998), but clearance of HCV viremia through treatment-induced SVR eliminates the potential for transmission.

HCV-infected persons on hemodialysis have a decreased quality of life and increased mortality compared with those who are uninfected (Fabrizi, 2002); (Fabrizi, 2007); (Fabrizi, 2009). HCV infection in this population also has a deleterious impact on kidney transplantation outcomes with decreased patient and graft survival (Fabrizi, 2014). The increased risk for nosocomial transmission and the substantial clinical impact of HCV infection in those on hemodialysis are compelling arguments for HCV therapy as effective antiviral regimens that can be used in persons with advanced renal failure are now available (see Patients with Renal Impairment).

## Patients Unlikely to Benefit From HCV Treatment

Patients with a limited life expectancy that cannot be remediated by HCV treatment, liver transplantation, or another directed therapy do not require antiviral treatment. Patients with a short life expectancy owing to liver disease should be managed in consultation with an expert. Chronic hepatitis C is associated with a wide range of comorbid conditions (Butt, 2011); (Louie, 2012). Little evidence exists to support initiation of HCV treatment in patients with a limited life expectancy (<12 months) owing to nonliver-related comorbid conditions. For these patients, the benefits of HCV treatment are unlikely to be realized and palliative care strategies should take precedence (Holmes, 2006); (Maddison, 2011).

## Pretreatment Assessment

| Recommendation for Pretreatment Assessment | |
| --- | --- |
| RECOMMENDED | RATING ⓘ |
| Evaluation for advanced fibrosis using liver biopsy, imaging, and/or noninvasive markers is recommended for all persons with HCV infection, to facilitate decision making regarding HCV treatment strategy and to determine the need for initiating additional measures for the management of cirrhosis (eg, hepatocellular carcinoma screening) (see HCV Testing and Linkage to Care). | I, A |

An accurate assessment of fibrosis remains vital, as the degree of hepatic fibrosis is one of the most robust prognostic factors used to predict HCV disease progression and clinical outcomes (Everhart, 2010). Individuals with severe fibrosis require surveillance monitoring for liver cancer, esophageal varices, and hepatic function (Garcia-Tsao, 2007); (Bruix, 2011). In some instances, the recommended duration of treatment is also longer.

AASLD   IDSA
When and in Whom to Initiate HCV Therapy
From www.HCVGuidance.org on September 21, 2017

Although liver biopsy is the diagnostic standard, sampling error and observer variability limit test performance, particularly when inadequate sampling occurs. Up to one-third of bilobar biopsies had a difference of at least 1 stage between the lobes (Bedossa, 2003). In addition, the test is invasive and minor complications are common, limiting patient and practitioner acceptance. Although rare, serious complications such as bleeding are well recognized.

Noninvasive tests to stage the degree of fibrosis in patients with chronic HCV infection include models incorporating indirect serum biomarkers (routine tests), direct serum biomarkers (components of the extracellular matrix produced by activated hepatic stellate cells), and vibration-controlled transient liver elastography. No single method is recognized to have high accuracy alone, and each test must be interpreted carefully. A publication from the Agency for Healthcare Research and Quality found evidence in support of a number of blood tests; however, at best, they are only moderately useful for identifying clinically significant fibrosis or cirrhosis (Selph, 2014).

Vibration-controlled transient liver elastography is a noninvasive way to measure liver stiffness and correlates well with measurement of substantial fibrosis or cirrhosis in patients with chronic HCV infection. The measurement range, however, overlaps between stages (Ziol, 2005); (Afdhal, 2015); (Castera, 2005).

The most efficient approach to fibrosis assessment is to combine direct biomarkers and vibration-controlled transient liver elastography (Boursier, 2012); (European Association for the Study of the Liver and Asociacion Latinoamericana para el Estudio del Higado, 2015). A biopsy should be considered for any patient who has discordant results between the 2 modalities that would affect clinical decision making (eg, one shows cirrhosis and the other does not). The need for liver biopsy with this approach is markedly reduced.

Alternatively, if direct biomarkers or vibration-controlled transient liver elastography are not available, the AST-to-platelet ratio index (APRI) or fibrosis-4 (FIB-4) index score can prove helpful (Sebastiani, 2009); (Castera, 2010); (Chou, 2013)—although neither is sensitive enough to rule out substantial fibrosis (Chou, 2013). Biopsy should be considered for those in whom more accurate fibrosis staging would impact treatment decisions. Individuals with clinically evident cirrhosis do not require additional staging (biopsy or noninvasive assessment).

## Recommendation for Repeat Liver Disease Assessment

| RECOMMENDED | RATING ❶ |
|---|---|
| Ongoing assessment of liver disease is recommended for persons in whom therapy is deferred. | I, C |

Ongoing assessment of liver disease is especially important in patients for whom therapy has been deferred. In line with evidence-driven recommendations for treatment of nearly all HCV-infected patients, several factors must be taken into consideration if treatment deferral is entertained or mandated by lack of medication access. As noted, strong and accumulating evidence argue against deferral because of decreased all-cause morbidity and mortality, prevention of onward transmission, and quality-of-life improvements for patients treated regardless of baseline fibrosis. Additionally, treatment of HCV infection may improve or prevent extrahepatic complications, including diabetes mellitus, cardiovascular disease, renal disease, and B-cell non-Hodgkin lymphoma (Conjeevaram, 2011); (Hsu, 2015); (Torres, 2015), which are not tied to fibrosis stage (Allison, 2015); (Petta, 2016). Deferral practices based on fibrosis stage alone are inadequate and shortsighted.

Fibrosis progression varies markedly between individuals based on host, environmental, and viral factors (Table 1); (Feld, 2006). Fibrosis may not progress linearly. Some individuals (often those aged >50 years) may progress slowly for many years followed by an acceleration of fibrosis progression. Others may never develop substantial liver fibrosis despite longstanding infection. The presence of existing fibrosis is a strong risk factor for future fibrosis progression. Fibrosis



healthcare budget.

There is no formula that provides a good means of integrating the concerns of value and affordability. When new therapies for HCV are deemed cost-effective, it indicates that these therapies provide good benefit for the resources invested, and providing such therapy to more people would be a good long-term investment. Determining the total resources that can be spent on HCV treatment, however, depends on political and economic factors that are not captured by cost-effectiveness determinations.

## Cost-Effectiveness of Current Direct-Acting Antiviral Regimens for Hepatitis C Treatment

Since the first direct-acting antivirals (DAAs) received US Food and Drug Administration approval in 2011, several cost-effectiveness investigations have compared DAA-based regimens to previous standard-of-care regimens to calculate ICERs. They have also investigated the cost-effectiveness of eliminating HCV treatment restrictions. Compared to interferon-based regimens, the ICER for DAAs has consistently been estimated at <$100,000/QALY for all genotypes and fibrosis stages.

Several studies have compared DAA regimens against one another. In general, when given a choice between recommended HCV DAA regimens, the less costly regimen is preferred as a more efficient use of resources (even if it requires multiple tablet dosing). Because of the similar efficacy of most DAA regimens, cost becomes the critical factor driving cost-effectiveness. Recent studies have also estimated the cost-effectiveness of HCV treatment in special populations, including patients awaiting liver transplantation, HIV/HCV coinfected patients, those with chronic kidney disease, and persons who inject drugs—all with favorable ICERs. At this time, it is reasonable to conclude that DAA regimens provide good value for the resources invested.

## Cost vs Affordability for HCV Treatment

Despite a growing body of evidence that HCV treatment is cost-effective and may even be cost saving over the long term in some cases, many US payers—especially those offering Medicaid insurance products—continue to limit access to HCV treatment. Access has improved as cost has decreased but limitations remain. Proposed reductions in healthcare spending for Medicaid would likely exacerbate the problem as the value of the HCV medications would remain unchanged but the resources available to provide them would shrink.

## Conclusions

Several recent studies have demonstrated the economic value of HCV treatment and made it clear that HCV therapy is cost-effective. The high cost of these medications combined with the high prevalence of disease has led to limiting access for some patients. The issue is complex. Although the wholesale acquisition costs of HCV drugs often make treatment appear unaffordable, the reality is that insurers, PBMs, and government agencies negotiate pricing and few actually pay this much-publicized price. Negotiated pricing and cost structure for pharmaceutical products in the US are not transparent, however. Thus, it is therefore difficult to estimate the true budgetary impact of providing HCV drugs. Competition and negotiated pricing have reduced prices but cost continues to limit the public health impact of new DAA therapies. Insurers, government, and pharmaceutical companies should work together to bring medication prices to the point where all persons in need of treatment are able to afford and readily access it.

**Last update:** September 21, 2017

Case 4:19-cv-00053-RH-MAF   Document 70   Filed 07/13/21   Page 91 of 92

# Monitoring Patients Who Are Starting HCV Treatment, Are on Treatment, or Have Completed Therapy

This section provides guidance on monitoring patients with chronic hepatitis C who are starting treatment, are on treatment, or have completed treatment. The section is divided into 3 parts: pretreatment and on-treatment monitoring; post-treatment follow-up for persons in whom treatment has failed to clear the virus; and post-treatment follow-up for those who achieved a sustained virologic response (SVR; virologic cure).

## Pretreatment and On-Treatment Monitoring

| Recommended Assessments Prior to Starting Antiviral Therapy | |
|---|---|
| RECOMMENDED | RATING ⓘ |
| Staging of hepatic fibrosis is essential prior to HCV treatment (see Testing and Linkage to Care and see When and in Whom to Treat). | I, C |
| Assessment of potential drug-drug interactions with concomitant medications is recommended prior to starting antiviral therapy.<br><br>• Patients should also be educated about the proper administration of medications (eg, dose, frequency of medicines, food effect, missed doses, adverse effects, etc), the crucial importance of adherence, and the necessity for close supervision and blood tests during and after treatment.<br><br>**The following laboratory tests are recommended within 12 weeks prior to starting antiviral therapy:**<br><br>• Complete blood count (CBC)<br>• International normalized ratio (INR)<br>• Hepatic function panel (ie, albumin, total and direct bilirubin, alanine aminotransferase (ALT), aspartate aminotransferase (AST), and alkaline phosphatase levels)<br>• Calculated glomerular filtration rate (GFR)<br><br>**The following laboratory tests are recommended at any time prior to starting antiviral therapy:**<br><br>• HCV genotype and subtype<br>• Quantitative HCV RNA (HCV viral load) | |
| Patients scheduled to receive an HCV NS3 protease inhibitor (ie, paritaprevir, simeprevir, grazoprevir, voxilaprevir, glecaprevir) should be assessed for a history of decompensated liver disease and for liver disease severity using the Child-Turcotte-Pugh (CTP) score (see third-party calculator).<br><br>• Patients with current or prior history of decompensated liver disease or with a current CTP | I, A |

Wallace Gary Collier 081345
Union Correctional Institution
P.O. Box 1000
Raiford, Florida 32083

"LEGAL MAIL"

CHECKED JUL 12 2021

United States District Court
Northern District of Florida
Office of The Clerk
111 North Adams St, Suite 322
Tallahassee, Florida 32301-7730

"LEGAL MAIL"

Mailed from a State
Correctional Institution



PRIORITY MAIL 2-DAY®

$0.00

Origin: 32 183
07/08/21
11786604-3-02

EXPECTED DELIVERY DAY: 07/12/21

0 Lb 15.9) Oz

1006

SHIP
TO:
111 N ADAMS ST
STE 322
Tallahassee FL 32301-7730

C001

USPS TRACKING® #

9505 5166 3086 1189 1010 32

US POSTAGE • PITNEY BOWES
ZIP 32083 $000.00
02 4W
0001288735 JUL 06 2021